IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SARAH BORCHGREVINK, | § | |
| REPRESENTATIVE OF THE ESTATE OF | § | |
| MATTHEW RYAN SHELTON, DECEASED | § | |
| and MARIANNA RUTH THOMSON, | § | |
| statutory wrongful death beneficiary of | § | |
| MATTHEW RYAN SHELTON, DECEASED | § | Civil Action No. _____ |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| HARRIS COUNTY, TEXAS and HARRIS | § | |
| COUNTY HOSPITAL DISTRICT d/b/a | § | |
| HARRIS HEALTH SYSTEMS | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs SARAH BORCHGREVINK and MARIANNA RUTH THOMSON file this 42 U.S.C. § 1983, Americans with Disabilities Act (ADA), and Rehabilitation Act of 1973 (Rehab Act) lawsuit against Defendants HARRIS COUNTY, TEXAS (Harris County) and HARRIS COUNTY HOSPITAL DISTRICT d/b/a/ HARRIS HEALTH SYSTEMS (Harris Health) and would show the Court and Jury the following in support thereof:

### I.      PARTIES

1.      This lawsuit arises from the death of Matthew Ryan Shelton, deceased (Mr. Shelton).

2.      Plaintiff Sarah Borchgrevink is the natural sister of Mr. Shelton and the independent administrator of his estate. Ms. Borchgrevink is a resident of Harris County, Texas.

3.      Plaintiff Marianna Ruth Thomson is Mr. Shelton's mother and sues in her capacity as a statutory beneficiary under the Texas Wrongful Death Act. Ms. Thomson is a resident of McLennan County, Texas.

4.      Defendant Harris County is a Texas county that owns and whose employees operate a county jail pursuant to Local Government Code Chapter 351. Harris County may be served by and through its county judge, the Honorable Lina Hidalgo, 1001 Preston, Suite 911, Houston, Harris County, Texas 77002.

5.      Defendant Harris County Hospital District d/b/a Harris Health Systems is a political subdivision of the State of Texas, created on January 1, 1966, pursuant to Texas Health & Safety Code Chapter 281. Harris Health provides medical treatment to pretrial detainees in the Harris County Jail and sets policies and procedures for the same pursuant to an interlocal agreement that was in place at the time of the incident and remains in place. It may be served by and through its chief executive officer, Dr. Esmaeil Porsa, at 4800 Fournace Place, Bellaire, Harris County, Texas 77401 or alternatively, may be served at his other places of employment or residence which, on information and belief, are in Harris County, Texas.

## II.      JURISDICTION & VENUE

6.      This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States and Mr. Shelton's death occurred in Harris County, Texas.

7.      Venue is proper in this Court because all relevant acts and omissions giving rise to Plaintiffs' claims occurred in Harris County, Texas. *See* 28 U.S.C. § 1391.

### III.    FACTS

8.      On March 27, 2022, Mr. Shelton died of diabetic ketoacidosis after Defendants cut off his insulin supply for more than three days despite knowing Mr. Shelton needed the insulin to live.

9.      As a consequence of Defendants' typical policies and practices, they intentionally and deliberately denied Mr. Shelton access to insulin for over three days by failing to make obvious modifications to their policies and practices governing medication prescribing and by ignoring his requests for help, despite knowing he was an insulin-dependent diabetic who needed insulin and blood glucose monitoring to survive, and after treating him at least twice for dangerously high blood sugars.

***A.  Harris County and Harris Health Deny Mr. Shelton Life-Sustaining Insulin and Cause His Death.***

10.     Under state law, Harris County is responsible for operating a county jail that meets the minimum standards and rules set by the Texas Commission on Jail Standards. These standards and rules require the Jail to provide procedures for acute, emergency, and routine medical care to detainees.

11.     To meet these standards, Harris Health began providing clinical medical staff for the Harris County Jail ("Jail") in 2019. Between 2020 and 2022, the Harris County Commissioner's Court studied and ultimately approved a plan to transition direct Jail medical care from the Harris County Sheriff's Office to Harris Health. The plan was codified into an interlocal agreement which provided for a transition of care, with Harris Health assuming full responsibility for Jail medical care on March 1, 2022.

12.     In the months to years before Harris Health took over, significant issues with medication at the Jail had been identified by the County and Harris Health as a "high risk concern."

Despite this, the relevant policies and practices of Harris Health and Harris County's jail medical staff, employees, and contractors regarding the treatment of detainees and the prescription of medications including insulin went unchanged until many months after the death of Mr. Shelton on March 27, 2022.

13.     Mr. Shelton voluntarily surrendered to the Harris County Jail around 4:15 p.m. on March 22, 2022, for charges relating to failure to appear for a years-old misdemeanor DWI charge. A Type 1 insulin-dependent diabetic, he brought with him the diabetic supplies he needed to survive, including both short-acting and long-acting insulin.  These supplies were confiscated from him during the initial booking process and Mr. Shelton never again had access to them.

14.     All detainees at the Harris County Jail are initially processed in the Joint Processing Center (JPC), a building that is part of the Harris County Jail complex. Among other intake procedures, all detainees are evaluated for medical and mental health concerns at the JPC before being assigned to housing in one of the Harris County Jail buildings.

15.     At the time of Mr. Shelton's death, it was the policy or practice of Harris County and Harris Health for all medication orders at the JPC to be ordered as single administrations rather than as repeating orders (e.g., once a day for a month) until the detainee was assigned to a housing unit. This policy or practice specifically applied to life-sustaining maintenance medications which must be taken daily or, like insulin, more frequently in order to survive.

16.     Almost immediately upon his arrival at the JPC, Mr. Shelton's blood glucose was taken by medical staff and was so high that the glucometer was unable to calculate a reading, instead indicating only "HI." On information and belief, Harris County's glucometers in the JPC were capable of reading blood glucose up to 599 mg/dL, so a reading of "HI" corresponded to a

reading over 600 mg/dL. Mr. Shelton reported eating a sandwich and cookies "a few hours" before he surrendered.

17.    Typical glucose for a Type 1 diabetic who has not just eaten should be between 80 and 130 mg/dL and no higher than 180 mg/dL two hours after eating. Blood glucose over 300 mg/dL is dangerous and requires immediate medical attention, while blood glucose over 600 mg/dL is a life-threatening emergency.

18.    Defendants' nursing staff immediately flagged Mr. Shelton for further evaluation to determine whether he would be accepted for booking at the Jail or whether he would need to go to a hospital emergency room for treatment of his high blood glucose, a process referred to as "medical clearance," before returning to complete booking.

19.    Dr. Sudad al Hadad, a physician employed or contracted by Defendants, evaluated Mr. Shelton shortly before 5 p.m., identified him as a Type 1 insulin-dependent diabetic, determined he could be accepted for booking and his high blood glucose treated in the JPC/Harris County Jail. But she ordered only a single dose of short-acting and long-acting insulin and for his blood glucose to be checked again in an hour.

20.    At this time, Dr. al Hadad also ordered Defendants' medical staff take Mr. Shelton's blood glucose twice a day for the following three days, starting at 8 p.m., that night. However, this order was not followed after March 24, 2022, and automatically expired on March 25, 2022.

21.    Despite knowing that Mr. Shelton would need insulin every day in which he was jailed, Dr. al Hadad intentionally and deliberately did not enter an order for either short- or long-acting insulin as a repeating or maintenance order, consistent with Defendants' medication policies and practices.

22.     And despite knowing that his blood glucose needed to be monitored every day for as long as he remained in the jail, Dr. al Hadad intentionally and deliberately ordered Defendants' medical staff to take Mr. Shelton's blood glucose for only three days, consistent with Defendants' medication policies and practices.

23.     Over an hour later, at 6:30 p.m., on March 22, 2022, when Defendants' medical staff measured Mr. Shelton's blood glucose again, it was 458 mg/dL, still a dangerously high reading. Physician's Assistant Daesha Cuttrell-Hendrickson (PA Hendrickson), an employee or contractee of Defendants, saw Mr. Shelton, obtained information regarding his typical insulin dosages for his short- and long-acting insulin at home, entered this information into Mr. Shelton's medical record, and ordered another single-dose injection of short-acting insulin.  Approximately two hours later, his blood glucose had finally dropped to 108 mg/dL, a normal reading.

24.     At 8:59 p.m., PA Hendrickson reviewed Mr. Shelton's labs, including his blood glucose, and okayed him to be discharged from the JPC medical clinic to continue the rest of the booking process in the JPC.

25.     But despite knowing that Mr. Shelton needed insulin as an accommodation for his disability every day to survive, PA Hendrickson intentionally and deliberately did not order either short- or long-acting insulin as repeating or maintenance orders, consistent with Defendants' medication policies and practices.

26.     Similarly, though she knew it was necessary to accommodate his disability and for his survival, PA Hendrickson intentionally and deliberately did not order Defendants' medical staff to measure Mr. Shelton's blood glucose on a repeating basis, consistent with Defendants' medication policies and practices.

27.     The following morning, March 23, 2022, at 3:20 a.m., Registered Nurse Benedicta Edema, an employee or contractee of Defendants, confirmed Mr. Shelton's home insulin dosages, entered these into the medical record, and took Mr. Shelton's vitals. This was the last time Defendants' employees or contractees updated Mr. Shelton's medications (including insulin) in his Jail medical record.

28.     Mr. Shelton's blood glucose at that time was dangerously high again, measuring 429 mg/dL.

29.     At 3:45 a.m., PA Hendrickson again ordered single-dose administrations of both short- and long-acting insulin and ordered medical staff to check Mr. Shelton's blood glucose again in an hour. Registered Nurse Mayra Rodriguez (RN Rodriguez), an employee or contractee of Defendants, documented that she administered the short- and long-acting insulin ordered by PA Hendrickson at or around 3:45 a.m.; however, this administration was not entered until 4:34 a.m.

30.     When RN Rodriguez took Mr. Shelton's blood glucose at 5:05 a.m., it had risen alarmingly to 505 mg/dL. When RN Rodriguez took Mr. Shelton's blood glucose again at 5:44 a.m., it had dropped to 335 mg/dL.

31.     Despite 335 mg/dL still being a dangerous blood glucose reading, PA Hendrickson ordered Mr. Shelton discharged from the JPC medical clinic again at 5:45 a.m., encouraged him to drink water, and noted in his medical record "will continue to monitor."

32.     At that time and despite knowing Mr. Shelton would definitely need ongoing monitoring and additional at-least daily insulin to accommodate his disability and survive, PA Hendrickson again intentionally and deliberately did not enter a repeating or maintenance order for either short- or long-acting insulin, consistent with Defendants' medication policies and practices.

33.     PA Hendrickson also intentionally and deliberately did not enter an order for Defendants' medical staff to measure Mr. Shelton's blood glucose on a repeating basis, consistent with Defendants' medication policies and practices.

34.     The March 23rd 3:45 a.m. single-dose orders for short- and long-acting insulin were the last times Defendants gave Mr. Shelton any insulin.

35.     Deprived of the medication Defendants knew his disability required for him to survive, Mr. Shelton's remaining four days in the Harris County Jail were nothing short of a living hell as his blood glucose levels rose to dangerous levels with no means for him to protect himself.

36.     At approximately 9:44 a.m. on March 23rd, Mr. Shelton was transferred to a single-bed cell located in the 1200 Baker Street building in the Harris County Jail complex ("1200 Baker").

37.     Later that afternoon/evening at 4:48 p.m., Licensed Vocational Nurse Charles Esapa (LVN Esapa), an employee or contractee of Defendants, took Mr. Shelton's blood glucose, which was determined to be 308 mg/dL, a dangerously high blood glucose requiring insulin.

38.     Consistent with Defendants' policies and practices, LVN Esapa intentionally or deliberately did not notify a medication prescriber of Mr. Shelton's dangerously high blood glucose reading despite knowing that insulin was necessary to accommodate Mr. Shelton's disability. In other words, LVN Esapa, pursuant to Defendants' policies, deliberately denied Mr. Shelton the obvious accommodation—insulin—he and Defendants knew he needed.

39.     Mr. Shelton was not evaluated by a physician or physician's assistant at that time, nor did any of Defendants' employees or contractees order any insulin for Mr. Shelton's high blood glucose at 4:48 p.m. even though they each knew he needed it to survive.  As a consequence, Mr. Shelton's blood glucose continued to rise to more dangerous levels.

40.     On March 24, 2022, at 1:54 a.m., Licensed Vocational Nurse Samuel Osunsanya (LVN Osunsanya), an employee or contractee of Defendants, took Mr. Shelton's blood glucose, which was 352 mg/dL, a dangerously high blood glucose which was notably higher than the glucose taken approximately nine hours before. Yet while LVN Osunsanya and the Defendants knew that Mr. Shelton needed insulin to accommodate his disability and survive, consistent with Defendants' policies and practices, he intentionally did not provide it to him or notify a clinician about the dangerously high blood glucose levels to ensure he received it.

41.     On information and belief, Mr. Shelton was not evaluated by any of Defendants' physicians or physician's assistants, nor did Defendants' employees or contractees order any insulin in response to Mr. Shelton's dangerously high blood glucose at 1:54 a.m.

42.     The measure at 1:54 a.m. on March 24, 2022, was the last time Defendants bothered to ever monitor Mr. Shelton's blood glucose and they never took his blood glucose again until he died more than three full days later.

43.     On information and belief, during the next three days preceding his death from diabetic ketoacidosis, Mr. Shelton told employees and/or contractees of Harris County and/or Harris Health he was a Type 1 diabetic and needed insulin numerous times from his cell at 1200 Baker.

44.     But he was never provided insulin as an accommodation even though Defendants knew he had Type 1 diabetes and knew he needed daily doses of insulin in order to live.  Rather, upon information and belief, these employees and contractees told Mr. Shelton he was not on the list to receive insulin.

45.     At the time of Mr. Shelton's detention and death, it was the policy or practice of Defendants to not only deny requests for insulin to detainees whose names were not on a list of

detainees to be given insulin but also to refuse or fail to communicate these requests to a medication prescriber. It was likewise the policy or practice of Defendants for employees and contractees receiving these requests to fail or refuse to document them in a detainee's medical record.

46.     Defendants' employees and contractees to whom Mr. Shelton made the requests for insulin intentionally and deliberately did not notify a medication prescriber of Mr. Shelton's requests for insulin.

47.     Defendants' employees and contractees from whom Mr. Shelton requested insulin intentionally and deliberately did not document Mr. Shelton's insulin requests in his medical record.

48.     Thus, consistent with Defendants' policies and procedures, Mr. Shelton's multiple requests for insulin in the days before he died were intentionally not relayed to a physician or physician's assistant or otherwise documented in Mr. Shelton's medical record.

49.     As a result of not receiving insulin or having his blood glucose measured, Mr. Shelton was placed in grave jeopardy. In order to extend his life, Mr. Shelton tried not to eat, but without insulin glucose monitoring, his death became inevitable.

50.     On information and belief, Defendants' employees and/or contractees saw Mr. Shelton was attempting to live by skipping and/or consuming only partial meals, yet Defendants still did nothing to accommodate Mr. Shelton.

51.     At the time of Mr. Shelton's death, it was the practice of Defendants for their employees and contractees not to notify medication prescribers or any other medical personnel that diabetic detainees skipped or ate only partial meals and to not document the same in a detainee's medical record.

52.     Defendants' employees and contractees deliberately and intentionally failed or refused to notify medical personnel that Mr. Shelton was skipping or consuming only partial meals and deliberately and intentionally failed to document his meal-skipping in his medical record.

53.     Thus, consistent with Harris County Jail policies and procedures, these actions were not relayed to a physician or physician's assistant or otherwise documented in Mr. Shelton's medical record.

54.     Between March 23 and March 27, Plaintiff Sarah Borchgrevink spoke to Mr. Shelton, learned he was being denied insulin by Defendants, and attempted to contact Harris County Jail and/or Harris Health to notify them of her brother's disability and his need for immediate and continuing access to insulin. Despite repeated attempts, Plaintiff was unable to reach anyone at Harris County Jail or Harris Health to relay the message.

55.     Of course, Defendants already knew that Mr. Shelton was a type 1 diabetic, knew that his blood glucose levels were at unsafe levels and knew he needed insulin.  But because of their policies and indifference, Mr. Shelton was discriminated against and denied the most basic accommodations every diabetic person housed in a jail needs to live: insulin and glucose monitoring every day, multiple times a day.

56.     As a direct result of Defendants' actions, practices, and the dangerous conditions of the Harris County Jail, Mr. Shelton's disability was utterly and deliberately disregarded and he died a painful death.

57.     In persons who do not have the disability of diabetes, their naturally occurring insulin hormone helps the cells in their bodies convert glucose to energy.  When a diabetic person does not receive insulin, among other complications, glucose builds up in the blood and the cells use fat instead of glucose for energy. That process, diabetic ketoacidosis, produces acidic ketones that are

toxic and when they build up, they injure internal organs such as the brain, heart, and lungs. Diabetic ketoacidosis causes extreme thirst, nausea, vomiting, weakness, pain, shortness of breath, and severe confusion before it causes death, if not treated.

58.     During his final three days in the Jail, Mr. Shelton experienced these symptoms, as well as significant pain, stress, and mental anguish.

59.     Yet because Defendants did nothing to accommodate or protect him, the inevitable happened.

60.     On March 27, 2022, at approximately 3:45 p.m., Detention Officer Charley Lauder, an employee of Harris County, noticed Mr. Shelton was not responding to her when she was passing out the evening meal. Officer Lauder then entered Mr. Shelton's cell, where she noted he was unresponsive, stiff, and cold to the touch.

61.     Officer Lauder left Mr. Shelton's cell without calling for medical attention or initiating CPR and went to find her supervisor or another officer. After searching unsuccessfully for approximately twenty minutes, Officer Lauder found Officer Garrett Woods who entered the cell with her and confirmed Mr. Shelton was unresponsive.

62.     After this unnecessary delay of approximately 28 minutes, Officer Lauder finally contacted medical staff for a possible death in custody.

63.     Defendants' medical staff responded to Mr. Shelton's cell around 4:20 p.m. and immediately began life-saving efforts, including CPR. Dr. Andres Hughes, who was one of Defendants' employees or contractees in the medical clinic that day, consulted Mr. Shelton's records while waiting for medical staff to return to the clinic with Mr. Shelton. He immediately identified that Mr. Shelton was an insulin-dependent Type 1 diabetic.

64.     Licensed Vocational Nurse Mary Thomas (LVN Thomas), an employee or contractee of Defendants, assessed Mr. Shelton in his cell, including feeling for a pulse and checking for respirations, and began CPR. LVN Thomas noted during these resuscitation efforts that Mr. Shelton had dark brown fluid coming from his nose and mouth and, after he was moved, bright red blood was visible on a towel under his head.

65.     Upon Mr. Shelton's arrival in the medical clinic, Dr. Hughes immediately ordered the automatic external defibrillator (AED) placed on Mr. Shelton. The AED advised Mr. Shelton had no shockable heart rhythm present. Dr. Hughes ordered Defendants' medical staff to administer the medications Epinephrine and Glucagon, to suction and bag Mr. Shelton to address his airway, to continue CPR, and to take a blood glucose. Defendants' medical staff were unable to obtain any blood to fulfill the order to measure Mr. Shelton's blood glucose. During resuscitative efforts, Houston Fire Department (HFD) responded to the Jail to transport Mr. Shelton to the emergency room.

66.     Though Defendants' medical staff attempted resuscitation, Mr. Shelton was not revived. HFD and Defendants' medical staff concurred that Mr. Shelton was deceased, and transport was cancelled.

67.     Mr. Shelton was declared dead at the Harris County Jail at 4:40 p.m. on March 27, 2022.  He was only twenty-eight years old at the time of his death.

68.     The Harris County medical examiner later confirmed Mr. Shelton's death was the result of diabetic ketoacidosis.

69.     As diabetic ketoacidosis was the result of Defendants' failure to provide an insulin-dependent diabetic with necessary, life-sustaining insulin and blood glucose monitoring, Mr. Shelton's death was preventable if Defendants had reasonably modified their policies and practices

regarding medication orders for insulin or if they had simply made even basic accommodations for his disability by providing regular glucose monitoring and insulin.

**B.** *The Texas Commission on Jail Standards Cites Harris County Jail for Noncompliance with Minimum Jail Standards Relating to Prescribing Medications, Including Insulin.*

70.     Nearly nine months after Mr. Shelton's preventable death, in December 2022, the Texas Commission on Jail Standards (Commission) investigated and cited Harris County Jail for noncompliance with minimum jail standards found in 37 Texas Administrative Code § 273.2(12), which require the Jail to provide procedures that require a qualified medical professional to review "as soon as possible" prescription medications, like insulin, that a detainee is taking when booked.

71.     On information and belief, the Commission's citation of the Jail for this violation related to Defendants' intentional and deliberate denial of insulin to Mr. Shelton after he left the JPC.

72.     Dr. O. Reggie Egins, as Chief Medical Officer for Correctional Health at Harris Health, was responsible for the dangerous policies with regard to insulin and monitoring and for developing and executing the corrective action plan to address the deficiency cited by the Commission.

73.     According to his Corrective Action Plan submitted to the Commission, in December 2022, Defendants finally discontinued the regular use of single-dose medication orders, trained staff that all medication orders must contain a frequency order which attaches to the medical record, and modified their electronic health records system to discourage the use of single-dose orders unless the provider certifies they intend for the medication to be a non-maintenance medication.

74.     Despite these reported "changes," the Commission completed a follow-up inspection of Harris County Jail in February 2023 and determined Harris County Jail remained out of

compliance with minimum jail standards related to reviewing, ordering, and administering medications to detainees.

75.     On information and belief, Harris County Jail remains out of compliance with these minimum jail standards.

### C. The Harris County and Harris Health Have a Long-Standing and Routine Custom of Denying Necessary Medication and Monitoring to Diabetic Detainees.

76.     Unfortunately, Mr. Shelton's death is part of a longstanding pattern of denial of life-sustaining treatment for chronic conditions, including diabetes.  Harris County's and Harris Health's denial of life-sustaining insulin and glucose monitoring has led to a long string of deaths at the Harris County Jail.

77.     Well over a decade before Mr. Shelton died, in 2008 and 2009, the medical care at Harris County Jail departed so far from constitutional standards of care that the Department of Justice (DOJ) investigated and confirmed that these conditions violated the constitutional rights of detainees at the jail. The DOJ noted, "the number of inmates [sic] deaths related to inadequate medical care…is alarming." [1] DOJ Report, p. 2.

78.     Indeed, it was the medical care for serious chronic medical conditions—like insulin-dependent diabetes—that DOJ specifically found was so lacking it "place[d] detainees at an unacceptable risk of death or injury." *Id*., p. 3.

79.     In fact, one of the examples given by DOJ in its report, was the death of EE, a woman with diabetes who received pain medication rather than insulin in response to her reports of diabetic symptoms. EE died with low blood sugar less than a week after her complaints.  *Id.* at 7.

---

[1] June 4, 2009 DOJ Findings Letter – Harris County Jail,  *at*
*https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/harris_county_jail_findlet_060409.pdf*.

80.     Specifically, the DOJ found that Harris County Jail violated the constitutional rights of its detainees who needed medical care for chronic conditions like diabetes by, in part,

a.  Failing to re-assess detainees who were receiving medication, *id.* at 5,

b.  Failing to provide continuity of care by ensuring accurate records were kept, *id.*,

c.  Failing to provide continuity of care by ensuring qualified staff complete follow-up exams, *id.*,

d.  Implementing administrative procedures that allowed delays in care to be easily overlooked, *id.* at 6, and

e.  Failing to ensure staff documented factually accurate and legible information in medical records in a manner consistent with professional record-keeping. *Id.* at 8.

81.     In 2009, DOJ gave Harris County the prescription for the constitutionally inadequate medical care at its jail—in part, DOJ recommended:

> The Jail should develop a chronic care program consistent with generally accepted correctional medical standards. This program should include a process that will identify detainees who should be enrolled in a chronic care program; a roster of detainees enrolled in the program; a schedule of medical visits for each detainee enrolled in the program; a system for determining which diagnostic tests will be required for each chronic condition; and record-keeping which includes documentation of lab work and medical orders.

*Id.* at p. 20.

82.     On information and belief, in the thirteen years that followed the DOJ report, Harris County did not develop the chronic care program recommended by DOJ, but instead continued to deny people with diabetes regular access to necessary diagnostic tests required for their condition; continued to inappropriately document orders for lab work, orders for medications, and results of lab work; failed to schedule necessary and periodic medical visits to ensure providers were seeing

detainees with diabetes and other serious health conditions; and continued to fail to reassess detainees who were on medication.

83.     On information and belief, if these changes had been implemented, Mr. Shelton would have had regular access to tests for his blood sugar; correctly ordered at-least-daily tests for his blood sugar; correctly documented and administered insulin prescriptions; and a medical prescriber see him to evaluate his condition.

84.     On information and belief, if these or similar changes had been implemented, Mr. Shelton would likely still be alive.

85.     Instead, having been put on notice in 2009 that the Jail's medical care in each of these aspects violated constitutional rights, was likely to cause serious injury or death to detainees, and had already caused serious injuries and death to detainees, Harris County Jail acted with deliberate indifference to its diabetic detainees and corrected none of these deficiencies.

86.     Seven years later, in October 2016, the constitutionally deficient and deadly medical care at the jail was front and center in the debates between then-Sheriff Ron Hickman and current Sheriff Ed Gonzalez.

87.     When asked what he would do about the concerning history of deaths that had gone on for many years and was continuing, Sheriff Gonzalez specifically cited the triage area (now part of the JPC), where detainees are first assessed for chronic conditions like diabetes, as needing improvement if the jail was going to halt its pattern of deaths.[2]

88.     Though his debate statements highlight that Sheriff Gonzalez was aware of the ongoing pattern of deaths in the Harris County Jail and the role deficient medical care, and

---

[2] ABC13, "Ron Hickman, Ed Gonzalez face off in ABC13 / Univision debate," Oct. 18, 2016, *available at https://abc13.com/debate-harris-county-sheriffs-office-sheriff-law-enforcement/1552812/.*

specifically deficient initial medical assessment and treatment, played in those deaths, Sheriff Gonzalez did not halt the pattern of deaths in his jail.

89.     In the almost seven years since the debate, dozens of Harris County Jail detainees have continued to die, at least eleven of whom were diabetics who died from complications of diabetes, as detailed below. On information and belief, the Jail's continuing deficient medical care, namely denial of life-sustaining insulin and regular glucose testing, led or contributed to these deaths.

90.     In 2019, medication practices at the Harris County Jail continued to be so constitutionally inadequate that they were named as a "high risk concern" that led to Harris Health stepping in to provide medical personnel at the jail.

91.     They remained a high-risk concern and on December 9, 2020, the Commission issued its annual report on the Harris County Jail, finding the Jail non-compliant with minimum jail standards concerning documentation of medication. Specifically, the Commission discovered many medication forms were blank, making it unclear if the medication was ever even offered to the detainees. On information and belief, detainees with blank medical forms who were potentially not offered medication included detainees with diabetes who needed insulin to live. At the time of this notice, Harris Health was providing many, if not most, of the medication prescribers in the Harris County Jail—this notice put both the Jail and Harris Health on notice, once again, that jail medication practices placed detainees' health and lives at risk.

92.     On information and belief, though Harris Health increasingly provided medical providers and assistance with medical care at the Harris County jail between 2021 and early 2022, very little had changed when Harris Health assumed direct control over the medical care at the jail on March 1, 2022.

93.     Specially, on March 21, 2022, on information and belief, Dr. al Hadad and PA Hendrickson were not trained to order insulin for Type 1 diabetics as repeating orders to be performed daily, or more frequently.

94.     Instead, Dr. al Hadad and PA Hendrickson were trained by Defendants specifically to order all medications including insulin orders, as single-dose orders.

95.     On information and belief, Defendants failed to train medication prescribers to order insulin for Type 1 diabetics as repeating orders.

96.     Instead, Harris County and Harris Health trained their medication prescribers to order insulin as single-dose orders, even for Type 1 diabetics.

97.     Because medication prescribers were trained to write insulin as single-dose orders, it was and remains common for diabetic detainees at the Harris County Jail to be denied insulin.

98.     On information and belief, Dr. al Hadad and PA Hendrickson were not trained to order blood glucose monitoring for Type 1 diabetics as repeating orders lasting longer than three days.

99.     Instead, Dr. al Hadad and PA Hendrickson were trained by Defendants specifically to order labs for medication, like blood glucose, as short-term orders for single measurements or, if they repeated, for not more than three days.

100.     On information and believe, Defendants failed to train medication prescribers to order routine, at-least daily glucose monitoring for all Type 1 diabetics.

101.     Because medication prescribers are not trained to order routine blood glucose monitoring for diabetics, it was and remains common for diabetic detainees at Harris County Jail to have high blood glucose that goes untreated and undocumented.

102.    On information and belief, LVN Esapa and LVN Osunsanya were not trained to immediately notify a medication prescriber when inmate blood glucose readings obtained under a standing or repeating order were over 300 mg/dL.

103.    On information and belief, none of Defendants' non-prescribing employees and contractrees were trained to immediately notify a medication prescriber when inmate blood glucose readings obtained under a standing or repeating order were over 300 mg/dL.

104.    On information and belief, none of Defendants' employees or contractees working at the Jail were trained to immediately notify a medication prescriber if a detainee was asking for insulin or to document the request in the detainee's medical record.

105.    Because of this lack of training, it was and remains common for diabetic detainees at the Jail to ask for insulin and for none of Defendants' employees or contractees to notify a medication prescriber or to document this request in the detainee's medical record.

106.    On information and belief, none of Harris County's or Harris Health's employees or contractees working at the Jail were trained to immediately notify medical staff if a diabetic detainee was skipping meals or to document the missed meals in a detainee's medical record.

107.    Because of this lack of training, it was and remains common for diabetic detainees at the Jail to skip or eat only partial meals and for none of Defendants' employees or contractees to notify medical staff or to document this request in the detainee's medical record.

108.    As Harris County's and Harris Health employees and contractees were not trained to notify medication prescribers when detainee blood glucose readings were dangerously high, when detainees were asking for insulin, or when diabetic detainees were skipping meals, diabetic detainees at the Harris County Jail were routinely denied life-saving insulin.

109.    Other examples of deaths caused by Harris County's and Harris Health's routine custom of denying life-saving insulin and glucose monitoring to diabetic detainees include:

    a.    Kristan Smith who died on May 28, 2022 at the age of 38 from complications of her diabetes, a mere month after she was booked in to the Jail, two months after Mr. Shelton's preventable death, and seven months before Harris County and Harris Health made changes to their medication policies.

    b.    Antelmo Lara who died in the Jail on September 2, 2021 from diabetes mellitus and related health conditions.

    c.    Edward Lewis who died in the Jail on March 8, 2020 from diabetes mellitus and related health conditions. Mr. Lewis had been booked into Harris County Jail less than two weeks before his death.

    d.    Donald Mathes who died on July 22, 2016 in the Jail from diabetes mellitus and related health conditions.

    e.    Ed Phillips, aged 47, who died in the Jail on March 13, 2015, two months after he was booked in. Mr. Phillips cause of death was complications from his diabetes mellitus.

    f.    Derek Franklin who died in the Jail on November 30, 2013 at age 49 from complications of diabetes mellitus.

110.    In addition to these deaths, in the ten years before Mr. Shelton's death an additional nine diabetic detainees died in the Harris County Jail from other medical conditions for which their diabetes was a contributing factor.  On information and belief, Harris County's and Harris Health's routine custom of denying life-saving insulin and regular glucose monitoring to diabetic detainees contributed to their deaths. These detainees include:

    a.    Alejandro Tillman, a diabetic detainee who died in the Jail on March 25, 2021, less than two months after he was booked into the Jail.

    b.    Stephen Windsor, a diabetic detainee who died only three weeks after being booked into the Jail. Mr. Windsor died on January 1, 2021.

    c.    Carlos Romero, who died after a single day in the Jail, on October 4, 2019.

    d.    Donald Robinson, a diabetic detainee who died on July 29, 2019, only five weeks after being booked into the Jail.

e.     Roger Dansby, aged 49, who died in the Jail on February 9, 2019.

f.     Floyd Rachelle who died on November 15, 2018. Mr. Rachelle was only 30 years-old at the time of his death and had been in the Jail less than three months.

g.     Rodney Butler who died on March 27, 2017, less than six weeks after being booked into the Jail.

h.     Danny Neelys, who was only 40 years old when he died in the Jail on September 16, 2015.

i.     Frank Gomez, 46, who died on November 12, 2013, after only two months in the Jail.

111.    As is shown by the extensive history above, Defendants routinely deny life-sustaining medications and regular glucose monitoring to insulin-dependent diabetics and such denial causes a pattern of diabetic detainee deaths in the Jail.

112.    Nor was this pattern a secret—as detailed above, the Department of Justice warned the Jail in 2009 that its constitutionally deficient medical care had caused inmate deaths and was likely to cause more if the Jail did not immediately implement changes to ensure detainees with chronic medical conditions like diabetes had accurately documented medical records, were assessed and periodically reassessed, and were prescribed and provided appropriate medication and lab work, among other changes.

113.    In 2016, Sheriff Ed Gonzalez spoke directly to these deaths during the televised debate for his position. Three years later, "high risk" medication practices like failing or refusing to provide life-sustaining medications like insulin and failing or refusing to order related, necessary tests like blood glucose monitoring continued at the jail, prompting the Harris County Commissioner's Court to study and approve plans to transition medical care, including responsibility for medication prescribing for detainees, from Harris County's direct responsibility

to Harris Health's. It was in the midst of these studies and plans that the Commission placed the Jail in non-compliant status for its deficient medication practices and documentation.

114.    Defendants' policymakers were integral to the studies and plans for the transition of responsibility for medication prescribing for inmates; indeed, such studies and plans could not have been completed without them.

115.    Defendants' policymakers were aware of the "high risk" concerns with medication prescribing when transitioning direct medical care from Harris County Jail staff to Harris Health staff.

116.    Defendants' policymakers were aware of the December 9, 2020 Commission report citing the Jail for medication administration records that were so deficient it was not clear detainees were even being offered medications like insulin.

117.    Defendants' policymakers were aware that it was the policy or practice of medication prescribers to write single-dose orders of insulin, when though Type 1 diabetics need insulin on a repeating, multiple-times-a-day basis to survive.

118.    Defendants' policymakers were aware that it was the policy or practice of medication prescribers to order single-instance or short term, e.g., not more than three days, orders for blood glucose monitoring, despite Type 1 diabetics needing ongoing, regular monitoring to live.

119.    Defendants' policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022, yet refused or failed to change the obviously dangerous policies and electronic health record until December 2022, at the earliest.

120.    Defendants' policymakers ratified this policy or practice when they failed or refused to train or re-train staff to order life-sustaining insulin and blood glucose monitoring as repeating

or maintenance orders for Type 1 diabetics until after December 2022, nine months after Mr. Shelton's death.

121.    Defendants were aware that it was the policy or practice of their employees and contractees to fail or refuse to notify medication prescribers when they obtained blood glucose readings over 300 mg/dL.

122.    Defendants' policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022.

123.    Defendants' policymakers ratified this policy or practice when they failed or refused to retrain their employees or contactees to notify medication prescribers anytime they obtained a blood glucose level over 300 mg/dL.

124.    Defendants were aware that it was the policy or practice of their employees and contractees to not only deny detainee requests for insulin if a diabetic detainee's name was not on an insulin list, but also to fail or refuse to communicate the request to a medication prescriber or document the request in a detainees' medical record.

125.    Defendants' policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022.

126.    Defendants' policymakers ratified this policy or practice when they failed or refused to train or retrain their employees and contractees to communicate requests for insulin to a medication prescriber and/or to document such requests in the detainees' medical record.

127.    Defendants were aware that it was the policy or practice of their employees and contractees to not notify a medication prescriber or other medical personnel when a diabetic detainee skipped or ate only partial meals and to not document the same in the detainee's medical record.

128.    Defendants' policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022.

129.    Defendants' policymakers ratified this policy or practice when they failed or refused to train or retrain their employees and contractees to notify medical personnel when diabetic detainees skip meals or eat only partial meals and to document the missed meals in the detainee's medical record.

130.    Each of these individual policies and practices are related to and contributed to the ultimate policy and practice of Defendants in place at the time of Mr. Shelton's death—intentionally or deliberately denying Type 1 diabetics life-sustaining insulin and at-least daily blood glucose monitoring.

131.    Defendants' policymakers were aware that their employees and contractees were intentionally or deliberately denying Type 1 diabetics life-sustaining insulin and at-least daily blood glucose monitoring in the years before Mr. Shelton's death.

132.    Defendants' policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022.

133.    Defendants' policymakers ratified this policy or practice when they failed or refused to train or retrain their employees and contractees to provide diabetic detainees with the insulin they needed to survive and to regularly monitor their blood glucose.

134.    As a direct and proximate result of their policies and practices, Harris County and Harris Health employees and contractees denied Mr. Shelton his life-sustaining insulin, causing his death.

## IV.    CAUSES OF ACTION

### A.  *Americans With Disabilities Act and Rehabilitation Act of 1973*

135.     Plaintiffs incorporate paragraphs 1-134 in this section for all purposes as if fully restated herein and further state that Defendants are recipients of federal funds to run, albeit in a dangerous fashion, the Harris County Jail.

### 1.  Mr. Shelton was a qualified individual with a disability who requested accommodations for his diabetes.

136.     Mr. Shelton suffered from Type 1 diabetes and was insulin-dependent, requiring several doses of both short- and long-acting insulin and blood glucose monitoring at least daily to manage his diabetes.

137.     These impairments substantially limited Mr. Shelton's ability to carry out the normal operation of his endocrine system and digest food. Once Defendants intentionally and deliberately denied Mr. Shelton access to life-sustaining insulin, his diabetes affected his ability to maintain consciousness, breathe, and, ultimately, live.

138.     As a detainee in the Jail with physical impairments that substantially limited his ability to have a functioning endocrine system, digest food, maintain consciousness, breathe, and live, Mr. Shelton was a qualified individual with a disability within the meaning of the ADA and the Rehab Act.

### 2.  Defendants were aware of Mr. Shelton's disabilities and his need for accommodations.

139.     Mr. Shelton informed Defendants that he was a Type 1 insulin-dependent diabetic and Defendants confirmed that Mr. Shelton did in fact suffer from this disease.

140.     Defendants were aware of the limitations imposed on Mr. Shelton by his diabetes, including his inability to have a functioning endocrine system and to digest food, as well as his inability to maintain consciousness, breathe, and live if not provided with insulin.  In fact, in the

first few days of his incarceration, Defendants observed dangerously high blood glucose levels on numerous occasions – all of which mandated insulin for Mr. Shelton.

141.     Mr. Shelton asked Defendants for accommodations for his disability when he entered the Jail and when he repeatedly asked for insulin in the days before his death.

142.     To the extent Defendants claim they were unaware of Mr. Shelton's disabilities, Plaintiffs aver that Mr. Shelton's disabilities were obvious, as was his need for accommodations.

### 3. *Defendants excluded Mr. Shelton from participation in and denied him the benefits of the Jail's services, programs, and activities by denying his reasonable accommodations.*

143.     Title II of the ADA and the Rehab Act require public entities, like Harris County and Harris Health, to reasonably accommodate people with disabilities in all their programs and services for which people with disabilities are otherwise qualified.

144.     Jail housing and classification, recreation programs, vocational programs, meals, supervision, and even detention so that a person can be brought to court are programs, services, and activities offered by Harris County to all detainees at the Jail for purposes of the ADA Title II and the Rehab Act.

145.     Likewise, medical care is a service offered to all detainees by Harris County and Harris Health at the Harris County Jail for purposes of the ADA Title II and the Rehab Act.

146.     As a detainee in the Harris County Jail, Mr. Shelton was "qualified" to access each of these programs and services.

147.     Mr. Shelton was entitled to reasonable modifications to Defendants' policies and practices—i.e. being provided with insulin and regular blood glucose monitoring—so that he could live to access the Jail's housing and classification, recreation programs, vocational programs, meals, supervision, and detention to be brought to court.

148.     Mr. Shelton was also entitled to reasonable modifications to Defendants' policies and practices of denying insulin and blood glucose monitoring to diabetic detainees so that he could access ongoing medical care for his Type 1 diabetes.

149.     Defendants acknowledged in their corrective action to the Commission that making regular, repeating dosages of medications the default order rather than single-dose orders would correct a deficiency that led to Mr. Shelton's death and was a modification they were easily able to make.

150.     Similarly, Defendants' employees and contractees notify medication prescribers and other medical personnel of other medical events and document the same in detainee medical records on a daily basis. Notifying medication prescribers and documenting when Mr. Shelton's blood glucose was measured over 300 mg/dL, when he requested insulin, and when he missed meals were reasonable and obvious modifications Defendants were easily able to make to their policies and practices.

151.     Indeed, simply providing insulin and regular blood glucose monitoring to Mr. Shelton were reasonable accommodations Defendants could easily have made to ensure his access to their regular jail programs, services, and activities.

### 4. Defendants denied Mr. Shelton's accommodations, discriminating against him because of his disability, and caused his painful death.

152.     Yet, instead of accommodating him by giving him insulin and monitoring his blood glucose, as required under the ADA and Rehab Act, Defendants deliberately and intentionally failed to make these reasonable accommodations for Mr. Shelton's needs, thereby causing him to suffer more pain and punishment than non-disabled detainees.  Because of Defendants' failures, Mr. Shelton could not regulate his blood glucose and ultimately fell unconscious and died.

153.     Defendants Harris County and Harris Health should have accommodated Mr. Shelton by

    a.  Prescribing insulin as a repeating or maintenance medication;

    b.  Monitoring his blood glucose levels multiple times each day;

    c.  Notifying medication prescribers when his blood glucose level was over 300 mg/dL;

    d.  Notifying medication prescribers when he asked for insulin;

    e.  Documenting his requests for insulin in his medical record;

    f.  Notifying medical personnel when he missed or ate only partial meals; and

    g.  Documenting his missing meals in his medical record.

154.     Yet, Defendants failed or refused to make any of these reasonable modifications to their policies and practices despite knowing Mr. Shelton was a Type 1 diabetic and that he needed insulin and glucose monitoring in order to live and that the failure to provide these accommodations would kill him. Defendants' failures to make accommodations was intentional and illegal discrimination under the ADA, entitling Plaintiffs to compensatory relief.

155.     As a direct and proximate result of Defendants' actions, Mr. Shelton died and Plaintiffs suffered damages.

156.     On information and belief, Harris County and Harris Health accept federal funding for the programs, divisions, and personnel at issue in this lawsuit.

**B. *Fifth and Fourteenth Amendment § 1983* Monell *Claim Against Defendants.***

157.      Plaintiffs incorporate paragraphs 1-156 in this section for all purposes as if fully restated herein.

158.     Defendants adopted dangerous conditions in the Harris County Jail that proximately caused the death of Mr. Shelton and the violation of his rights under the Fifth and Fourteenth Amendment.

159.     Moreover, the actions of Defendants' employees and contractees described in this complaint constituted medical care so deficient that it amounted to deliberate indifference to Mr. Shelton's serious medical needs, in violation of the Fifth Amendment, as incorporated by the Fourteenth Amendment.

160.     At all material times, Defendants' employees and contractees whose actions and inactions are described herein acted under color of state law, as agents of Harris County and/or Harris Health.

161.     At all material times, Defendants' employees and contractees whose actions and inactions are described herein were acting within the scope of their duties at the time they denied Mr. Shelton with his life-sustaining insulin and glucose monitoring.

162.     Defendant Harris Health's policymaker for all matters related to healthcare at the Harris County Jail was and still is Dr. O. Reggie Egins.

163.     Defendant Harris County's policymaker for all matters related to the Harris County Jail was and still is Sheriff Ed Gonzalez.

164.     Defendants Harris County Jail and Harris Health had or ratified the following policies, practices, or customs in place when their employees and contractees denied Mr. Shelton his necessary insulin and glucose monitoring between March 23 and March 27, 2022:

a.  Prescribing insulin as a single-dose medication for Type 1 diabetics and not on a recurring basis;

b.  Failing to train medication prescribers to prescribe insulin as a repeating or maintenance order for Type 1 diabetics;

c.  Ordering blood glucose monitoring of Type 1 diabetics as single-instance orders or for time periods no longer than three days, and not every day an individual was housed at the Jail;

d.  Failing to train medication prescribers to order blood glucose measures as repeating orders lasting longer than three days for Type 1 diabetics;

e.  Failing to notify medication prescribers when a detainee has a blood glucose over 300 mg/dL;

f.  Failing to train medical personnel to notify a medication prescriber when a detainee has a blood glucose over 300 mg/dL;

g.  Failing to notify medication prescribers when a detainee is asking for insulin;

h.  Failing to train medical and non-medical staff to notify medication prescribers when a detainee is asking for insulin;

i.  Failing to document requests for insulin from a detainee in their medical record;

j.  Failing to train medical and non-medical staff to document requests for insulin in the detainee's medical record;

k.  Failing to notify medical personnel when a diabetic detainee skips or eats only partial meals;

l.  Failing to train medical and non-medical staff to notify medical personnel when a diabetic detainee skips or eats only partial meals;

m.  Failing to document in a diabetic detainee's medical record when they skip or eat only partial meals;

n.  Failing to train medical and non-medical staff to document in a diabetic detainee's medical records when they skip or eat only partial meals;

o.  Denying Type 1 diabetic detainees life-sustaining insulin;

p.  Failing to train medical personnel to provide Type 1 diabetic detainees with insulin;

q.  Denying Type 1 diabetic detainees with regular blood glucose monitoring; and

r.  Failing to train medical personnel to provide Type 1 diabetic detainees with regular blood glucose monitoring.

165.    Harris Health's employees and contractees whose actions are described herein violated Mr. Shelton's constitutional rights when Dr. Egins failed to supervise them by failing to train them to order insulin as a repeating medication for Type 1 diabetics; to order blood glucose monitoring as repeating orders lasting longer than three days for Type 1 diabetics; to notify a medication prescriber when a detainee has a blood glucose level over 300 mg/dL; to notify medication prescribers when a detainee is asking for insulin; to document in their medical record

when a detainee asks for insulin; to notify medical personnel when a diabetic detainee skips or eats only partial meals; to document when a diabetic detainee skips or eats only partial meals; to provide insulin multiple times a day to Type 1 diabetic detainees; and to provide blood glucose monitoring at least daily to Type 1 diabetic detainees, all of which proximately caused the violations of Mr. Shelton's constitutional rights.

166.    Dr. Eggins was deliberately indifferent to the known and obvious consequences of these policies, practices, training, and customs which he was aware of, authorized, and encouraged, rather than acting to correct them. Dr. Eggins was actually aware of facts from which any reasonable policymaker could draw the inference that a substantial risk of serious harm and violations of constitutional rights existed, and actually drew that inference.

167.    Dr. Egins was aware of the pattern of similar incidents that occurred before and after Harris Health's employees and contractees denied Mr. Shelton the insulin and blood glucose monitoring that he needed to survive, although it was also apparent and obvious that a constitutional violation was a highly predictable consequence of Harris Health's delineated policies. Dr. Egins was specifically aware that his employees and contractees had violated the constitution by providing medical care to diabetic detainees in the Harris County Jail that was so deficient as to amount to deliberate indifference to their serious medical needs and unconstitutional conditions of confinement, and that no additional procedures, policies, training, or practices had been implemented that would resolve this ongoing risk of constitutional harm to diabetic detainees.

168.    Likewise, Dr. Egins knew that failing to train his employees and contractees to order insulin as a repeating medication for Type 1 diabetics; to order blood glucose monitoring as repeating orders lasting longer than three days for Type 1 diabetics; to notify a medication prescriber when a detainee has a blood glucose level over 300 mg/dL; to notify medication

prescribers when a detainee is asking for insulin; to document in their medical record when a detainee asks for insulin; to notify medical personnel when a diabetic detainee skips or eats only partial meals; to document when a diabetic detainee skips or eats only partial meals; to provide insulin multiple times a day to Type 1 diabetic detainees; and to provide blood glucose monitoring at least daily to Type 1 diabetic detainees would cause Harris Health employees and contractees to violate the constitutional rights of diabetic detainees in the Harris County Jail, like Mr. Shelton. Nonetheless, though Dr. Egins knew of these obvious deficiencies, he chose to retain this dangerously flawed training program.

169.     Similarly, Harris County's employees and contractees whose actions are described herein violated Mr. Shelton's constitutional rights when Sheriff Gonzalez failed to supervise them by failing to train them to order insulin as a repeating medication for Type 1 diabetics; to order blood glucose monitoring as repeating orders lasting longer than three days for Type 1 diabetics; to notify a medication prescriber when a detainee has a blood glucose level over 300 mg/dL; to notify medication prescribers when a detainee is asking for insulin; to document in their medical record when a detainee asks for insulin; to notify medical personnel when a diabetic detainee skips or eats only partial meals; to document when a diabetic detinee skips or eats only partial meals; to provide insulin multiple times a day to Type 1 diabetic detainees; and to provide blood glucose monitoring at least daily to Type 1 diabetic detainees, all of which proximately caused the violations of Mr. Shelton's constitutional rights.

170.     Sheriff Gonzalez was deliberately indifferent to the known and obvious consequences of these policies, practices, training, and customs which he was aware of, authorized, and encouraged, rather than acting to correct them. Sheriff Gonzalez was actually aware of facts from

which any reasonable policymaker could draw the inference that a substantial risk of serious harm and violations of constitutional rights existed, and actually drew that inference.

171.    Sheriff Gonzalez was aware of the pattern of similar incidents that occurred before and after Harris County's and Harris Health's employees and contractees denied Mr. Shelton the insulin and blood glucose monitoring that he needed to survive, although it was also apparent and obvious that a constitutional violation was a highly predictable consequence of Harris County's delineated policies. Sheriff Gonzalez was specifically aware that his and Harris Health's employees and contractees had violated the constitution by providing medical care to diabetic detainees in the Harris County Jail that was so deficient as to amount to deliberate indifference to their serious medical needs and unconstitutional conditions of confinement, and that no additional procedures, policies, training, or practices had been implemented that would resolve this ongoing risk of constitutional harm to diabetic detainees.

172.    Likewise, Sheriff Gonzalez should have known that failing to train his and Harris Health's employees and contractees to order insulin as a repeating medication for Type 1 diabetics; to order blood glucose monitoring as repeating orders lasting longer than three days for Type 1 diabetics; to notify a medication prescriber when a detainee has a blood glucose level over 300 mg/dL; to notify medication prescribers when a detainee is asking for insulin; to document in their medical record when a detainee asks for insulin; to notify medical personnel when a diabetic detainee skips or eats only partial meals; to document when a diabetic detinee skips or eats only partial meals; to provide insulin multiple times a day to Type 1 diabetic detainees; and to provide blood glucose monitoring at least daily to Type 1 diabetic detainees would cause Harris County's and Harris Health's employees and contractees to violate the constitutional rights of diabetic

detainees in the Harris County Jail, like Mr. Shelton. Nonetheless, though Sheriff Gonzalez knew of these obvious deficiencies, he chose to retain this dangerously flawed training program.

173.    Rather both Dr. Egins and Sheriff Gonzalez ratified their employees' and contractees' conduct and continued to approve their employees' and contractees' violations of diabetic detainee's constitutional rights.

174.    Each of the policies, practices, and customs delineated above was actually known, constructively known, approved, and/or ratified by Harris Health and its policymaker for correctional healthcare, Dr. O. Reggie Egins, and was promulgated with deliberate indifference to Mr. Shelton's Fifth and Fourteenth Amendment rights under the United States Constitution. Moreover, the known and obvious consequence of these policies, practices, or customs was that Harris Health employees and contractees would be placed in recurring situations in which the constitutional violations described in this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

175.    Each of the policies, practices, and customs delineated above was also actually known, constructively known, approved, and/or ratified by Harris County and its policymaker for the Harris County Jail, Sheriff Ed Gonzalez, and was promulgated with deliberate indifference to Mr. Shelton's Fifth and Fourteenth Amendment rights under the United States Constitution. Moreover, the known and obvious consequence of these policies, practices, or customs was that Harris County employees and contractees would be placed in recurring situations in which the constitutional violations described in this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

176.     Consequently, the policies and conduct delineated above were a moving force of Mr. Shelton's and Plaintiffs' constitutional deprivations and injuries, including Mr. Shelton's ultimate death, and proximately caused him to suffer a painful death.

## V.     DAMAGES

177.     Plaintiffs incorporate paragraphs 1 - 176 in this section for all purposes as if fully restated herein.

178.     Plaintiff Borchgrevink, in her capacity as the representative of the Estate of Matthew Shelton, asserts a survival claim on behalf of the Estate. As a result of Defendants' acts and omissions set forth herein, the Estate suffered injuries and damages including without limitation the following:

A.     Conscious pain and mental anguish;

B.     Funeral and burial expenses;

C.     Pre-judgment and post-judgment interest at the highest rates allowable under the law;

D.     Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

E.     All other economic damages to which Plaintiff may be entitled.

179.     Plaintiff Marianna Ruth Thomson in her capacity as wrongful death beneficiary, asserts claims on her own behalf. Plaintiff Marianna Ruth Thomson has incurred damages including, but not limited to the following:

A.     Expenses for psychological treatment incurred as a result of Defendants' conduct and Mr. Shelton's death;

B.     Past and future mental anguish;

C.     Past and future loss of companionship and society;

D.     Past and future pecuniary loss, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value;

E.    Pre-judgment and post-judgment interest at the highest rates allowable under the law;

F.    Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

G.    All other economic damages to which Plaintiff may be entitled.

## VI.    ATTORNEY'S FEES

180.    Plaintiffs would show that they are entitled to recover reasonable and necessary attorneys' fees incurred as a result of prosecuting these claims, pursuant to 29 U.S.C. § 794a(b) and 42 U.S.C. § 12205 and as otherwise allowed by law.

## VII.    JURY DEMAND

181.    Plaintiffs request that this case be tried by jury.

## VIII.    PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Defendants be cited to appear and answer herein and that upon final hearing they have judgment against Defendants for actual damages, for costs of court and attorney's fees, for prejudgment and post-judgment interest at the highest rate allowable under the law, and for all other relief, legal and equitable, to which they may be entitled.

Respectfully submitted,

John Flood, attorney-in-charge
State Bar No. 07155910
So. Dist. Bar No. 12593
OF COUNSEL:
Jeff Edwards
State Bar No. 24014406
jeff@floodtriallawyers.com
Lisa Snead
State Bar No. 24062204
lisa@floodtriallawyers.com
**JOHN T. FLOOD, L.L.P.**
802 N. Carancahua St., Ste. 900
Corpus Christi, Texas 78401
Tel. 361-654-8877

Fax. 371-654-8879
john@floodtriallawyers.com
irma@floodtriallawyers.com

**ATTORNEYS FOR PLAINTIFFS**