IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SARAH BORCHGREVINK, REPRESENTATIVE OF THE ESTATE OF MATTHEW RYAN SHELTON, DECEASED and MARIANNA RUTH THOMSON, statutory wrongful death beneficiary of MATTHEW RYAN SHELTON, DECEASED | § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 4:23-cv-03198 |
| HARRIS COUNTY, TEXAS; HARRIS COUNTY HOSPITAL DISTRICT d/b/a HARRIS HEALTH SYSTEMS; DETENTION SHERIFF ED GONZALEZ; OFFICER CHARLEY LAUDER; DETENTION OFFICER ELIZABETH GARCIA; DETENTION OFFICER PAULINO OLGUIN; DETENTION OFFICER WILLIAM RUSSELL; DETENTION OFFICER GARRETT WOODS; DETENTION OFFICER TIMOTHY OWENS; DETENTION OFFICER KALIN STANFORD; DETENTION OFFICER BRAYAN SILVA; DETENTION OFFICER AMBER BAILEY; DETENTION OFFICER AMALIA RUIZ; DETENTION OFFICER JEREMIAH ADEBOLA; DETENTION OFFICER ALLYSON HURD; DETENTION OFFICER DENTRELL WOODS; DETENTION OFFICER KIMBERLY ROSSELL; DETENTION OFFICER MARVIN PERKINS; DETENTION OFFICER LONNIE BROOKS; SERGEANT ALEJANDRO NIETO; and SERGEANT BRYAN COLLINS. | § § § § § § § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | | |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

Plaintiffs SARAH BORCHGREVINK and MARIANNA RUTH THOMSON file this 42

U.S.C. § 1983, Americans with Disabilities Act (ADA), and Rehabilitation Act of 1973 (Rehab

Act) lawsuit against Defendants HARRIS COUNTY, TEXAS (Harris County); HARRIS COUNTY HOSPITAL DISTRICT d/b/a/ HARRIS HEALTH SYSTEMS (Harris Health); SHERIFF ED GONZALEZ; DETENTION OFFICER CHARLEY LAUDER; DETENTION OFFICER ELIZABETH GARCIA; DETENTION OFFICER PAULINO OLGUIN; DETENTION OFFICER WILLIAM RUSSELL; DETENTION OFFICER GARRETT WOODS; DETENTION OFFICER TIMOTHY OWENS; DETENTION OFFICER KALIN STANFORD; DETENTION OFFICER BRAYAN SILVA; DETENTION OFFICER AMBER BAILEY; DETENTION OFFICER AMALIA RUIZ; DETENTION OFFICER JEREMIAH ADEBOLA; DETENTION OFFICER ALLYSON HURD; DETENTION OFFICER DENTRELL WOODS; DETENTION OFFICER KIMBERLY ROSSELL; DETENTION OFFICER MARVIN PERKINS; DETENTION OFFICER LONNIE BROOKS; SERGEANT ALEJANDRO NIETO; and SERGEANT BRYAN COLLINS and would show the Court and Jury the following in support thereof:

## I. PARTIES

1. This lawsuit arises from the death of Matthew Ryan Shelton, deceased (Mr. Shelton).

2. Plaintiff Sarah Borchgrevink is the natural sister of Mr. Shelton and the independent administrator of his estate. Ms. Borchgrevink is a resident of Harris County, Texas.

3. Plaintiff Marianna Ruth Thomson is Mr. Shelton's mother and sues in her capacity as a statutory beneficiary under the Texas Wrongful Death Act. Ms. Thomson is a resident of McLennan County, Texas.

4. Defendant Harris County is a Texas county that owns and whose employees operate a county jail pursuant to Local Government Code Chapter 351. Harris County has been served and has made an appearance in this case.

5.     Defendant Harris County Hospital District d/b/a Harris Health Systems is a political subdivision of the State of Texas, created on January 1, 1966, pursuant to Texas Health & Safety Code Chapter 281. Harris Health provides medical treatment to pretrial detainees in the Harris County Jail and sets policies and procedures for the same pursuant to an interlocal agreement that was in place at the time of the incident and remains in place. Harris Health has been served and has made an appearance in this case.

6.     Sheriff Ed Gonzalez is the elected Sheriff of Harris County, Texas and as such was the policymaker for Harris County. He is sued in his individual capacity for compensatory and punitive damages. At all relevant times, he was acting under color of law as the Harris County Sheriff. He may be served with process at the Harris County Sheriff's Office, 1200 Baker Street, Houston, Texas 77002 or wherever he may be found. **Service is hereby requested.**

7.     Detention Officer Charley Lauder was a Harris County detention officer and is sued in her individual capacity for compensatory and punitive damages. At all relevant times, Charley Lauder was acting under color of law as a Harris County detention officer. She can be served with process at 22529 Kmiec Road, Hempstead, Texas 77445 or wherever she may be found. **Service is hereby requested.**

8.     Detention Officer Elizabeth Garcia was a Harris County detention officer and is sued in her individual capacity for compensatory and punitive damages. At all relevant times, Elizabeth Garcia was acting under color of law as a Harris County detention officer. She may be served with process at 5751 Greenhouse Road #414, Katy, Texas 77449 or wherever she may be found. **Service is hereby requested.**

9.     Detention Officer Paulino Olguin is a Harris County detention officer and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Paulino

Olguin was acting under color of law as a Harris County detention officer. He may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever he may be found. **Service is hereby requested.**

10.    Detention Officer William Russell is a Harris County detention officer and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, William Russell was acting under color of law as a Harris County detention officer. He may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever he may be found. **Service is hereby requested.**

11.    Detention Officer Garrett Woods is a Harris County detention officer and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Garrett Woods was acting under color of law as a Harris County detention officer. He may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever he may be found. **Service is hereby requested.**

12.    Detention Officer Timothy Owens is or was a Harris County detention officer and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Timothy Owens was acting under color of law as a Harris County detention officer. He may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever he may be found. **Service is hereby requested.**

13.    Detention Officer Kalin Stanford is or was a Harris County detention officer and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Kalin Stanford was acting under color of law as a Harris County detention officer. He may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever he may be found. **Service is hereby requested.**

14.     Detention Officer Brayan Silva is or was a Harris County detention officer and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Brayan Silva was acting under color of law as a Harris County detention officer. He may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever he may be found. **Service is hereby requested.**

15.     Detention Officer Amber Bailey is or was a Harris County detention officer and is sued in her individual capacity for compensatory and punitive damages. At all relevant times, Amber Bailey was acting under color of law as a Harris County detention officer. She may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever she may be found. **Service is hereby requested.**

16.     Detention Officer Amalia Ruiz is or was a Harris County detention officer and is sued in her individual capacity for compensatory and punitive damages. At all relevant times, Amalia Ruiz was acting under color of law as a Harris County detention officer. She may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever she may be found. **Service is hereby requested.**

17.     Detention Officer Jeremiah Adebola is or was a Harris County detention officer and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Jeremiah Adebola was acting under color of law as a Harris County detention officer. He may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever he may be found. **Service is hereby requested.**

18.     Detention Officer Allyson Hurd is or was a Harris County detention officer and is sued in her individual capacity for compensatory and punitive damages. At all relevant times, Allyson Hurd was acting under color of law as a Harris County detention officer. She may be

served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever she may be found. **Service is hereby requested.**

19.     Detention Officer Dentrell Woods is or was a Harris County detention officer and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Dentrell Woods was acting under color of law as a Harris County detention officer. He may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever he may be found. **Service is hereby requested.**

20.     Detention Officer Kimberly Rossell is or was a Harris County detention officer and is sued in her individual capacity for compensatory and punitive damages. At all relevant times, Kimberly Rossell was acting under color of law as a Harris County detention officer. She may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever she may be found. **Service is hereby requested.**

21.     Detention Officer Marvin Perkins is or was a Harris County detention officer and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Marvin Perkins was acting under color of law as a Harris County detention officer. He may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever he may be found. **Service is hereby requested.**

22.     Detention Officer Lonnie Brooks is or was a Harris County detention officer and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Lonnie Brooks was acting under color of law as a Harris County detention officer. He may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever he may be found. **Service is hereby requested.**

23.     Sergeant Alejandro Nieto is or was a Harris County detention officer supervisor and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Alejandro Nieto was acting under color of law as a Harris County detention officer supervisor. He may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever he may be found. **Service is hereby requested.**

24.     Sergeant Bryan Collins is a Harris County detention officer supervisor and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Bryan Collins was acting under color of law as a Harris County detention officer supervisor. He may be served with process at the Harris County Jail, 1200 Baker Street, Houston, Texas 77002 or wherever he may be found. **Service is hereby requested.**

## II.     JURISDICTION & VENUE

25.     This Court has jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the laws of the United States and Mr. Shelton's death occurred in Harris County, Texas.

26.     Venue is proper in this Court because all relevant acts and omissions giving rise to Plaintiffs' claims occurred in Harris County, Texas. *See* 28 U.S.C. § 1391.

## III.     FACTS

27.     On March 27, 2022, Matthew Shelton died of diabetic ketoacidosis after Defendants cut off his insulin supply and failed to monitor him for more than four days despite knowing Mr. Shelton needed the insulin to live.

28.     As a consequence of Harris County's and Harris Health's typical policies and practices, their employees and contractees intentionally and deliberately denied Mr. Shelton access to insulin for over four days by failing to make obvious modifications to their policies and practices governing medication prescribing and by ignoring his requests for help, despite knowing he was

an insulin-dependent diabetic who needed insulin and blood glucose monitoring to survive, and after treating him at least twice for dangerously high blood glucose.

29.     As a consequence of Harris County's typical practices, Harris County detention officers also intentionally and deliberately failed to monitor Mr. Shelton in the days before his death as he visibly suffered and died, with numerous officers falsifying records indicating they had checked on Mr. Shelton when, in fact, no such checks were conducted.

30.     Accordingly, by the time detention officers found Mr. Shelton on March 27, 2022, he had been dead for hours, with rigor mortis so set in that his limbs could not be moved.

**A. *Harris County and Harris Health Deny Mr. Shelton Life-Sustaining Insulin and Cause His Death.***

31.     Type 1 diabetes is a well-known and well-understood endocrine disorder and disability that results when a person's pancreas does not produce its own insulin, the hormone necessary to carry glucose (produced naturally from ingested food) into cells to be converted into energy. Without insulin, glucose builds up in the blood stream which causes damage to organs. When cells do not obtain glucose, they begin breaking down fat for energy instead, which the liver then processes into acidic ketones. These ketones build up faster than the body can use them for energy, causing the blood to become acidic and creating the condition called diabetic ketoacidosis.

32.     As ketones build up in the Type 1 diabetic's blood, they cause damage to internal organs including the brain, heart, and lungs and cause insatiable thirst, nausea, vomiting, severe weakness, shortness of breath, flushed face, debilitating confusion, and agonizing pain.

33.     In later stages, a Type 1 diabetic in diabetic ketoacidosis will develop a Kussmaul breathing pattern characterized by noticeably rapid, deep, and labored breaths as the lungs and blood become too acidic. Kussmaul breathing has been described as "air hunger" as the Type 1 diabetic will be audibly gasping for air.

34.     Diabetic ketoacidosis does not develop along a linear pattern; instead, symptoms can arise within hours and a Type 1 diabetic can be fully in diabetic ketoacidosis in less than 24 hours.

35.     It is inevitable that a Type 1 diabetic denied insulin will develop diabetic ketoacidosis, suffer painfully, and die within mere days, if not within hours.

36.     To compensate for their bodies' lack of natural insulin and to prevent serious injury or death, Type 1 diabetics must receive insulin multiple times a day, typically administered as regular doses of long-acting insulin twice a day, supplemented with multiple doses of short-acting insulin throughout the day to account for meals and other causes of blood glucose spikes. Type 1 diabetics are thus also sometimes referred to as "insulin-dependent diabetics."

37.     To ensure accurate dosing of short-acting insulin and to catch high blood glucose early before it causes organ damage or death, Type 1 diabetics must measure their blood glucose multiple times a day, typically before each meal and at bedtime. Blood glucose is usually measured by pricking a finger to obtain a single drop of blood that is then read by a small, portable device called a glucometer.

38.     The fact that Type 1 diabetics require insulin and blood glucose monitoring multiple times a day, every single day or they will die is a basic concept that every one of Harris County's and Harris Health's nurses, physician's assistants, and doctors at the Harris County Jail knew.

39.     Mr. Shelton voluntarily surrendered to the Harris County Jail around 4:15 p.m. on March 22, 2022. A Type 1 insulin-dependent diabetic, he brought with him the diabetic supplies he needed to survive, including both short-acting and long-acting insulin. These supplies were confiscated from him during the initial booking process and Mr. Shelton never again had access to them.

40.     At the time Mr. Shelton surrendered to the jail, Harris Health had recently taken over direct responsibility for medical care at the jail, effective March 1, 2022, after studying taking on this responsibility for several years. The transition plan took over a year to complete and, as part of the transition, the nurses, physician's assistants, and doctors previously employed or contracted and trained by Harris County whose actions are described herein became Harris Health employees effective March 1, 2022.

41.     All detainees at the Harris County Jail are initially processed in the Joint Processing Center (JPC), a building that is part of the Harris County Jail complex.

42.     During the initial intake screening, Mr. Shelton told Harris County staff that he was a Type 1 or insulin-dependent diabetic who also took daily medication for his blood pressure. Harris County noted in his jail record that he was an insulin-dependent diabetic.

43.     Mr. Shelton was then seen by licensed vocational nurse (LVN) Brittany Beard who took Mr. Shelton's blood glucose which was so high that the glucometer was unable to calculate a reading, instead indicating only "HI." On information and belief, Harris County's glucometers in the JPC were capable of reading blood glucose up to 599 mg/dL, so a reading of "HI" corresponded to a reading over 600 mg/dL.

44.     Typical glucose for a Type 1 diabetic who has not just eaten should be between 80 and 130 mg/dL and no higher than 180 mg/dL two hours after eating. Blood glucose over 300 mg/dL can be dangerous and requires immediate insulin, while blood glucose over 600 mg/dL is a life-threatening emergency.

45.     Because insulin for detainees at the Harris County Jail is stored and administered by Harris Health staff, a Type 1 diabetic detainee with a blood glucose over 300 mg/dL at the Jail requires immediate medical attention so that they can receive the necessary insulin.

46.     LVN Beard immediately flagged Mr. Shelton for further evaluation to determine whether he would be accepted for booking at the Jail or whether he would need to go to a hospital emergency room for treatment of his high blood glucose, a process referred to as "medical clearance," before returning to complete booking.

47.     Dr. Sudad Alhadad, a physician employed or contracted through a staffing agency, Physician Resources, Inc. (PRI), evaluated Mr. Shelton shortly before 5 p.m., identified him as a Type 1 diabetic, and determined he could be accepted for booking and his high blood glucose treated in the JPC/Harris County Jail.

48.     Though diabetic ketoacidosis was on a list of criteria for providers[1] in the JPC to reject a detainee for booking at the jail and Mr. Shelton's extremely high blood glucose was a flag for the presence of ketones, Dr. Alhadad did not order that Mr. Shelton be tested for ketones. At that time, the Jail had the ability to test for the presence of ketones using a special strip that would change color within seconds to indicate the presence of ketones in urine. Such strips are common and may be used by any person—including a detention officer—to alert a person to ketones.

49.     Under Harris County and Harris Health's policies and practices in March 2022, Mr. Shelton could not be tested for ketones in the JPC unless he was admitted to the medical clinic, which required Dr. Alhadad to make the decision to accept or reject him for booking without testing him for ketones first.

50.     When she ordered Mr. Shelton could be accepted for booking, Dr. Alhadad only ordered single doses of both long-acting and short-acting insulin for Mr. Shelton.

51.     Though there was no reason to wait to order insulin on a repeating basis for a Type 1 diabetic and Dr. Alhadad knew Mr. Shelton required continuous doses of insulin while he was at

---

[1] A "provider" in the Harris County Jail is a medical doctor, doctor of osteopathy, physician's assistant, or a nurse practitioner—essentially, someone with authority to issue prescriptions and orders.

the Jail, at the time of Mr. Shelton's death, it was the policy or practice of Harris County and Harris Health for all medication orders at the JPC to be ordered as single-dose administrations rather than as repeating orders (e.g., once a day for a month). This single-dose policy or practice specifically applied to life-sustaining maintenance medications which must be taken daily or, like insulin, more frequently in order to survive.

52.     There was no reason to prevent providers from prescribing life sustaining medications like insulin on a continuous basis, rather than a one-time basis.

53.     Harris County originally contracted with PRI for Dr. Alhadad's services and trained her on the single-dose policy or practice before March 1, 2022.

54.     On March 1, 2022, Harris Health took over direct control of medical care at the jail as well as the contract with PRI. Though Harris Health's policymaker knew about Harris County's single dose policy or practice, he continued it without change after March 1, 2022.

55.     Accordingly, and despite knowing that Mr. Shelton would need insulin every day, multiple times a day, Dr. Alhadad intentionally and deliberately did not enter an order for either short- or long-acting insulin as a repeating or maintenance order, consistent with Harris County and Harris Health's' medication policies and practices.

56.     At this time, Dr. Alhadad also entered an order for medical personnel to take Mr. Shelton's blood glucose twice a day for three days, starting at 8 p.m. that night.

57.     At the time of Mr. Shelton's death, it was the policy or practice of Harris County and Harris Health to limit blood glucose orders to three days or less, though again there was no reason to wait to issue the repeating order for a Type 1 diabetic who would need his blood glucose monitored multiple times a day, every day he remained in the jail.

58. Harris County had originally trained Dr. Alhadad on this short-term blood glucose policy or practice before March 1, 2022 when Harris County retained direct control of jail medical care.

59. Though Harris Health's policymaker knew about Harris County's short-term blood glucose policy or practice, he continued it without change after March 1, 2022 when Harris Health took over direct responsibility for medical care at the jail.

60. At the time of Mr. Shelton's death, it was also the policy or practice of Harris County and Harris Health to limit blood glucose checks of detainees to only twice per day, even if a Jail provider believed a detainee would need his blood glucose checked more than twice a day. Indeed, the standard of care for Type 1 diabetes is to test blood glucose before every meal and before bedtime, not simply twice a day. Yet Harris Health policies and practices, all of which were known to its policymaker and to Harris County's Sheriff, prevented this.

61. Harris County originally trained Dr. Alhadad on the no-more-than-twice-a-day blood glucose policy before March 1, 2022 when Harris County retained direct control of Jail medical care.

62. Though Harris Health's policymaker knew about Harris County's no-more-than-twice-a-day blood glucose policy or practice, he continued it without change after March 1, 2022 when Harris Health took over direct responsibility for medical care at the Jail.

63. Accordingly, and despite knowing that Mr. Shelton's blood glucose needed to be monitored every day, multiple times per day for as long as he remained in the Jail, Dr. Alhadad intentionally and deliberately ordered the Jail medical staff to take Mr. Shelton's blood glucose only twice a day and for only three days, consistent with Harris County's and Harris Health's medication policies and practices.

64.     Dr. Alhadad also ordered Mr. Shelton admitted into the medical clinic at the JPC rather than continue with the rest of the booking process and ordered that he be given IV fluids. In the JPC Clinic, nursing staff administered both short-acting and long-acting insulin and IV fluids to Mr. Shelton.

65.     After Mr. Shelton arrived at the JPC medical clinic, Dr. Alhahad intentionally and deliberately ordered that Mr. Shelton receive a single dose of his daily blood pressure medication despite knowing he would need it every day. This single dose order was also the result of and consistent with Harris County and Harris Health's single dose order policy or practice and training.

66.     Harris Health nursing staff administered this single dose to Mr. Shelton shortly before 6:00 p.m.

67.     Dr. Alhadad left when her shift ended at 6:00 p.m. and Physician's Assistant Daesha Cuttrell-Hendrickson (PA Hendrickson) took over as Mr. Shelton's provider.

68.     Shortly before 6:30 p.m., registered nurse (RN) Mayra Rodriguez measured Mr. Shelton's blood glucose again and found it was 458 mg/dL, still a dangerously high reading.

69.     PA Hendrickson, an employee or contractee through staffing agency Vista Staffing Solutions (Vista), saw Mr. Shelton ten minutes later, obtained information regarding his typical dosages for his short- and long-acting insulin at home, entered this information into Mr. Shelton's medical record, and ordered another single-dose injection of short-acting insulin and additional IV fluids.

70.     During this appointment, PA Hendrickson found that Mr. Shelton was pleasant but anxious about how his diabetes would be accommodated in the Jail.

71.     Approximately two hours later, his blood glucose had finally dropped to 108 mg/dL, a normal reading.

72.     At 8:59 p.m., PA Hendrickson reviewed Mr. Shelton's labs, including his blood glucose, and okayed him to be discharged from the JPC medical clinic to continue the rest of the booking process in the JPC.

73.     But despite knowing that Mr. Shelton needed insulin as an accommodation for his disability every day to survive, PA Hendrickson intentionally and deliberately did not order either short- or long-acting insulin as repeating or maintenance orders, consistent with Harris County and Harris Health's medication policies and practices. In fact, because she could only issue single orders of insulin under Defendants' policies and practices, she instructed Mr. Shelton to notify Harris County detention officers working in the JPC the next time he needed insulin.

74.     Likewise, PA Hendrickson did not order Mr. Shelton's blood pressure medication as a repeating or maintenance order, consistent with Harris County and Harris Health's medication policies or practices.

75.     Though she knew it was necessary to accommodate his disability and for his survival, PA Hendrickson also intentionally and deliberately did not order medical staff to measure Mr. Shelton's blood glucose on a repeating basis for more than three days, consistent with Harris County and Harris Health's medication policies, practices, and training.

76.     Though PA Hendrickson also knew Mr. Shelton needed his blood glucose checked more frequently than twice a day and would have ordered more frequent checks than twice a day if she could have, PA Hendrickson deliberately and intentionally did not order medical staff to measure Mr. Shelton's blood glucose more than twice per day, consistent with Harris County and Harris Health's no-more-than-twice-a-day policy, practice, and training.

77.     Harris County originally contracted with Vista for PA Hendrickson's services and trained her on the single-dose policy or practice, the short-term blood glucose order policy or

practice, and the no-more-than-twice-a-day blood glucose order policy or practice before March 1, 2022.

78.     Harris Health took over the contract with Vista on March 1, 2022 and PA Hendrickson continued working at the jail, following these three policies or practices that Harris Health's policymaker was aware of but intentionally and deliberately had not changed.

79.     Back in the main area of the JPC, shortly after 10:00 p.m. Mr. Shelton appeared before a magistrate judge who placed Mr. Shelton on a PR bond for his two alleged Harris County offenses. After 10:05 p.m. on March 22, 2022, he remained in jail solely on a hold by Waller County, Texas for a years' old misdemeanor DWI charge.

80.     Sometime around midnight, Harris County detention officers gave Mr. Shelton a sandwich and cookies—a typical meal in the JPC. Hungry because he had not eaten in over eight hours, Mr. Shelton ate the carbohydrate-heavy meal.

81.     Though he needed blood glucose monitoring and insulin to account for this meal when it was served as an accommodation for his disability—and Harris County, Harris Health, and his providers knew he needed this—he did not get it, as there was no order for either.

82.     Before detainees are housed at the Harris County Jail, they receive a medical screening called a "New House" assessment by a registered nurse. If the registered nurse identifies the detainee as having any medical condition, the detainee is sent to the JPC Clinic to see a provider who, at that time, can finally enter an order for repeating doses of medication and any necessary lab work, like blood glucose.

83.     During the so-called New House appointment for a Type 1 diabetic, the provider would issue repeating orders for at least daily long-acting insulin, short-acting insulin multiple times a day, and blood glucose checks twice a day (but no more frequently). The provider would

also order diabetic meals, snacks to help control blood glucose dips and spikes, an appointment with a dietician, and an appointment with the Jail's Clinic for follow up within the next 14 days.

84.     Each of these orders – repeating doses of insulin, repeating blood glucose checks, diabetic meals and snacks, and appointments with specialists—were necessary and reasonable accommodations for Mr. Shelton to be able to access the Jail's various programs and services provided to other detainees. He never received these accommodations.

85.     Without these accommodations, Type 1 diabetics at the jail were not able to receive the benefit of the jail's programs and services like safe housing, medical care, detention to be brought to trial, recreation, and food service.

86.     Though detainees at the Harris County Jail can and do stay in the JPC for upwards of 72 hours before receiving their New House assessments, it was the policy or practice of Harris County for no repeating orders of medications, including life-sustaining medications like insulin, to be issued until this assessment.

87.     Likewise, it was the policy or practice of Harris County for no orders for blood glucose to be longer than three days, even for Type 1 diabetics, until the New House assessment.

88.     Though Harris Health's policymaker was aware of these dangerous policies or practices, he continued them without change when Harris Health took over jail medical care on March 1, 2022.

89.     Harris County and Harris Health staff in March 2022 tracked whether a detainee had completed his New House assessment and was ready for housing in the Jail on a piece of paper that contained check boxes and a single line for staff initials titled "JPC Medical Intake Screening." Because of the way the form was designed, it was impossible to determine who documented

whether any given detainee had completed the New House assessment or when the assessment occurred from looking at the paper.

90.     Instead, though the electronic medical records clearly indicated whether a detainee had completed the New House assessment and obtained all necessary orders for medication, lab work, meals, and medical appointments, it was the policy or practice of Harris County and Harris Health staff to rely instead on the single, unattributed "x" on  the JPC Medical Intake Screening paper to confirm a detainee was ready to move out of the JPC and into Jail housing.

91.     At 3:20 a.m. on March 23, 2022, RN Benedicta Edema started Mr. Shelton's New House assessment by conducting a brief medical assessment, logging his home medications into the electronic medical record, and taking his vitals, including his blood glucose. This was the last time Harris County or Harris Health's employees or contractees updated Mr. Shelton's medications (including insulin) in his Jail medical record.

92.     Mr. Shelton's blood glucose at that time was dangerously high again, measuring 429 mg/dL.

93.     Rather than continue with the New House assessment, RN Edema sent Mr. Shelton to the JPC Clinic again on a "stat" rush.

94.     At 3:34 a.m., PA Hendrickson evaluated Mr. Shelton again, reviewed his vitals and blood glucose results, and again, despite knowing Mr. Shelton needed insulin on a repeating basis, issued single-dose orders for both long-acting and short-acting insulin as well as IV fluids. These orders were consistent with and issued in accordance with Harris County and Harris Health's medication policies, practices, and training of waiting until the New House assessment to issue repeating orders, though there was no reason to wait until then to issue these orders.

95.     PA Hendrickson documented this interaction and her orders for Mr. Shelton in the medical record as a "prebooking" note, not a New House assessment note. According to her, this evaluation was not Mr. Shelton's New House assessment and he did not receive any of the repeating orders, diabetic meals, or medical appointments he would have received at the New House assessment.

96.     PA Hendrickson intentionally and deliberately did not order repeating doses of short-acting or long-acting insulin or issue an ongoing order for blood-glucose monitoring for Mr. Shelton to last more than three days despite knowing his disability required it because it was Harris County and Harris Health's policy, practice, and training not to issue these orders until the New House assessment.

97.     RN Rodriguez documented that she administered the single doses of short- and long-acting insulin ordered by PA Hendrickson at or around 3:45 a.m. and started an IV shortly thereafter; however, these administrations were not entered until 4:34 a.m.

98.     When RN Rodriguez took Mr. Shelton's blood glucose again at 5:05 a.m., it had risen alarmingly to 505 mg/dL. When RN Rodriguez took Mr. Shelton's blood glucose again at 5:44 a.m., it had dropped to 335 mg/dL.

99.     Despite 335 mg/dL still being a potentially dangerous blood glucose reading requiring additional monitoring and additional insulin if it did not drop further, PA Hendrickson ordered Mr. Shelton discharged from the JPC medical clinic again at 5:45 a.m. and noted in his medical record "will continue to monitor." This monitoring did not happen.

100.    At that that time, despite it being obviously dangerous to do so, it was the policy or practice of Harris County and Harris Health to treat blood glucose over 300 mg/dL but under 350 mg/dL as "normal" and to provide no medical intervention—that is, to provide no insulin, no

follow-up blood glucose checks, and no additional medical evaluation for detainees with blood glucose in this range.

101.     Harris County instructed PA Hendrickson to treat blood glucose between 300-350 mg/dL as normal and to deny detainees with this blood glucose medical interventions before March 1, 2022.

102.     Harris Health's policymaker, though he knew it was Jail policy or practice to treat blood glucose between 300 and 350 mg/dL as "normal" and to provide no medical intervention, continued this policy or practice without change after Harris Health took over Jail medical care on March 1, 2022.

103.     Accordingly, and consistent with Harris County and Harris Health's policies and practices concerning blood glucose between 300 mg/dL and 350 mg/dL, PA Hendrickson intentionally and deliberately discharged Mr. Shelton from the JPC Clinic without further evaluation, insulin, or blood glucose monitoring once his blood glucose dropped below 350 mg/dL, despite it remaining over 300 mg/dL.

104.     Further, at 5:45 a.m. on March 23, 2022, despite knowing Mr. Shelton would definitely need ongoing blood glucose monitoring and additional at-least daily insulin to accommodate his disability and survive, PA Hendrickson again intentionally and deliberately did not enter a repeating or maintenance order for either short- or long-acting insulin, consistent with Harris County and Harris Health's medication policies and practices.

105.     PA Hendrickson also intentionally and deliberately did not enter an order for Harris County and Harris Health's medical staff to measure Mr. Shelton's blood glucose on a repeating basis or more often than twice a day, consistent with Defendants' medication policies and practices.

106. The March 23rd, 3:45 a.m. single-dose orders for short- and long-acting insulin were the last times Harris County or Harris Health gave Mr. Shelton any insulin.

107. Though PA Hendrickson had not completed a New House Assessment for Mr. Shelton, Harris Health checked the box on his intake form that it was complete. Consistent with Harris County and Harris Health's policies and practices at the time, no one consulted Mr. Shelton's medical records to confirm if he had completed the assessment. Accordingly, Harris County transferred Mr. Shelton out of the JPC.

108. Harris County classification officers specifically assigned Mr. Shelton to the 1200 Baker Street building (1200 Baker) rather than one of the other buildings in the correctional complex because he was a Type 1 diabetic. The 1200 Baker building houses the main Jail medical clinic.

109. In March 2022, Harris County was still implementing Covid-19 quarantine protocols that required incoming detainees to be placed in single-bed cells. Sometime between 9:44 a.m. and 11:30 a.m., Harris County detention officers transferred Mr. Shelton into a single-bed cell in the 2L1 pod in 1200 Baker.

110. At that time, new detainees in single cells for quarantine were allowed out of their cells for only one hour a day and had no contact with other detainees. The only access a detainee had to make phone calls, submit sick call requests or grievances using the kiosk in the dayroom, and shower was this single hour once a day.

111. State laws and regulations required Harris County detention officers to conduct face-to-face observations of detainees in single cells at least every sixty minutes. During these hourly checks, Harris County detention officers were to observe each detainee face-to-face to assess for

signs of psychological or medical distress. This was especially important for Type 1 diabetics as their fluctuating blood glucose levels can, and often do, place them in serious danger.

112.    To aid in identifying medical distress during observations, Harris County trained its detention officers to spot symptoms of asthma attacks, seizures, intoxication and withdrawal, and common adverse reactions to medications.

113.    However, Harris County and Sheriff Gonzalez intentionally and deliberately chose not to train its detention officers to recognize signs or symptoms of low or high blood glucose, diabetic ketoacidosis, or the need for Type 1 diabetics to receive insulin daily, despite the obvious danger of failing to do so and their knowledge that Type 1 diabetics are regularly housed at the Jail.

114.    In 1200 Baker, LVNs assigned to do blood glucose checks and administer insulin to diabetic detainees would be given two lists: one list of detainees to check for blood glucose only and one list of detainees to measure blood glucose and administer insulin (the insulin list).

115.    These lists were auto-generated by the Jail's electronic medical records system. The LVNs obtained these lists in the 1200 Baker Clinic before taking a cart containing insulin, syringes, and blood glucose testing supplies from unit to unit in the Jail, checking blood glucose and administering insulin according to the lists.

116.    At that time, the cart was not equipped with a computer or tablet that would allow the LVN to check any information in a detainee's medical record while interacting with the detainee—like whether they were a Type 1 diabetic.

117.    The two lists also did not indicate whether any detainee on the list was a Type 1 diabetic or why the detainee was ordered to have his blood glucose checked, though this would have been easy to indicate and would have served to notify LVNs that a detainee was a Type 1

diabetic and should be sent to the Clinic to see a provider for high blood glucose, even if they were not on the insulin list.

118. If a detainee asked for insulin, even if they also said they were a Type 1 diabetic, it was the practice of LVNs who circulated with the cart to tell detainees they were "not on the list."

119. It was also Harris County and Harris Health's policy or practice for LVNs to intentionally and deliberately not document these detainee requests for insulin anywhere and not otherwise pass on the request to any other medical personnel or provider who could review or act on the requests.

120. Consistent with Harris County and Harris Health's policies and practices of limiting blood glucose orders to no more than twice a day, the LVNs assigned to the insulin cart circulated in 1200 Baker only twice a day. Harris County and Harris Health's policies required LVNs with the insulin cart to be accompanied by Harris County detention officers.

121. At 4:48 p.m. on March 23, 2022, LVN Charles Esapa came to the 2L1 unit to measure Mr. Shelton's blood glucose and a Harris County detention officer removed Mr. Shelton from his cell. Because there was no order for Mr. Shelton to receive insulin, Mr. Shelton's name was on only the blood glucose list and not the insulin list.

122. It had been a little over 12 hours since Harris Health last administered insulin to Mr. Shelton and he was due for another dose of long-acting insulin, as well as short-acting insulin to account for the carbohydrates in the dinner served at the jail. Despite Harris County and Harris Health's knowledge that Mr. Shelton was a Type 1 diabetic, since Mr. Shelton did not have an order for diabetic meals, he received the same carbohydrate-heavy meal served to other detainees.

123. Mr. Shelton required insulin, a reasonable accommodation for his disability, to be able to be able to digest this meal as well as all others served in the Jail.

124.     But because Mr. Shelton's Type 1 diabetes diagnosis was not indicated on the blood glucose list and LVN Esapa had no access to the electronic medical records once he left the Clinic, LVN Esapa did not confirm that Mr. Shelton was a Type 1 diabetic.

125.     With a detention officer standing within earshot, LVN Esapa took Mr. Shelton's blood glucose. Mr. Shelton's blood glucose was 308 mg/dL, a high blood glucose requiring insulin.

126.     Harris County had trained LVN Esapa to treat blood glucose over 300 mg/dL but less than 350 mg/dL as "normal." Though Harris County and then Harris Health's policies, practices, and training allowed LVN Esapa to send a detainee to the Clinic if there were other symptoms of illness or injury or reasons for concern, Harris County and Harris Health's policies and practices did not allow LVN Esapa to send a detainee to the Clinic solely because of a blood glucose over 300 mg/dL even though they knew such a reading required insulin.

127.     Thus, consistent with Harris County and Harris Health's policies and practices to treat a blood glucose over 300 mg/dL but under 350 mg/dL as "normal" and despite knowing such a reading in fact required insulin for Type 1 diabetics, LVN Esapa intentionally and deliberately did not arrange for Mr. Shelton to go to the Clinic for evaluation of his high blood glucose, insulin, or additional blood glucose monitoring.

128.     Consistent with Harris County and Harris Health's policies and practices to treat a blood glucose over 300 mg/dL but under 350 mg/dL as "normal," LVN Esapa also intentionally and deliberately did not notify a provider of Mr. Shelton's high blood glucose despite knowing that insulin is necessary to accommodate the disability of Type 1 diabetes. In other words, LVN Esapa, pursuant to Harris County and Harris Health's policies, deliberately denied Mr. Shelton the obvious accommodation—insulin—Harris County and Harris Health knew he needed as a Type 1 diabetic.

129.     When LVN Esapa returned to the Clinic about an hour later, he logged Mr. Shelton's 308 mg/dL blood glucose result in the electronic medical record and routed the result as a message through the electronic medical record to Dr. Alhadad and the Harris County Jail Provider Pool.

130.     At the time, it was the policy or practice of Harris County and Harris Health for the results of lab tests to be sent to the ordering provider as well as a provider pool, though there was no policy or practice requiring these messages to be checked by anyone in the provider pool within any sort of timeframe, even if the lab result was for blood glucose for a Type 1 diabetic. Accordingly, on information and belief, the practice at the time was for providers in the provider pool to take several days to review and acknowledge these lab results.

131.     Dr. Alhadad did not work again until March 29, 2022, after Mr. Shelton died, so she did not receive notification of this blood glucose until that date as she had no access to the electronic medical record outside of the Jail and no one from Harris Health bothered to check his records to see what anyone would know—Mr. Shelton needed insulin.

132.     Though Harris County Jail has providers at the Jail 24 hours a day and, on information and belief, these providers receive notifications that there is a lab result waiting for the provider pool, no provider checked the message for this lab result until seven days later, on March 30, 2022 when Physician's Assistant Josephine Peters (PA Peters) opened it. Of course, by then it was too late.

133.     Accordingly, Mr. Shelton was not evaluated by a provider on the afternoon or early evening of March 23, 2022, nor did any of Harris County's or Harris Health's employees or contractees order any insulin for Mr. Shelton's high blood glucose at 4:48 p.m. even though they each knew Type 1 diabetics like Mr. Shelton need it to survive.  As a consequence, Mr. Shelton's blood glucose continued to rise to more dangerous levels.

134.     LVN Samuel Ogunsanya was assigned to the insulin cart for the overnight shift from March 23 – March 24, 2022. He printed the auto-generated blood glucose only list and the insulin list and set out with the insulin cart.

135.     On March 24, 2022, around 1:50 a.m., LVN Ogunsanya came to the Mr. Shelton's unit to measure Mr. Shelton's blood glucose and an unidentified Harris County detention officer again removed Mr. Shelton from his cell. Once again, because there was no order for Mr. Shelton to receive insulin, his name was on only the blood glucose list and not the insulin list.

136.     With the unidentified detention officer standing within earshot, LVN Ognsanya took Mr. Shelton's blood glucose, which was 352 mg/dL, a similarly high blood glucose requiring insulin and, as expected, was notably higher than the glucose taken approximately nine hours before.

137.     Of course, because LVN Ogunsanya's insulin cart did not have a computer or tablet on it to access electronic medical records, LVN Ogunsanya did not know that Mr. Shelton's blood glucose less than 12 hours before was also over 300 mg/dL.

138.     According to the Mayo Clinic, Type 1 diabetics with two back-to-back blood glucose readings over 300 mg/dL should receive emergency medical care. This care is needed to, among other reasons, test for and treat potential diabetic ketoacidosis.

139.     By 1:54 a.m. on March 24, 2022, it had been almost 24 hours since Mr. Shelton's last dose of long-acting insulin and any residual effect the long-acting insulin had to control his blood glucose had worn off.

140.     When Mr. Shelton asked LVN Ogunsanya for insulin, LVN Ogunsanya told him that he was not on the list.

141.     Instead, LVN Ogunsanya gave Mr. Shelton a white medical pass to give to Harris County detention officers indicating that he needed to go to the Clinic.

142.     When medical staff give a detainee at the Harris County Jail a white medical pass, a Harris County detention officer still has to issue a red transit pass to the detainee which authorizes movement in the Jail.

143.     The red transit pass includes the date and time the pass was issued, the intended destination of the detainee, and initials for the officer issuing the pass as well as blanks for the receiving deputy at the clinic to mark the time the detainee arrived.  The bottom portion of the pass serves as a return pass back to the cellblock and includes spaces for the date, time, and initials of the officer sending the detainee back from the Clinic.

144.     Because Mr. Shelton was still in his Covid quarantine, he was required to be escorted by a Harris County detention officer to the Clinic in 1200 Baker.

145.     On information and belief, in March 2022, Harris County Jail was severely understaffed with not enough detention officers available to issue passes and escort detainees with passes to the Clinic.

146.     According to LVN Ogunsanya, at the same time he gave Mr. Shelton the pass, he also directly told the unidentified Harris County detention officer accompanying him with the insulin cart that Mr. Shelton needed to be taken to the Clinic right away. This detention officer saw LVN Ogunsanya fill out and give Mr. Shelton the white medical pass.

147.     Despite LVN Ogunsanya's issuing Mr. Shelton a white pass and telling the Harris County detention officer accompanying him that Mr. Shelton needed to go to the Clinic, no Harris County detention officer issued Mr. Shelton a red pass to the Clinic on March 24, 2022 and no Harris County detention officer took Mr. Shelton to the Clinic.

148. Though Harris County has not identified this detention officer despite repeated requests to do so, on information and belief, this detention officer was Defendant Detention Officer Charley Lauder. Alternatively, this Defendant Detention Officer was Elizabeth Garcia, Paulino Olguin, William Russell, Garrett Woods, Timothy Owens, Kalin Stanford, Brayan Silva, Amber Bailey, Amalia Ruiz, Jeremiah Adebola, Allyson Hurd, Dentrell Woods, Kimberly Rossell, Marvin Perkins, Lonnie Brooks, Sergeant Alejandro Nieto, or Sergeant Bryan Collins.

149. On information and belief, and based on the unidentified detention officer that told all of the other Defendant Detention Officers and Sergeants working at 1:55 a.m. on March 24, 2022 that LVN Ogunsany had directed that Mr. Shelton needed to be taken to the Clinic.

150. Accordingly, each of the Defendant Detention Officers knew and understood that Mr. Shelton needed to be taken to the Clinic and that they had a duty to escort him or ensure he was immediately escorted to the Clinic. Rather than take him, they intentionally and deliberately ignored and disregarded the nurse's instruction and intentionally and deliberately failed to to get or escort Mr. Shelton to the Clinic. Each acted with deliberate indifference to Mr. Shelton's serious medical needs, as each knew that the consequences of not taking someone sick and in need of immediate care would be dire

151. At the time this Defendant Detention Officers intentionally chose not to issue a transit pass or escort Mr. Shelton to the Clinic, the Jail was also insufficiently staffed. Nevertheless, the Defendant Detention Officers did not care enough about Mr. Shelton and his condition to even try to find another detention officer in the Jail to escort him or to call the Clinic to alert a provider that Mr. Shelton needed to be seen.

152. Even after being told that Mr. Shelton needed to be escorted to the Clinic immediately to address a serious medical need, the Defendant Detention Officers deliberately and intentionally

also failed or refused to monitor or observe Mr. Shelton for signs his medical condition was worsening, which it obviously was. This deliberate and intentional decision to refuse or fail to monitor Mr. Shelton and ignore the serious medical condition of which they were aware was made with deliberate indifference to Mr. Shelton's serious medical needs.

153.     Because detainees with diabetes were spread out in the 1200 Baker building in March 2022, it often took LVNs with the insulin cart several hours to complete their rounds with the blood glucose list and insulin list. According to Harris County Jail staff, this time was extended by lack of Harris County detention officers to accompany LVNs with the cart.[2]

154.     LVN Ogunsanya did not complete his rounds and return to the Clinic until around 3:00 a.m., an hour after he saw Mr. Shelton. At that time, LVN Ogunsanya told the Clinic charge nurse that he had given Mr. Shelton a pass to the Clinic for high blood glucose.

155.     In March 2022, Harris County and Harris Health's policy and practice, which was known to their policymakers, was to not follow up if a detainee was given a medical pass to the Clinic but did not present to the Clinic, even if the detainee was a Type 1 diabetic whom medical personnel all knew needed insulin to accommodate their disability and to survive. This was the policy or practice even if the Type 1 diabetic's blood glucose was over 300 mg/dL, indicating an immediate need for insulin—no follow up was done.

156.     Accordingly, no one – not LVN Ogunsanya, the charge nurse, or the provider in the Clinic—followed up with Mr. Shelton or the Harris County detention officers assigned to the 2L1 unit to see why Mr. Shelton had not come to the Clinic or insist he be escorted to the Clinic. This decision not to have Mr. Shelton transported or escorted the Clinic is all the more shocking as

---

[2] *See, John Doe 1 & John Doe 2 v. Harris County, Texas, et al.*, Cause No. 4:21-cv-03036 in the United States District Court for the Southern District of Texas, Plaintiffs' Original Complaint for Declaratory Judgment and Injunctive Relief, p. 33, ¶ 83 (nurse employed by Harris County relaying that lack of staff causes nurses taking medication carts around the jail to have to wait for detention officers, meaning detainees do not receive their medications as prescribed.)

every medical provider and nurse at Harris Health or in the Jail knew that failing to provide insulin to a detainee with high blood glucose levels endangered a Type 1 diabetic's life. Likewise, no one consulted his medical records to see if there was an order for him to receive inulin for his high blood glucose. These refusals or failures to follow up and to review his medical records were intentional and deliberate and made in line with Harris County and Harris Health's policies and practices.

157.     After returning to the Clinic, LVN Ogunsanya logged Mr. Shelton's 352 mg/dL blood glucose result in his medical record at 3:21 a.m. on March 24, 2022, and added a note that he had given Mr. Shelton a pass.

158.     LVN Ogunsanya also routed the blood glucose result to Dr. Alhadad and the Harris County Jail Providers Pool.

159.     Consistent with Harris County and Harris Health's policies and practices, the provider pool message was intentionally and deliberately not checked for six days until March 30, 2022, so no provider received notification of Mr. Shelton's high blood glucose and immediate need for insulin until after he had died.

160.     Accordingly, Mr. Shelton was not evaluated by any medical providers nor did providers order any insulin in response to Mr. Shelton's dangerously high blood glucose at 1:54 a.m. on March 24, 2022, though all of them knew that a Type 1 diabetic with blood glucose of 352mg/dL needed immediate insulin and would develop diabetic ketoacidosis if untreated. As a result, Mr. Shelton's blood glucose continued to rise.

161.     Though Dr. Alhadad's three-day order required medical staff to check Mr. Shelton's blood glucose again at 8 p.m. on March 24, 2022 and 8 a.m. on March 25, 2022, the measure at 1:54 a.m. on March 24, 2022, was the last time Harris County and Harris Health ever bothered to

monitor Mr. Shelton's blood glucose.  No one took his blood glucose again until he died more than three full days later.

162.     Of course, Harris County and Harris Health already knew that Mr. Shelton was a Type 1 diabetic, knew that his blood glucose levels were at unsafe levels and knew he needed insulin. But because of their policies and indifference, Mr. Shelton was discriminated against and denied the most basic accommodations every diabetic person housed in a jail needs to live: insulin and glucose monitoring every day, multiple times a day.

163.     As a direct result of Harris County and Harris Health's actions, practices, and the dangerous conditions of the Harris County Jail, Mr. Shelton's disability was utterly and deliberately disregarded and he died a painful death.

164.     On the evening of March 24, 2022, during the one hour he was allowed out of his cell, Mr. Shelton called his sister, Plaintiff Sarah Borchgrevink, and told her that he couldn't get any insulin. He repeated what LVN Ogunsanya told him—that his name was not on the list to receive insulin.

165.     Mr. Shelton reported that he could not receive insulin until he saw a doctor but he didn't know how to see one as he had never been booked into the Harris County Jail and, on information and belief, did not know how to use the kiosk to submit a sick call request to see a doctor. None of the Defendant Detention Officers—or any other detention officer or medical personnel—showed him how to do so.

166.     Instead, in a futile attempt to control his blood glucose, Mr. Shelton told his sister he was refraining from eating.

167.     Though Mr. Shelton's Covid test results came back negative the following morning, March 25, 2022, he remained in a single cell, with no cellmate who could also have tried to alert

detention officers as Mr. Shelton began to suffer and grow increasingly sick from Harris County and Harris Health's denial of insulin. He likewise remained subject to the Covid restrictions requiring he be escorted by a detention officer if he left the unit.

168. On information and belief, by the time Harris County detention officers delivered breakfast on March 25, 2022, Mr. Shelton was experiencing the effects of diabetic ketoacidosis including but not limited to nausea, headache, thirst, weakness, pain, a red and flushed face, and labored breathing.

169. On information and belief, throughout the day on March 25, 2022, Mr. Shelton told Defendant Detention Officers Charley Lauder, Garrett Woods, Lonnie Brooks, and Amalia Ruiz that he was a Type 1 diabetic, needed insulin, needed a doctor, and had symptoms of diabetic ketoacidosis.

170. On information and belief, and consistent with Harris County's complete failure to train them concerning Type 1 diabetes and despite knowing he needed to be taken to the Clinic, each of these four Defendant Detention Officers ignored Mr. Shelton's medical distress and pleas for help and deliberately and intentionally failed or refused to contact the Clinic to report Mr. Shelton's symptoms, diagnosis, or request for insulin to any medical provider who could have checked Mr. Shelton's medical records, identified he was a Type 1 diabetic, and ordered insulin or, at a minimum, ordered he be brought to the Clinic for evaluation.

171. Each of these Defendant Detention Officers also intentionally failed or refused to contact the Clinic to report Mr. Shelton's symptoms of medical distress, even though by this time they knew he needed immediate medical attention as it was obvious, even without training, that Mr. Shelton was in medical distress.

172.    Likewise, each of these four Defendant Detention Officers intentionally and deliberately refused or failed to explain to Mr. Shelton how to submit a sick call request.

173.    In March 2022, Harris County detention officers logged observation checks using a program called CorreTrack loaded onto a device approximately the size of an iPhone.

174.    On March 25, 2022 during the day, Defendant Detention Officers Charley Lauder, Garrett Woods, Lonnie Brooks, and Amalia Ruiz were charged with observing each of the detainees on 2L1, including Mr. Shelton, and logging these rounds using CorreTrak.

175.    On information and belief, in March 2022, it was the regular practice of Harris County detention officers to intentionally and deliberately fail or refuse to conduct observation checks on detainees in single cells. Instead of stopping at each cell to assess the condition of the detainee and check for medical distress, it was the intentional and deliberate practice of officers to walk by, often without breaking stride or even turning their heads in the direction of the cells they were supposed to be observing detainees in.

176.    This practice is reflected in the CorreTrak Rounds Activity record on March 25, 2022 which reflect that the Defendant Detention Officers who conducted the observation rounds recorded at 3:24 p.m.,[3] 4:20 p.m., 5:16 p.m., and 5:51 p.m. each took less than four minutes to observe all 24 of the detainees housed in individual cells on the two-story 2L1 unit.

177.    Though Harris County intentionally destroyed surveillance video evidence of these rounds after receiving a Texas Public Information Act Request, it is likely that most if not all of the observation checks completed by Defendant Officers Charley Lauder, Lonnie Brooks, Garrett Woods, and Amalia Ruiz on March 25, 2022 were intentionally and deliberately conducted without

---

[3] Though Plaintiffs' counsel timely requested records be preserved, Rounds Activity documentation before March 25, 2022 at 3:24 p.m. was destroyed by Harris County.

actually stopping at Mr. Shelton's cell and assessing his condition and whether he was in any medical distress.

178.    By the time Defendant Detention Officer Amalia Ruiz delivered dinner to Mr. Shelton's cell around 3:20 p.m. on March 25, 2022, Mr. Shelton had not eaten much of anything from his breakfast and lunch containers. Defendant Detention Officer Ruiz would have noticed Mr. Shelton still had his meals from earlier in the day, yet she did nothing about this, even after Mr. Shelton told her, again, he was a Type 1 diabetic, was feeling sick from not receiving insulin, and couldn't eat (or continue to live) without it.

179.    At the time of Mr. Shelton's death, it was the practice of Harris County and Harris Health for their employees and contractees not to notify providers or any other medical personnel when diabetic detainees skipped or ate only partial meals or to document this information anywhere.

180.    Thus, consistent with Harris County's policy or practice, Defendant Detention Officer Ruiz intentionally and deliberately failed or refused to notify anyone that Mr. Shelton had not eaten all day and intentionally and deliberately failed or refused to document this information anywhere.

181.    Accordingly, on March 25, 2022, no provider or medical personnel was told that a detainee who said he was a Type 1 diabetic was missing or skipping meals or that Matthew Shelton needed immediate help for his serious condition.

182.    In March 2022, it was also the practice of Harris County detention officers to intentionally and deliberately conduct rounds using the CorreTrak device while logged in as a different detention officer, making it impossible to confirm from the Rounds Activity record alone which detention officer completed an observation check.

183.    At that time it was likewise the intentional and deliberate practice of Harris County detention officers to log observation checks using the CorreTrak device but not actually enter the unit to conduct the checks, making it impossible to confirm from the Rounds Activity report whether an observation check was in fact done, though state regulations required them at least every sixty minutes. When CorreTrak records were intentionally and deliberately falsified in this manner, detainees would go two hours or more without detention officers making even an attempt to observe them.

184.    Accordingly, though Detention Officer Amalia Ruiz's login was used to log the 3:25 p.m., 4:20 p.m., 5:16 p.m., and 5:51 p.m. observation checks, it is likely these checks were instead completed by Detention Officers Charley Lauder, Lonnie Brooks, and Garrett Woods. These checks were falsified with Detention Officer Ruiz's knowledge and to help her appear to have completed her assigned observation checks.

185.    Consistent with Harris County practice at the time, each of these Defendant Detention Officers deliberately and intentionally failed or refused to stop at Mr. Shelton's cell to check whether he was in medical distress.

186.    Had they done so, they would have seen that Mr. Shelton's face was deeply flushed, he was obviously experiencing fatigue and severe pain, and he was breathing at an alarmingly rapid pace.

187.    Alternatively, though Detention Officer Amalia Ruiz's login was used to log the 4:20 p.m., 5:16 p.m., and 5:51 p.m. observation checks, it is likely that none of the Defendant Detention Officers charged with completing these observations – Charley Lauder, Lonnie Brooks, Garrett Woods, and Amalia Ruiz—actually completed them. Instead, these Defendant Officers

intentionally and deliberately committed a fraud and falsified the CorreTrak records by indicating a check was done when it was not done.

188.     Thus Mr. Shelton spent the day alone in his cell, unattended to, as the pain in his stomach, muscles, and head worsened, his thirst became insatiable, he experienced nausea and vomiting, he struggled to breathe, and he became increasingly disoriented.

189.     On information and belief, the Defendant Detention Officers working on March 25, 2022 failed to check on Mr. Shelton at all and did not even offer him the ability to leave his cell for an hour out.

190.     Alternatively, by the time Defendant Detention Officers working during the afternoon or evening of March 25, 2022 offered Mr. Shelton his hour out of his cell to shower and make phone calls, Mr. Shelton was in so much pain and in such a confused state that he was not able to leave his cell to contact his family as he had the day before.

191.     Despite the fact that Mr. Shelton's obvious weakness, illness, and disorientation prevented him from leaving his cell for his hour out, each of the Defendant Detention Officers who was working on March 25, 2022 intentionally and deliberately failed or refused to contact medical personnel to seek assistance for Mr. Shelton.

192.     Following shift change around 6:00 p.m. on March 25, 2022, Defendant Detention Officers Paulino Olguin, Jeremiah Adebola, Amber Bailey, Marvin Perkins, and Kimberly Rossell took over responsibility for observation checks on Mr. Shelton's unit.

193.     Once again, consistent with Harris County's practice of detention officers logging observation checks logged in as other officers, it is likely that Defendants Jeremiah Adebola, Marvin Perkins, and Kimberly Rossell each intentionally and deliberately completed at least one of the twelve observation check rounds logged under Defendant Detention Officer Amber Bailey's

name. These checks were falsified with Detention Officer Bailey's knowledge and to help her appear to have completed her assigned observation checks.

194. Consistent with Harris County practices of not assessing each individual detainee for signs of distress during observation checks, the thirteen observation checks logged under the names of Defendant Detention Officers Paulino Ogluin and Amber Bailey between 6:47 p.m. on March 25, 2022 and 6:11 a.m. on March 26, 2022 indicate it took only one to two minutes to individually "observe" all 24 detainees in the two-story unit.

195. Though Harris County intentionally destroyed surveillance video evidence showing these rounds, it is also likely that of the thirteen rounds logged in CorreTrak between 6:47 p.m. and 6:11 a.m., several rounds were intentionally and deliberately falsified and none of the Defendant Detention Officers charged with completing these rounds – Paulino Olguin, Jeremiah Adebola, Amber Bailey, Marvin Perkins, and Kimberly Rossell—even entered the unit when the Rounds Activity report indicates a check was done and thus none of them actually observed Mr. Shelton for signs of medical distress at least hourly. This failure to refusal to observe Mr. Shelton as required was an intentional and deliberate choice by the Defendant Detention Officers that each knew endangered detainees and was consistent with Harris County practices.

196. Had these Defendant Detention Officers actually observed Mr. Shelton for medical distress, they would have noticed that Mr. Shelton's face was flushed, he was obviously experiencing fatigue and severe pain, and he was breathing at an alarmingly rapid pace.

197. On information and belief, Mr. Shelton told each of the Defendant Detention Officers Paulino Olguin, Jeremiah Adebola, Amber Bailey, Marvin Perkins, and Kimberly Rossell at least once between 6:47 p.m. on March 25, 2022 and 6:11 a.m. on March 26, 2022 that he was a Type 1 diabetic, was sick, and would die without insulin. During these brief conversations, on

information and belief, Mr. Shelton also obviously appeared to be in medical distress: his face was flushed, he appeared weak and in pain, and he was breathing at a rapid pace as he gasped for air.

198.    Alternatively, he was so sick and in so much pain he could not even muster the strength to even ask for help.

199.    Consistent with Harris County's failure to train them concerning Type 1 diabetes, each of these five Defendant Detention Officers deliberately and intentionally failed or refused to contact the Clinic to report Mr. Shelton's symptoms, diagnosis, or request for insulin to any medical personnel who could have checked Mr. Shelton's medical records, identified he was a Type 1 diabetic, discovered his alarmingly high blood glucose reading from earlier, determined he was in diabetic ketoacidosis, and ordered the insulin he needed to save his life or gotten him to the hospital.

200.    Thus, consistent with Harris County's policies, procedures, and lack of training, Mr. Shelton's self-identification as a Type 1 diabetic, his requests for insulin, and his obvious symptoms of medical distress were not communicated to any provider or other medical personnel who could have acted on them, though these were necessary and reasonable accommodations for his disability.

201.    Each of these five Defendant Detention Officers also intentionally failed or refused to contact the Clinic to report Mr. Shelton's symptoms of medical distress, even though by this time they knew he needed immediate medical attention as it was obvious, even without training, that Mr. Shelton was in medical distress.

202.    Likewise, each of these Defendant Detention Officers deliberately and intentionally failed or refused to explain to Mr. Shelton how to submit a sick call request.

203. Instead, Mr. Shelton was left to suffer severe stomach and muscle pain, headaches, extreme thirst, nausea, and vomiting alone in his cell with no help. Throughout the night, he suffered pain akin to torture, became increasingly disoriented, and struggled to breathe.

204. On information and belief, even during hours when these Defendant Detention Officers might have expected Mr. Shelton to be sleeping, his rapid, gasping breaths were an obvious indication that Mr. Shelton was in medical distress had they bothered to look.

205. On the morning of March 26, 2022, Defendant Detention Officers Allyson Hurd, Dentrell Woods, Garrett Woods, and Brayan Silva were assigned to the 2L1 unit and responsible for conducting the observation checks during the day as well as passing out lunch and dinner. Defendant Sergeant Bryan Collins was responsible for supervising these Defendant Detention Officers, including conducting at least one observation round himself.

206. Between 6:41 a.m. and 6:22 p.m., fifteen observation checks were logged into CorreTrak—twelve by Defendant Detention Officer Garrett Woods, one by Defendant Detention Officer Brayan Silva, and two as supervisor rounds by Defendant Sergeant Bryan Collins.

207. Consistent with Harris County's practice of detention officers logging observation checks logged in as other officers, it is likely that Defendant Detention Officers Allyson Hurd and Dentrell Woods each completed at least one of the twelve observation rounds while intentionally and deliberately logged in as Defendant Detention Officer Garrett Woods. These checks were falsified with Detention Officer Garrett Wood's knowledge and to help him appear to have completed his assigned observation checks.

208. Consistent with Harris County practices of not assessing each individual detainee for signs of distress during observation checks, the fifteen observation checks logged between 6:41 a.m. and 6:22 p.m. on March 26, 2022 were each entered indicating the Defendant Detention

Officers individually "checked" all 24 detainees in two-story unit in less than five minutes, including the supervisor round.

209.     Though fifteen rounds were logged in CorreTrak between 6:41 a.m. and 6:22 p.m., it is also likely many of these rounds were intentionally and deliberately falsified and none of the Defendant Detention Officers charged with completing these rounds – Allyson Hurd, Dentrell Woods, Garrett Woods, Brayan Silva, and Sergeant Bryan Collins—even entered the unit when the Rounds Activity report indicates a check was done and thus none of them actually observed Mr. Shelton for signs of medical distress at least hourly.

210.     On information and belief, Mr. Shelton told each of the Defendant Detention Officers Allyson Hurd, Dentrell Woods, Garrett Woods, and Brayan Silva, and Sergeant Bryan Collins at least once between 6:41 a.m. and 6:22 p.m. on March 26, 2022 that he was a Type 1 diabetic, needed insulin, was feeling ill, and would die without insulin. During these brief conversations, on information and belief, Mr. Shelton was in obvious medical distress including being obviously weak, in pain, and confused.  On information and belief, his face was alarmingly flushed and he was rapidly gasping for air.

211.     Consistent with Harris County's failure to train them concerning Type 1 diabetes, each of these five Defendant Detention Officers and Defendant Sergeant Collins intentionally and deliberately failed or refused to contact the Clinic to report Mr. Shelton's symptoms, diagnosis, or request for insulin to any medical provider who could have checked Mr. Shelton's medical records, identified he was a Type 1 diabetic, and ordered insulin.

212.     Each of these five Defendant Detention Officers and Sergeant Collins also intentionally failed or refused to contact the Clinic to report Mr. Shelton's symptoms of medical

distress, even though by this time they knew he needed immediate medical attention as it was obvious, even without training, that Mr. Shelton was in medical distress.

213.     Thus, consistent with Harris County's policies, procedures, and lack of training, Mr. Shelton's self-identification as a Type 1 diabetic, his requests for insulin, and his obvious symptoms of medical distress were not communicated to any provider or other medical personnel who could have acted on them.

214.     As with the day before, Mr. Shelton again tried futilely to control his blood glucose and safe his life by not eating. Though the Defendant Detention Officers who delivered meals to Mr. Shelton's unit on March 26, 2022 saw that he had five (lunch) and then six (dinner) food containers in his cell, they deliberately and intentionally failed or refused to contact the Clinic to report that a detainee who said he was a Type 1 diabetic had not eaten in at least two days.

215.     This failure to report that a Type 1 diabetic was missing or skipping meals was consistent with Harris County's practice at the time of not reporting or documenting when a Type 1 diabetic missed or skipped meals, though reporting was a necessary and reasonable accommodation for his disability.

216.     Thus, consistent with Harris County Jail policies and procedures, these actions were not relayed to a provider or otherwise documented in Mr. Shelton's medical record.

217.     On information and belief, by the time the Defendant Detention Officers working during the afternoon or evening of March 26, 2022 offered Mr. Shelton his hour out of his cell to shower and make phone calls, Mr. Shelton was too weak, sick, and disoriented to leave his cell.

218.     Despite the fact that Mr. Shelton's obvious weakness, illness, and disorientation prevented him from leaving his cell for his hour out, none of the Defendant Detention Officers

who worked on March 26, 2022 contacted medical personnel to seek assistance for Mr. Shelton though it was obvious and they knew he needed medical attention.

219.     Around 6:00 p.m. on March 26, 2022, Defendant Detention Officers Elizabeth Garcia, William Russell, Kalin Stanford, Jeremiah Adebola, Paulino Olguin, and Timothy Owens as well as Defendant Sergeant Alejandro Nieto came on duty and had the responsibility for conducting observation checks on Mr. Shelton's unit.

220.     Between 7:18 p.m. and 11:43 p.m., six observation checks were logged into CorreTrack: five under Defendant Detention Officer Elizabeth Garcia and one under Defendant Detention Officer Timothy Owens.

221.     Consistent with Harris County's practice of detention officers logging observation checks logged in as other officers, it is likely some of these checks were completed by other Defendant Detention Officers on shift—William Russell, Kalin Stanford, Jeremiah Adebola, and Paulino Olguin—while intentionally and deliberately logged in as Elizabeth Garcia or Timothy Owens. These checks were falsified with Detention Officer Garcia's and Detention Officer Owens's knowledge and to help them appear to have completed their assigned observation checks.

222.     Consistent with Harris County practices of not assessing each individual detainee for signs of distress during observation checks, these six observation checks logged between 7:18 p.m. and 11:43 p.m. on March 26, 2022 each took only one to three minutes to individually "observe" all of the detainees in the 24-bed, two-story unit, including the supervisor round.

223.     Though six rounds were allegedly logged in CorreTrak between 7:18 p.m. and 11:43 p.m., it is also likely, many of these rounds were intentionally and deliberately falsified and none of the Defendant Detention Officers charged with completing these rounds – Elizabeth Garcia, William Russell, Kalin Stanford, Jeremiah Adebola, Paulino Olguin, and Timothy Owens—even

entered the unit when the Rounds Activity report indicates a check was done and thus none of them actually observed Mr. Shelton for signs of medical distress at least hourly.

224.    On information and belief, had they done so, they would have seen Mr. Shelton was in obvious pain, weak, vomiting, and rapidly gasping for air with an unnaturally flushed red face. On information and belief, even during hours when Defendant Detention Officers might have expected Mr. Shelton to be sleeping, his rapid, gasping breaths were an obvious indication that Mr. Shelton was in medical distress, had they bothered to look.

225.    At some point before 12:39 a.m. on March 27, 2022, upon information and belief, Mr. Shelton removed his shirt. Because Mr. Shelton had a relatively thin frame, the rise and fall (or lack therefore) of his chest and ribs as he took breaths was obvious or would have been obvious to any Defendant Detention Officer who actually looked to see if he was breathing. On information and belief, this made Mr. Shelton's desperate and gasping breaths even more obvious and apparent.

226.    At 12:39 a.m. on March 27, 2022, Defendant Detention Officer Paulino Olguin intentionally and deliberately falsely logged into CorreTrak as Defendant Elizabeth Garcia. This check was falsified with Detention Officer Garcia's knowledge and to help her appear to have completed her assigned observation checks.

227.    Consistent with Harris County practices regarding how observation checks were completed, during this observation round when he reached Mr. Shelton's cell door, Defendant Detention Officer Paulino Olguin intentionally and deliberately did not break stride or even turn his head to glance in the direction of Mr. Shelton's cell. It was therefore impossible for him to see Mr. Shelton, much less determine whether Mr. Shelton was in medical distress.

228.    When Defendant Detention Officers Paulino Olguin and Elizabeth Garcia deliberately and intentionally failed to check on Mr. Shelton at 12:39 a.m., Mr. Shelton had been denied insulin

for almost four full days. He was in severe and obvious distress from diabetic ketoacidosis and would die within hours.

229.     At 1:30 a.m., Defendant Detention Officer William Russell logged that he completed an observation check; however, consistent with Harris County practices, he too intentionally and deliberately did not glance in the direction of Mr. Shelton's cell as he walked past before falsely marking that everything on the unit was "all clear."

230.     When Defendant Detention Officer William Russell deliberately and intentionally failed to check on Mr. Shelton at 1:30 a.m., Mr. Shelton was in severe and obvious distress from diabetic ketoacidosis. Upon information and belief, his face was deeply red, his nose was bleeding, and he was rapidly gasping for air. There was blood or vomit on the floor near his head.

231.     At 2:16 a.m., Defendant Detention Officer Elizabeth Garcia falsely logged that she observed Mr. Shelton; however, consistent with Harris County practices, she also intentionally and deliberately did not so much as turn her head to look at Mr. Shelton's door, much less look to see if he was in medical distress as she walked by.

232.     When Defendant Detention Officer Elizabeth Garcia deliberately and intentionally failed to check on Mr. Shelton at 2:16 a.m., Mr. Shelton was in severe and obvious distress from diabetic ketoacidosis. Upon information and belief, his face was deeply red, his nose was bleeding, and he was rapidly gasping for air. There was blood or vomit on the floor near his head.

233.     At 2:58 a.m. Defendant Detention Officer Timothy Owens logged an observation check for the 2L1 unit in CorreTrak. Defendant Detention Officer Owens intentionally and deliberately did not stop at Mr. Shelton's door, consistent with Harris County practices. Upon information and belief, had he done so, he would have seen Mr. Shelton in severe and obvious distress from diabetic ketoacidosis. Upon information and belief, his face was deeply red, his nose

was bleeding, and he was rapidly gasping for air. There was blood or vomit on the floor near his head.

234.     At 3:52 a.m., Defendant Sergeant Alejandro Nieto logged into CorreTrak and intentionally and deliberately walked by Mr. Shelton's cell without looking into the window to observe Mr. Shelton, consistent with Harris County practices. Upon information and belief, had he taken even a moment to actually observe Mr. Shelton, he would have seen that Mr. Shelton was taking rapid and deep gasps of air and deeply flushed—all obvious signs of medical distress and indication that Mr. Shelton was dying from diabetic ketoacidosis as a result of Harris County and Harris Health's intentional and deliberate denial of insulin.

235.     At 4:47 a.m., Defendant Detention Officer Paulino Olguin deliberately and intentionally logged into CorreTrak as Defendant Detention Officer Timothy Owens, consistent with Harris County practices regarding falsifying which officer completed observation rounds. Defendant Olguin falsified this check with Defendant Owens' knowledge.

236.     When Defendant Detention Officer Paulino Olguin walked past Mr. Shelton's cell at 4:47 a.m. on March 27, 2022, like each of the Defendant Detention Officers before him and consistent with Harris County practices, he intentionally and deliberately did not actually observe Mr. Shelton who was in obvious and severe medical distress. Upon information and belief, Mr. Shelton's face was deeply red, his nose was bleeding, and he was rapidly gasping for air. There was blood or vomit on the floor near his head.

237.     At 5:37 a.m., Defendant Detention Officer Paulino Olguin again deliberately and intentionally falsified CorreTrak records, this time logging in as Defendant Detention Officer Kalin Stanford. Defendant Olguin falsified this check with full knowledge of Defendant Stanford who was responsible for completing this check. As with the preceding check, Defendant Olguin

acted in accordance with Harris County's practices at the time of detention officers logging in as other officers to complete checks.

238.     For the third time in five hours, Defendant Olguin intentionally and deliberately did not observe Mr. Shelton and so did not notice that he was visibly in life-threatening distress. Had Defendant Olguin stopped and actually looked at Mr. Shelton, upon information and belief, he would have seen Mr. Shelton's face was deeply red, his nose was bleeding, and he was rapidly gasping for air. There was blood or vomit on the floor near his head.

239.     Sometime around 6:00 a.m., the 2L1 dayshift arrived. Defendant Detention Officers Charley Lauder and Garrett Woods were responsible for completing observation checks on Mr. Shelton every sixty minutes over the next twelve hours. Defendant Sergeant Bryan Collins was the supervisor of Defendants Lauder and Woods on March 27, 2022 and was also charged with completing at least one round of supervisor observation checks. Defendant Detention Officer Paulino Olguin continued to work overtime on the 2L1 unit for a few more hours after the 6:00 a.m. shift change.

240.     In March 2022, as was the pattern known to the Sheriff, the Harris County Jail was severely understaffed, with detention officers often forced to work mandatory overtime. Such gross understaffing led to detention officers feeling pressured to rush through completing duties like observation rounds and endangered detainees.

241.     Accordingly, on March 27, 2022, Defendant Detention Officers Paulino Olguin, Charley Lauder, and Garrett Woods and Defendant Sergeant Collins were all working overtime.

242.     At 6:26 a.m. Defendant Detention Officer Paulino Olguin again logged into CorreTrak, this time as himself. Once again, Defendant Olguin intentionally and deliberately walked by Mr. Shelton's cell without actually confirming whether Mr. Shelton was in distress or

even alive. Upon information and belief, Mr. Shelton was in obvious distress—his face was deeply red, his nose was bleeding, and he was rapidly gasping for air. There was blood or vomit on the floor near his head.

243. At 7:19 a.m., Defendant Detention Officer Paulino Olguin logged his last check of Mr. Shelton. Consistent with Harris County practices and for the fifth time that day, Defendant Olguin intentionally and deliberately walked by Mr. Shelton's cell without observing him. Upon information and belief, at that time, Mr. Shelton was in obvious and potentially deadly distress, a fact that was obvious and apparent to anyone who looked at him. His face was deeply red, his nose was bleeding, and he was rapidly gasping for air. There was blood or vomit on the floor near his head.

244. At 8:03 a.m., consistent with Harris County practices, Defendant Detention Officer Charley Lauder deliberately and intentionally fabricated an observation check. Though she logged into CorreTrak and documented that she observed all of the detainees on the 2L1 unit, she did not set foot on the unit for over an hour.

245. If Defendant Lauder had actually observed Mr. Shelton, as she was required to do under state laws and regulations, she would have seen that he was in dire shape—upon information and belief, his face was deeply red, his nose was bleeding, and he was rapidly gasping for air. There was blood or vomit on the floor near his head.

246. At 8:58 a.m., Defendant Detention Officer Charley Lauder logged into CorreTrak and, while she did actually enter the 2L1 unit this time, she deliberately and intentionally did not look into Mr. Shelton's cell as she passed by, consistent with Harris County practices regarding observation checks.

247. As before, if Defendant Lauder had actually observed Mr. Shelton, as she was required to do under state laws and regulations, she would have seen that he was in severe distress—upon information and belief, his face was deeply red, his nose was bleeding, and he was rapidly gasping for air. There was blood or vomit on the floor near his head.

248. At 9:49 a.m., Defendant Detention Officer Charley Lauder logged into CorreTrak and once again intentionally and deliberately fabricated an observation check, not even bothering to walk onto the 2L1 unit, much less check individual cells to determine if detainees were in distress like Mr. Shelton. This fabricated check was consistent with Harris County practices concerning observation checks.

249. If Defendant Lauder had actually observed Mr. Shelton as required at 9:49 a.m., she would have clearly seen he was near death. He was gasping for air and deeply flushed with blood coming from his nose and vomit or blood on the floor in front of his head.

250. At 10:27 a.m., Defendant Detention Officer Charley Lauder escorted Jail trustees delivering lunch to detainees. She walked around to each cell and unlocked the "panhole" or the small area in the door just below waist height used to pass food and medication to detainees. When the panhole was unlocked, it folded down, creating a narrow shelf on which to place a food container.

251. The trustee distributing food placed a container of food on the shelf of Mr. Shelton's panhole. After a few moments, Defendant Lauder walked around the 2L1 unit closing and locking the panholes.

252. When she came to Mr. Shelton's cell, his food was still balanced on the shelf as he was too disoriented, weak, and sick to retrieve it. In the alternative, though he was still alive, Mr. Shelton had lost consciousness as his diabetic ketoacidosis progressed.

253.     Consistent with Harris County practices and rather than take even a moment to check to see whether Mr. Shelton was okay and why he had not gotten his lunch from the door, Defendant Detention Officer Lauder intentionally and deliberately picked up Mr. Shelton's lunch, put her arm through the panhole, and dropped his food onto the floor. She ignored Mr. Shelton's likely gasps and moans as well as the blood and vomit on the floor, locked the panhole, and walked away.

254.     Had Defendant Lauder actually looked to see why Mr. Shelton had not retrieved his food, she would have seen that he was in obvious and life-threatening medical distress. He was gasping alarmingly for air, deeply flushed, and bleeding from his nose.  There was blood or vomit on the floor near his head.

255.     At 11:19 a.m., Defendant Detention Officer Charley Lauder once again intentionally and deliberately fabricated an observation check—logging into CorreTrak and reporting rounds were complete without even entering the 2L1 unit. This choice was consistent with Harris County practices at the time.

256.     If Defendant Lauder had actually observed Mr. Shelton as required at 11:19 a.m., she would have clearly seen he was in severe, life-threatening medical distress. He was gasping for air and deeply flushed with blood coming from his nose and vomit or blood on the floor in front of his head.

257.     A Harris Health nurse arrived to the unit around 11:30 a.m. to distribute medications and Defendant Detention Officer Charley Lauder escorted her to the cells where detainees were prescribed medication. Because Harris Health had deliberately denied insulin to Mr. Shelton and thus had no prescription for Mr. Shelton—not his insulin or his blood pressure medication— neither the nurse nor Defendant Lauder spared even a glance at Mr. Shelton's window.

258.    Had Defendant Detention Officer Lauder actually taken the time to look through the window and observe Mr. Shelton for signs of distress, she would have immediately noticed them. Mr. Shelton was gasping for air, moaning, bleeding from his nose, and flushed. There was a pool of vomit or blood on the floor near his head.

259.    Instead, Defendant Detention Officer Lauder intentionally and deliberately falsified yet another CorreTrak round when she logged the medication distribution as an observation check, despite the fact that she had not actually observed every detainee in the unit and had specifically not observed Mr. Shelton. This false observation check was logged consistent with Harris County practices.

260.    At 12:31 p.m., on information and belief, Defendant Detention Officer Lauder intentionally and deliberately logged into CorreTrak as Defendant Detention Officer Garrett Woods and fabricated an observation check, in accordance with Harris County's practices. This check was falsified with Detention Officer Woods's knowledge and to help him make it appear that he had completed his observation round.

261.    In the alternative, on information and belief, at 12:31 p.m., Defendant Detention Officer Garrett Woods intentionally and deliberately logged into CorreTrak as himself and fabricated an observation check.

262.    In any event, at 12:31 p.m., though the Rounds Activity report indicated an observation check was done and everything on 2L1 was "all clear" though nothing could have been further from the truth, none of the Defendant Detention Officers on dayshift duty on March 27, 2022 completed an observation check at 12:31 p.m., consistent with the practice in Harris County for detention officers to fabricate at last some observation checks every shift.

263.     Had Defendant Detention Officer Charley Lauder or Garrett Woods actually observed Mr. Shelton, they would have seen that Mr. Shelton was obviously in medical distress. He was gasping for air, bleeding from his nose, and flushed red with blood or vomit on the floor in front of him.

264.     On information and belief, sometime after 1 p.m., Mr. Shelton died of diabetic ketoacidosis after Harris County and Harris Health denied him insulin for over four days. In the days before he died, he experienced nothing short of living hell, suffering agonizing and unimaginable pain as his organs shut down, unquenchable thirst, nausea and vomiting, difficulty breathing, and severe disorientation.

265.     When Mr. Shelton died, he was shirtless, laying on his left side on his bed, facing the door, with his legs hanging off his bunk. He had pulled his arms up and rested the left side of his face in his arms. Upon information and belief, the right side of his face was visible from his door, as were his right ribs and right side.

266.     Over the next several hours, Mr. Shelton's body became increasingly stiff as rigor mortis set in. Blood began to collect and visibly pool along Mr. Shelton's front left side.

267.     At 1:29 p.m., Defendant Detention Officer Charley Lauder intentionally and deliberately fabricated her fifth or sixth CorreTrak Rounds Activity in less than five hours. Though she logged that she had observed every detainee on the 2L1 unit, she never entered the 2L1 pod, much less personally observed each detainee. Again, this fabrication was consistent with Harris County practices at the time to fabricate at least some observation checks each shift.

268.     At 1:50 p.m. it had been over two hours since a detention officer had even set foot on 2L1 when Defendant Sergeant Bryan Collins entered the unit to complete a supervisor round with the CorreTrak device. Consistent with Harris County practices, Defendant Sergeant Collins walked

by Mr. Shelton's cell without personally observing him. If he had, he would have seen that Mr. Shelton was likely in horrible distress or that he had died, likely painfully.

269.     At 2:24 p.m., Defendant Detention Officer Charley Lauder logged an observation check into CorreTrak. Though she walked by Mr. Shelton's door, she intentionally and deliberately didn't break stride and did not personally observe his condition, consistent with Harris County practices.

270.     At 3:40 p.m., Defendant Detention Officer Lauder returned to 2L1 with trustees distributing dinner. As before, Defendant Detention Officer Lauder circulated through the unit and opened each cell's panhole so that the trustees could deliver food.

271.     This time, when Mr. Shelton's food remained untouched on his panhole shelf, Defendant Detention Officer Lauder knocked on his cell. When there was no response from Mr. Shelton, Defendant Lauder signaled for Defendant Detention Officer Garrett Woods to open his door from the pod control center.

272.     At 3:42 p.m., Defendant Detention Officer Lauder entered Mr. Shelton's cell. After poking him with the panhole key, she touched Mr. Shelton's right side and found him cold to the touch and not breathing. She did not call for help.

273.     A minute later, Defendant Detention Officer Lauder exited Mr. Shelton's cell, locked up the last few panholes, and exited 2L1.

274.     According to a statement she gave later that day, Defendant Detention Officer Lauder went to Defendant Sergeant Bryan Collin's office and the Floor Control Center looking for Defendant Collins.

275.     According to Defendant Detention Officer Lauder's own statement it took her over twenty-five minutes to check these two places, though, on information and belief, both were mere

minutes away from the 2L1 unit. Video accounting for Defendant Detention Officer Lauder's movements during this approximately twenty-five minutes was intentionally destroyed by Harris County.

276.     According to statements by Defendant Detention Officers Lauder and Garrett Woods, at 4:09 p.m., Defendant Lauder then went into the Pod Control Center where Defendant Woods was watching surveillance cameras and told him she had found Mr. Shelton deceased.

277.     At 4:10 p.m., Defendant Detention Officer Garrett Woods entered the 2L1 unit and entered Mr. Shelton's cell where he too found Mr. Shelton cold, stiff, and obviously deceased.

278.     He exited Mr. Shelton's cell about a minute later and found Defendant Sergeant Collins within three minutes, despite Defendant Detention Officer Lauder's alleged inability to find him a few minutes earlier.

279.     During this same time, someone finally called the Clinic in 1200 Baker where Dr. Andres Hughes was on duty. He dispatched LVNs Mary Thomas and Charles Desai to the 2L1 unit and checked Mr. Shelton's medical records where he immediately identified that Mr. Shelton was a Type 1 diabetic.

280.     Meanwhile, at 4:15 p.m. Defendant Sergeant Collins entered Mr. Shelton's cell where he checked Mr. Shelton's pulse and found him pulseless. He also noted that Mr. Shelton was cold to the touch and stiff.

281.     On information and belief, as Mr. Shelton had been dead for several hours, rigor mortis was set in and Mr. Shelton's body and limbs were stiff and fixed in place.

282.     Two minutes after Defendant Sergeant Collins arrived to Mr. Shelton's cell, LVNs Thomas and Desai arrived at Mr. Shelton's unit from the Clinic. Detention Lieutenant Joash Butler arrived shortly afterwards.

283.    LVN Thomas noted that Mr. Shelton had dark brown fluid coming from his nose and mouth and, after he was moved, bright red blood was visible on a towel under his head.

284.    Defendant Collins and LVN Desai carried Mr. Shelton on his mattress out of his cell and Defendant Detention Officer Garrett Woods and Lieutenant Butler then helped carry Mr. Shelton downstairs to the dayroom of 2L1 where the LVNs had left a stretcher.

285.    Once Mr. Shelton was on the stretcher, Harris County and Harris Health staff departed 2L1 to take Mr. Shelton to the Clinic.  LVN Desai climbed onto the stretcher to attempt CPR; however, Mr. Shelton was so stiff from rigor mortis that he could not be laid flat on his back, nor could his arms be pulled away from his face.

286.    Upon Mr. Shelton's arrival in the medical clinic, Dr. Hughes immediately ordered the automatic external defibrillator (AED) placed on Mr. Shelton. The AED advised Mr. Shelton had no shockable heart rhythm present. Dr. Hughes ordered medical staff to administer the medications Epinephrine and Glucagon, to suction and bag Mr. Shelton to address his airway, to continue CPR, and to take a blood glucose. Medical personnel were unable to obtain any blood to fulfill the order to measure Mr. Shelton's blood glucose. During resuscitative efforts, Houston Fire Department (HFD) responded to the Jail to transport Mr. Shelton to the emergency room.

287.    Though medical personnel attempted resuscitation, Mr. Shelton was not revived. HFD and Dr. Hughes concurred that Mr. Shelton was deceased and transport was cancelled.

288.    Mr. Shelton was declared dead at the Harris County Jail at 4:40 p.m. on March 27, 2022.  He was only twenty-eight years old at the time of his death.

289.    The Harris County medical examiner later confirmed Mr. Shelton's death was the result of diabetic ketoacidosis.

290.     As diabetic ketoacidosis was the result of Harris County and Harris Health's failure to provide an insulin-dependent diabetic with necessary, life-sustaining insulin and blood glucose monitoring, Mr. Shelton's death was preventable if Harris County and Harris Health had reasonably modified their policies and practices that prevented him from receiving insulin or if they had simply made even basic accommodations for his disability by providing regular glucose monitoring and insulin.

291.     When Mr. Shelton's cell was photographed after his death, a red transit pass was found neatly placed on top of several containers of uneaten food on his desk. The transit pass was blank except for the date –March 25, 2022—and the initials of Defendant Detention Officer Charley Lauder. Though Harris County policy and practice was to always complete the time a transit pass was entered, the time this pass was allegedly issued was blank, as was the information indicating when he arrived at the Clinic and then returned to the unit if the pass had actually been used.

292.     On information and belief, the initials on the pass were "CL" for Defendant Detention Officer Charley Lauder and the pass was a fraud.

293.     In the alternative, the initials on the pass were those of another Defendant Detention Officer and the pass was a fraud.

294.     On information and belief, the transit pass was intentionally and deliberately forged and was placed in Mr. Shelton's cell after his death by one of the Defendant Detention Officers working on March 27, 2022—Charley Lauder, Garrett Woods, or Sergeant Bryan Collins. These Defendant Detention Officers conspired to place the forged pass in Mr. Shelton's cell and so it was fraudulently left there with the knowledge of each of these three Defendants.

295.     In the alternative and on information and belief, at the time the red transit pass was issued to Mr. Shelton on March 25, 2022 by Defendant Detention Officer Charley Lauder, Garrett Woods, Lonnie Brooks, or Amalia Ruiz, the 2L1 unit was, as usual, insufficiently staffed and though a pass was given to Mr. Shelton, to the Officers did not escort him to the Clinic and the Defendant Detention Officers did not care enough about Mr. Shelton and his condition to even call the Clinic to get Mr. Shelton the help he desperately needed. These Defendant Detention Officers intentionally and deliberately did not take Mr. Shelton to the Clinic, despite the fact that each of these Defendant Detention Officers knew he needed to go.

296.     In the alternative and on information and belief, at the time the red transit pass was issued to Mr. Shelton on March 25, 2022 by Defendant Detention Officer Charley Lauder, Garrett Woods, Lonnie Brooks, or Amalia Ruiz, the 2L1 unit was insufficiently staffed and so the Defendant Detention Officers intentionally and deliberately told Mr. Shelton to go to the Clinic without an escort, though they knew he needed an escort and might  be turned away from the Clinic without one.

297.     Video evidence that would have conclusively established this was destroyed by Harris County, despite being on notice of litigation and despite the video being specifically requested by his family on April 26, 2022.

298.     Accordingly and on information and belief, Mr. Shelton attempted to go to the Clinic on March 25, 2022, but was unable to find or go to the Clinic unescorted as he was disoriented and unfamiliar with the Jail. From the 2L1 unit, the Clinic was down several hallways and an elevator and there were no signs indicating where to find it. Mr. Shelton never made it to the Clinic and was instead returned to his cell. The Defendant Detention Officers who returned him to his cell on March 25, 2022—Charley Lauder, Lonnie Brooks, Garrett Woods, and/or Amalia Ruiz—knew

Mr. Shelton needed to go to the Clinic as he was obvious ill—he was weak, in obvious pain, and breathing rapidly. Yet each intentionally and deliberately did not take him to the Clinic.

299.     In the alternative and on information and belief, Mr. Shelton did go to the Clinic with the red transit pass on March 25, 2022 but when he arrived was turned away by Harris Health staff because he did not have an escort and so was not evaluated by any medical personnel who could have checked his records, identified him as a Type 1 diabetic, provided insulin, and treated his diabetic ketoacidosis. When the Harris Health staff turned him away, Mr. Shelton had been without insulin for over 60 hours—he was weak, obviously in pain, and breathing rapidly. Each staff person who saw him when he was turned away therefore knew that he needed medical attention.

### B.  Obvious and Reasonable Accommodations Harris County and Harris Health Made for Type 1 Diabetics after Mr. Shelton's death.

300.     On March 29, 2022, only two days after Mr. Shelton's death, Harris County and Harris Health modified the "Accept/Reject" criteria for providers at the JPC to add a finger stick (or blood glucose test) greater than 400 mg/dL. If this criterion had been in place when Mr. Shelton surrendered to the Jail, he would not have been accepted for booking on March 22, 2022.

301.     Given the dangerous conditions of the Harris County Jail for Type 1 diabetics, including the inability of providers making Accept/Reject determinations to test for ketones before making that determination, rejecting Type 1 diabetics for booking who had blood glucose over 400 mg/dL was a reasonable and necessary accommodation to ensure a Type 1 diabetic in diabetic ketoacidosis was not booked into the jail.

302.     As they plainly should and could have done prior to March 22, 2022, Harris Health also purchased computers or tablets for the insulin carts so that nurses measuring blood glucose and administering insulin now have immediate access to detainee medical records to confirm whether a detainee who is asking for insulin is a Type 1 diabetic.

303.     LVN Esapa agreed after Mr. Shelton's death that if the computer had been on the insulin cart on March 23, 2022 or the blood glucose list indicated Mr. Shelton was a Type 1 diabetic, he would have immediately accommodated Mr. Shelton by sending him to the Clinic when his blood glucose registered 308 mg/dL at 4:48 p.m. on March 23, 2022.

304.     Knowing whether a detainee is a Type 1 diabetic or not is information that is crucial for healthcare providers at the Jail who test blood glucose. By denying medical personnel charged with measuring blood glucose access to this information when they are conducting these tests, Harris County and Harris Health's policy and practice to treat blood glucose between 300 – 350 mg/dL as "normal," created a dangerous condition at the Jail.

305.     Given the dangerous policies, practices, and conditions of Harris County and Harris Health for Type 1 diabetics in March 2022, providing LVNs who circulated around 1200 Baker with the insulin cart some means to identify whether a detainee whose blood glucose they were testing was a Type 1 diabetic was a reasonable and necessary accommodation. Though Harris Health chose to implement this accommodation by stocking insulin carts with computers to access medical records, even noting on the blood glucose and insulin lists that a detainee is a Type 1 diabetic was a reasonable, effective, and obvious accommodation available to Harris County and Harris Health before Mr. Shelton died, though neither implemented it before March 22, 2022.

306.     At the time of Mr. Shelton's detention, Harris County and Harris Health and their policymakers knew that Type 1 diabetics needed extra monitoring to be safe and knew that officers needed to observe them carefully given the known potential for blood glucose spikes or drops. Yet Harris County and Harris Health provided no training whatsoever to officers to identify detainees as diabetics.

307. At some point well after Mr. Shelton died from Harris County and Harris Health's deliberate denial of insulin for over four days, Harris County and Harris Health created a diabetic "tank" where all (or at least many) detainees who are on insulin are housed in one place. If there are too many Type 1, insulin-dependent diabetics for one tank, a second one is opened so that Type 1 diabetics are generally housed together.

308. Given Harris County and Harris Health's dangerous policies, practices, and conditions at the Harris County Jail for Type 1 diabetics, housing Type 1 diabetics in one place is a reasonable accommodation to ensure Type 1 diabetics are easily identified by Harris County and Harris Health staff as Type 1 diabetics and makes it less likely a Type 1 diabetic can go several days without receiving insulin or blood glucose monitoring.

309. Because both Harris County and Harris Health had identified that Mr. Shelton was a Type 1 diabetic while he was still in the JPC, had the reasonable accommodation of a diabetic tank been in use in March 2022, Mr. Shelton likely would have been assigned to this tank, would have received the insulin and other accommodations he needed to fully participate in the programs and services at the Jail, and would not have died.

### C. The Texas Commission on Jail Standards Cites Harris County Jail for Noncompliance with Minimum Jail Standards Relating to Prescribing Medications, Including Insulin.

310. Nearly nine months after Mr. Shelton's preventable death, in December 2022, the Texas Commission on Jail Standards (Commission) investigated and cited Harris County Jail for noncompliance with minimum jail standards found in 37 Texas Administrative Code § 273.2(12), which require the Jail to have a qualified medical professional review "as soon as possible" prescription medications, like insulin and blood pressure medication, that a detainee is taking when booked.

311.    On information and belief, the Commission's citation of the Jail for this violation related to Harris County and Harris Health's intentional and deliberate denial of insulin to Mr. Shelton and Harris County and Harris Health's intentional and deliberate denial of blood pressure medication to Mr. Shelton.

312.    Dr. O. Reggie Egins, as Chief Medical Officer for Correctional Health at Harris Health, was responsible for continuing the dangerous policies with regard to insulin and monitoring and for developing and executing the corrective action plan to address the deficiency cited by the Commission.

313.    According to his Corrective Action Plan submitted to the Commission, in December 2022, nine months after the employees and contractees following the policy had discriminated against and killed Mr. Shelton, Harris County and Harris Health finally discontinued the regular use of single-dose medication orders, trained staff that all medication orders must contain a frequency order which attaches to the medical record, and modified their electronic health records system to discourage the use of single-dose orders unless the provider certifies they intend for the medication to be a non-maintenance medication.

314.    Despite these reported "changes," the Commission completed a follow-up inspection of Harris County Jail in February 2023 and determined the Jail remained out of compliance with minimum jail standards related to reviewing, ordering, and administering medications to detainees.

315.    Harris County Jail remained out of compliance with these minimum jail standards concerning reviewing "as soon as possible medications" for incoming detainees for almost two years after Mr. Shelton's death.

### D. *Harris County and Sheriff Gonzalez's Deliberate Failure to Adequately Investigate Mr. Shelton's Death Highlights Harris County's Failure to Monitor Detainees.*

316.     The fact that Mr. Shelton was found with fully developed rigor mortis and with blood pooling in his limbs immediately put Harris County and Sheriff Gonzalez on notice that the Defendant Detention Officers responsible for observing Mr. Shelton on March 27, 2022 had not actually observed him in the hours and days before he died.

317.     The fact that Mr. Shelton was found cold and stiff to the touch (indicating rigor mortis) was documented by Defendant Detention Officers Charley Lauder, Garret Woods, and Sergeant Collins, as well as other detention officers involved in the response to Mr. Shelton's death in their statements during the investigation of Mr. Shelton's death. The rigor mortis was also documented in Mr. Shelton's Harris Health records, which Harris County owns and has a right of access to.

318.     Harris Health's records additionally noted that Mr. Shelton's blood had pooled darkly on the side he had been laying. Dr. Andres Hughes told Houston Police Department officers shortly after Mr. Shelton's death that these markings looked as if Mr. Shelton "was laying on himself for hours."

319.     The Sheriff was informed of the fact that Mr. Shelton was found with rigor mortis and pooled blood that indicated he had been dead for hours before he was found.

320.     Harris County was aware that it had engaged in wrongdoing and anticipated litigation as of March 27, 2022, Mr. Shelton's date of death. However, Harris County preserved only the surveillance videos of the observation checks and lack-of-observation checks on Mr. Shelton from March 27, 2022 and sent them to the Commission in April 2022 as part of their in-custody death reporting.

321.     Despite anticipating litigation and receiving a formal Texas Public Information Act request asking for all video concerning Mr. Shelton shortly after his death, Harris County destroyed video of Mr. Shelton's unit on March 23rd, 24th, 25th, and 26th.

322.     Moreover, despite these glaring red flags that Defendant Detention Officers and Sergeants had not observed Mr. Shelton in the days before he died, the Harris County Sheriff's Office Internal Affairs Department chose not to review any video from these days. Even the limited video surveillance it had preserved of the observation checks on March 27, 2022 was not reviewed until September 2023, after this suit was filed.

323.     This delay and the destruction/spoliation of video surveillance evidence before September 2023 meant that by the time Internal Affairs investigated detention officers' monitoring of Mr. Shelton 18 months after he died, Internal Affairs was unable to review any of the observation rounds conducted on Mr. Shelton during his last days in Jail when he was suffering the obvious signs and symptoms of diabetic ketoacidosis.

324.     Harris County's 18-month delay in reviewing Mr. Shelton's supervision also meant that Defendant Detention Officer Charley Lauder continued working at the Jail for eighteen months after fabricating numerous observation rounds before finally being deemed ineligible for rehire.

### E. Harris County and Harris Health Have a Long-Standing and Routine Custom of Denying Necessary Medication and Monitoring to Diabetic Detainees.

325.     Unfortunately, Mr. Shelton's death is part of a longstanding pattern of denial of life-sustaining treatment for chronic conditions, including diabetes. Harris County's and Harris Health's denial of life-sustaining insulin and glucose monitoring has led to a long string of deaths at the Harris County Jail.

326.     Well over a decade before Mr. Shelton died, in 2008 and 2009, the medical care at Harris County Jail departed so far from constitutional standards of care that the Department of Justice (DOJ) investigated and confirmed that these conditions violated the constitutional rights of detainees at the jail. The DOJ noted, "the number of inmates [sic] deaths related to inadequate medical care…is alarming." [4] DOJ Report, p. 2.

327.     Indeed, it was the medical care for serious chronic medical conditions—like insulin-dependent diabetes—that DOJ specifically found was so lacking it "place[d] detainees at an unacceptable risk of death or injury." *Id*., p. 3.

328.     In fact, one of the examples given by DOJ in its report was the death of EE, a woman with diabetes who received pain medication rather than insulin in response to her reports of diabetic symptoms. EE died with low blood sugar less than a week after her complaints. *Id.* at 7.

329.     Specifically, the DOJ found that Harris County Jail violated the constitutional rights of its detainees who needed medical care for chronic conditions like diabetes by, in part,

   a.  Failing to re-assess detainees who were receiving medication, *id.* at 5,

   b.  Failing to provide continuity of care by ensuring accurate records were kept, *id*.,

   c.  Failing to provide continuity of care by ensuring qualified staff complete follow-up exams, *id*.,

   d.  Implementing administrative procedures that allowed delays in care to be easily overlooked, *id.* at 6, and

   e.  Failing to ensure staff documented factually accurate and legible information in medical records in a manner consistent with professional record-keeping. *Id.* at 8.

330.     In 2009, DOJ gave Harris County the prescription for the constitutionally inadequate medical care at its jail—in part, DOJ recommended:

---

[4]     June 4, 2009 DOJ Findings Letter – Harris County Jail, *at* *https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/harris_county_jail_findlet_060409.pdf*.

> The Jail should develop a chronic care program consistent with generally accepted correctional medical standards. This program should include a process that will identify detainees who should be enrolled in a chronic care program; a roster of detainees enrolled in the program; a schedule of medical visits for each detainee enrolled in the program; a system for determining which diagnostic tests will be required for each chronic condition; and record-keeping which includes documentation of lab work and medical orders.

*Id*. at p. 20.

331.     On information and belief, in the thirteen years that followed the DOJ report, Harris County did not implement the chronic care program as recommended by DOJ, but instead continued to deny people with diabetes regular access to necessary diagnostic tests required for their condition; continued to inappropriately document orders for lab work, orders for medications, and results of lab work; failed to schedule necessary and periodic medical visits to ensure providers were seeing detainees with diabetes and other serious health conditions; and continued to fail to reassess detainees who were on medication.

332.     On information and belief, if the changes DOJ identified as necessary in 2009 had been implemented, Mr. Shelton would have received blood glucose checks multiple times a day; received insulin administrations daily; and a provider would have seen him to evaluate his condition during the final four days of his life.

333.     On information and belief, if these or similar changes had been implemented, Mr. Shelton would likely still be alive.

334.     Instead, having been put on notice in 2009 that the Jail's medical care in each of these aspects violated constitutional rights, was likely to cause serious injury or death to detainees, and had already caused serious injuries and death to detainees, Harris County Jail acted with deliberate indifference to its diabetic detainees, ignored the recommendations, and corrected none of these deficiencies.

335.     In September 2012, Harris County detention officer Rima E. Fortune was caught after she deliberately denied food to a diabetic detainee as punishment. The Harris County Sheriff allowed her to keep her job, sending the dangerous message that diabetics could be discriminated against.

336.     In 2015, care for detainees with Type 1 diabetics still had not improved and nearly caused the death of detainee Ahmed Elsweisy who was booked into Harris County Jail in the early morning hours of September 10, 2015.

337.     Though Mr. Elsweisy told Harris County Jail staff he was a Type 1 diabetic who usually took insulin five times a day, he was not seen by medical staff for over 16 hours. Even then, he was not provided insulin.

338.     On information and belief, after 24 hours without insulin, Mr. Elsweisy again asked a Harris County detention officer for insulin and said he was becoming ill. Consistent with Harris County's longstanding practices, the detention officer deliberately and intentionally refused to contact any Jail medical personnel to relay Mr. Elsweisy's diagnosis and requests for insulin.

339.     On information and belief, Mr. Elsweisy went without insulin for almost thirty hours in the Harris County Jail and was not given any until after he had passed out and become violently ill several times. Harris County Jail ultimately had to transport Mr. Elsweisy to Ben Taub, a hospital owned and operated by Harris Health, where he was treated for diabetic ketoacidosis.

340.     The Houston Chronicle included Mr. Elsweisy's account in an article published on November 21, 2015 entitled, "Harris County Jail considered 'unsafe and unhealthy' for inmates, public."[5] Members of the Harris County Commissioner's Court and the Sheriff's Office provided

---

[5] James Pinkerton & Anita Hassan, "Harris County Jail considered 'unsafe' and 'unhealthy' for inmates, public, HOUSTON CHRONICLE (Nov. 21, 2015), *available at* https://www.houstonchronicle.com/news/houston-texas/houston/article/Harris-County-Jail-is-unsafe-and-unhealthy-for-6649163.php

quotes for the article and current Sheriff Gonzalez not only knew about the incident, he discussed it during his campaign.

341.    In the article, the Chronicle also found 13 instances where detention officers failed or refused to seek medical attention for detainees in just the nine months before it published the story.

342.    Less than a year later, in October 2016, the constitutionally deficient and deadly medical care at the jail was front and center in the debates between then-Sheriff Ron Hickman and current Sheriff Ed Gonzalez.

343.    When asked what he would do about the concerning history of deaths that had gone on for many years and was continuing, Sheriff Gonzalez specifically cited the triage area (now part of the JPC) where detainees are first assessed for chronic conditions like diabetes as needing improvement if the County was going to halt its pattern of deaths in the Jail.[6]

344.    Though his debate statements highlight that Sheriff Gonzalez was aware of the ongoing pattern of deaths in the Harris County Jail and the role deficient medical care, and specifically deficient initial medical assessment and treatment, played in those deaths, Sheriff Gonzalez did not halt the pattern of deaths in his Jail, change the deficient training regimen, or provide any training concerning diabetes whatsoever.

345.    As a consequence, in the almost seven years since the debate, dozens of Harris County Jail detainees have continued to die, at least eleven of whom were diabetics who died from complications of diabetes, as detailed below. On information and belief, the Jail's continuing deficient medical care, namely denial of life-sustaining insulin and regular glucose testing, caused and/or contributed to these deaths.

---

[6] ABC13, "Ron Hickman, Ed Gonzalez face off in ABC13 / Univision debate," (Oct. 18, 2016), *available at* *https://abc13.com/debate-harris-county-sheriffs-office-sheriff-law-enforcement/1552812/*.

346.     In 2018, as detainees continued to die in Harris County Jail at alarming levels, Harris Health agreed to study the possibility of taking over direct responsibility for medical care at the Jail and hired Health Management Associates (HMA) to conduct a preliminary study of the Jail. Following an extensive review of the medical care provided in the Jail and interviews with staff of the Harris County Sheriff's Office, Harris County, and Harris Health, HMA issued a report in December 2018.

347.     HMA's 2018 report found the Jail still had under-developed oversight of healthcare outcomes of detainees with chronic conditions in the Jail, despite DOJ's identification of lack of oversight as a serious problem eleven years before. On information and belief, the lack of adequate oversight of outcomes for detainees with chronic conditions specifically included outcomes for detainees with Type 1 diabetes.

348.     In other words, in 2018, both Harris County and Harris Health (and their relevant policymakers) knew that Harris County was still not evaluating or following up on detainees with chronic diseases like Type 1 diabetes to determine if they were not receiving insulin, not receiving blood glucose checks, were developing diabetic ketoacidosis, or were otherwise being harmed by Harris County's failure to accommodate their disabilities in the Jail.

349.     The December HMA 2018 report also identified that medical staffing at the Jail was a grave concern, with a heavy reliance on third-party agencies for nurses and providers and many positions indefinitely vacant. At the time of the report, Harris County had identified that, even if the vacant Jail medical positions were fully staffed, it still needed to increase medical staffing to cover all locations, shifts, and functions at the jail.

350.     HMA also raised a concern that the Jail's pharmacy did not provide support to medical providers managing detainees with chronic diseases and was a key issue that would need to be addressed if Harris Health took over responsibility for the Jail's medical care.

351.     Though Harris Health knew these were problems years before it assumed direct responsibility for medical care on March 1, 2022, it took no steps to remedy them before March 22, 2022.

352.     When the HMA report and these findings were presented to the Harris Health Board of Trustees on December 6, 2018, Sheriff Ed Gonzalez personally participated in the presentation.

353.     The HMA report was also provided to the Commissioner's Court in January 2019.

354.     Between 2019 and 2020, the Commissioner's Court, Sheriff Gonzalez, and Harris Health continued discussions regarding transitioning medical care from Harris County's direct responsibility to Harris Health's.

355.     On December 9, 2020, the Commission issued its annual report on the Harris County Jail, finding the Jail non-compliant with minimum jail standards concerning documentation of medication. Specifically, the Commission discovered many medication forms were blank, making it unclear if the medication was ever even offered to detainees. On information and belief, detainees with blank medical forms who were potentially not offered medication included detainees with diabetes who needed insulin to live.

356.     Later that same month, the Commissioner's Court directed the Harris County Budget Management Department to collaborate with the Harris County Sheriff's Office and Harris Health to evaluate moving forward with the transition.

357. On information and belief, the December 9, 2020 Commission report finding deficiencies with medications in the jail contributed to this direction and Harris Health was made aware of the report.

358. Beginning the following month, in January 2021, Harris Health, the Harris County Sheriff's Office, and the Harris County Budget Management Department began having regular meetings to plan for transition of medical care to Harris Health.

359. In April 2021, the Harris County Budget Management Department, the Harris County Sheriff's Office, and Harris Health agreed that the transfer was feasible and would improve medical care for detainees. They recommended transition to the Commissioners Court.

360. In June 2021, Harris Health hired Dr. O. Reggie Egins to help lead the transition of the Jail's medical care from Harris County to Harris Health and named him the Chief Medical Officer for Correctional Health. On information and belief, he began working onsite at the Harris County Jail a week after he was hired.

361. While working in the Jail in 2021 and becoming familiar with its policies and practices, Dr. Egins learned about the single-dose order policy or practice, the short-term blood glucose order policy or practice, and the no-more-than-twice-a-day policy or practice all of which he knew were gross violations of basic standards of care for diabetes and imposed dangerous discrimination and unconstitutional limits no its medical providers working at the Jail. Despite the obviously dangerous conditions created by these practices, he deliberately and intentionally chose not to modify these policies and practices when Harris Health took over on March 1, 2022 and, instead, adopted and ratified them as Harris Health policies or practices.

362. He likewise learned of the policy or practice to treat blood glucose between 300 – 350 mg/dL as "normal" and to not indicate whether a detainee on the blood glucose only list was a

Type 1 diabetic. Again, despite the obvious dangers created by these policies or practices, Dr. Egins deliberately and intentionally chose not to modify these them when Harris Health took over on March 1, 2022 and, instead, adopted and ratified them as Harris Health policies or practices.

363.     By July 2021, HMA had updated its original study of medical care at Harris County Jail and shared its findings with both Harris Health and the Harris County Sheriff's Office. On information and belief, the report was reviewed by both Dr. Egins and Sheriff Gonzalez.

364.     In September 2021, an overview of the transition plan presented to the Harris County Commissioner's Court identified that Harris Health was already assessing medical services provided in the Jail and was developing strategies to optimize the timeliness of care provided to detainees.

365.     On information and belief, by this time, Dr. Egins and Harris Health had already identified that medication practices in the Jail were so dangerous they constituted a "high risk concern" that was a priority to address.

366.     Later in September 2021, Harris Health completed its review of the existing Harris County medical and IT equipment that needed to be replaced or added in the Jail. Either before or during this review, Dr. Egins identified that the insulin cart was not equipped with access to the electronic health records and LVNs who circulated through 1200 Baker with the cart did not have a means to identify whether a detainee whose blood glucose they were checking was a Type 1 diabetic.

367.     Despite the obvious danger created by depriving LVNs administering insulin and measuring blood glucose of a way to identify that a detainee was a Type 1 diabetic, Dr. Egins deliberately and intentionally did not change this practice but instead adopted and ratified it as Harris Health's on March 1, 2022.

368.	By November 2021, Harris Health had implemented EPIC, its electronic medical record platform, at the Jail.

369.	Between November 2021 and February 28, 2022, Harris Health transitioned Harris Health employees to its own employ, posted and hired for new or open positions at the Jail, and on-boarded the employees who had been transitioned over from Harris County. On information and belief, this on-boarding included training on Harris Health's policies and practices.

370.	On information and belief, though Dr. Egins was aware of the single-dose order policy or practice, the short-term blood glucose order policy or practice, and the no-more-than-twice-a-day policy or practice by this time, Dr. Egins intentionally and deliberately chose not to modify these policies or practices. Accordingly, he intentionally and deliberately chose not to add training on these topics to the on-boarding provided to medical personnel between November 2021 and February 28, 2022.

371.	The transition plan was codified into an interlocal agreement which provided for a transition of care, with Harris Health assuming full responsibility for Jail medical care on March 1, 2022.

372.	Despite months of planning and studying Jail policies and practices and the opportunity to on-board medical personnel on Harris Health policies and practices before March 1, 2022, Harris Health did not change any existing Jail policies or practices when it assumed direct control over the medical care at the Jail on March 1, 2022.

373.	Specially, on March 22, 2022, on information and belief, Dr. Alhadad and PA Hendrickson were not trained to order insulin for Type 1 diabetics as repeating orders to be performed daily, or more frequently.

374.     Instead, Dr. Alhadad and PA Hendrickson were trained and essentially required by Harris County to specifically to order all medications including insulin orders as single-dose orders. Sheriff Gonzalez knew about this training and knew it could and likely would result in denying detainees insulin and other necessary medications. Harris Health and Dr. Egins likewise knew about and adopted this training as their own, despite knowing it could, and likely would, result in denying insulin and other necessary medications to detainees.

375.     In March 2022, despite knowing it was dangerous not to, Harris County and Harris Health failed to train providers to issue all orders of insulin for Type 1 diabetics as repeating orders.

376.     Instead, Harris County and Harris Health trained their providers to order insulin as single-dose orders, even for Type 1 diabetics, while they remained in the JPC, despite knowing detainees could remain in the JPC for upwards of three days and despite the obvious danger inherent in this training and practice.

377.     Because medication prescribers were trained to write insulin as single-dose orders in the JPC, it was and remains common for diabetic detainees at the Harris County Jail to be denied insulin.

378.     On March 22, 2022, Dr. Alhadad and PA Hendrickson were not trained to order blood glucose monitoring for Type 1 diabetics as repeating orders lasting longer than three days until a detainee was being readied to move to housing.

379.     Instead, Dr. Alhadad and PA Hendrickson were trained by Harris County specifically to order labs, like blood glucose, as short-term orders for single measurements or, if they repeated, for not more than three days. Sheriff Gonzalez knew about this training and Harris Health and Dr. Egins likewise knew about and adopted this training as their own. Each knew this training endangered detainees.

380. In March 2022, Harris County and Harris Health failed to train providers to issue all orders for routine blood glucose monitoring for Type 1 diabetics as repeating or ongoing orders.

381. Instead, Harris County and Harris Health trained their providers to order blood glucose monitoring for no more than three days, even for Type 1 diabetics, while they remained in the JPC, despite knowing detainees could remain in the JPC for upwards of three days and despite the obvious danger inherent in this training and practice.

382. Because providers are not trained to order routine, ongoing blood glucose monitoring for diabetics, it was and remains common for diabetic detainees at Harris County Jail to have high blood glucose that goes untreated and undocumented.

383. On March 22, 2022, Dr. Alhadad and PA Hendrickson trained not to, and in essence required not to, order blood glucose monitoring for Type 1 diabetics to occur more than twice a day.

384. Instead, Dr. Alhadad and PA Hendrickson were trained by Harris County specifically to order blood glucose testing no more than twice a day, even for Type 1 diabetics. Sheriff Gonzalez knew about this training. Harris Health and Dr. Egins likewise knew about and adopted this training as their own, even though it is well known to violate acceptable standards of care for Type 1 diabetics, necessarily harms and endangers Type 1 diabetics, and reflects utter disregard for their disability.

385. In March 2022, Harris County and Harris Health failed to train providers to order blood glucose testing more than twice a day for Type 1 diabetics, including failing them to order blood glucose testing before each meal and at bedtime, as the standard of care requires.

386.    Instead, Harris County and Harris Health trained their providers to order blood glucose monitoring no more often than twice a day, even for Type 1 diabetics, despite the obvious danger inherent in this training and practice.

387.    Because providers are trained to order blood glucose monitoring for Type 1 diabetics no more than twice a day, it was and remains common for diabetic detainees at Harris County Jail to have high blood glucose that goes untreated and undocumented.

388.    On March 23, 2022, medical personnel were not trained to check a detainee's medical record to confirm the New House assessment was complete and necessary medication orders entered before approving him to be housed in the Jail.

389.    Instead, Harris County and Harris Health trained their medical personnel to rely on a single, unattributed "x" on a piece of paper to confirm a detainee was ready to move to housing.

390.    Because medical personnel were not trained to check a detainee's medical record before approving them to be housed, it was common for diabetic detainees at the Harris County Jail to be housed without necessary orders for insulin and blood glucose monitoring.

391.    On March 22 and 23, 2022, despite knowing it not to be so, Harris County Jail considered blood glucose over 300 mg/dL but under 350 mg/dL to be "normal" blood glucose and trained employees and contractees that no further insulin, blood glucose testing, or evaluation was to be conducted in response to a blood glucose in this range, absent additional signs, symptoms, or concerns. Sheriff Gonzalez knew about this training.

392.    Shockingly, Harris Health and Dr. Egins likewise knew about and adopted this training as their own.

393.    In March 2022, Harris County and Harris Health trained their providers and medical personnel to consider blood glucose between 300 mg/dL and 350 mg/dL to be "normal" blood

glucose and that no further insulin, blood glucose testing, or evaluation was to be conducted in response to a blood glucose in this range.

394.     Because providers and medical personnel are trained to consider blood glucose between 300 mg/dL and 350 mg/dL to be "normal" blood glucose requiring no further insulin, blood glucose testing, or evaluation, it was and remains common for diabetic detainees at Harris County Jail to have high blood glucose that goes untreated and undocumented.

395.     On March 23, 2022, LVN Esapa was not trained to notify a provider if a detainee had a blood glucose over 300 mg/dL but under 350 mg/dL.

396.     Instead, LVN Esapa was trained by Harris County specifically to consider a blood glucose over 300 mg/dL but under 350 mg/dL as "normal" blood glucose that require notifying a provider. Sheriff Gonzalez knew about this training. Harris Health and Dr. Egins likewise knew about and adopted this training as their own.

397.     In March 2022, Harris County and Harris Health failed to train medical personnel who obtained blood glucose results over 300 mg/dL but under 350 mg/dL to notify a provider.

398.     Instead, Harris County and Harris Health trained their medical personnel not to notify a provider when a detainee had a blood glucose reading over 300 mg/dL but under 350 mg/dL.

399.     Because medical personnel are trained to not notify providers when a detainee has a blood glucose over 300 mg/dL but under 350 mg/dL, it was and remains common for diabetic detainees at Harris County Jail to have high blood glucose that goes untreated and undocumented.

400.     On March 23-24, 2022, LVNs Esapa and Ogunsanya were not trained to notify a provider if a detainee disclosed that they were a Type 1 diabetic or asked for insulin if their name was not on the list to receive insulin. They were likewise not trained to document this request anywhere in the detainee's medical records.

401.    Instead, LVNs Esapa and Ogunsanya were trained by Harris County to not tell a provider about or document detainee insulin requests, even if they were made by detainees during blood glucose checks or by detainees who identified that they were Type 1 diabetics. Sheriff Gonzalez knew about this deficient and dangerous training. Harris Health and Dr. Egins likewise knew about and adopted this deficient and dangerous training as their own.

402.    In March 2022, Harris County and Harris Health failed to train medical personnel to notify providers either orally or through documentation in the medical records when a detainee requested insulin, even if the requests were made during blood glucose checks or by detainees who said they were Type 1 diabetics.

403.    Instead, Harris County and Harris Health trained their medical personnel not to notify providers either orally or through documentation in the medical records when a detainee requested insulin, even if the requests were made during blood glucose checks or by detainees who said they were Type 1 diabetics.

404.    Because medical personnel are trained to not notify providers either orally or through documentation in the medical records when a detainee request insulin, even if the detainee is making the request during a blood glucose check or identifies that they are a Type 1 diabetic, it was and remains common for diabetic detainees at Harris County Jail to have high blood glucose that goes untreated and undocumented.

405.    In March 2022, medical personnel were not trained to follow up when a Type 1 diabetic detainee given a pass did not arrive to the medical Clinic, even if the pass was for high blood glucose.

406.     Instead, Harris County and Harris Health trained their medical personnel to not follow up if a Type 1 diabetic detainee with high blood glucose never showed up to the Clinic after being given a white medical pass.

407.     Because medical personnel were not trained to follow up when a Type 1 diabetic detainee did not make it to the Clinic after being given a white pass for high blood glucose, it was and remains common for Type 1 diabetic detainees with high blood glucose to not receive insulin or evaluation after being given a white pass.

408.     In March 2022, PA Peters was not trained to open messages waiting in the provider pool containing detainee lab work results immediately, or even within the same day.

409.     Instead, PA Peters was trained by Harris County to check these messages when convenient, even if this was several days later. Sheriff Gonzalez knew about this deficient training. Harris Health and Dr. Egins likewise knew about and adopted this deficient training as their own.

410.     In March 2022, Harris County and Harris Health failed to train providers to open messages waiting in the provider pool containing detainee lab work results immediately or even within the same day.

411.     Instead, Harris County and Harris Health trained their providers to check these messages when convenient, even if this was several days later.

412.     Because providers are not trained to open messages waiting in the provider pool that contain detainee lab work results immediately or even within the same day, it was and remains common for high blood glucose results of Type 1 diabetics to go unacknowledged and untreated for days.

413.     In March, 2022, none of Harris County's detention officers were trained to notify any medical personnel if a detainee disclosed they were a Type 1 diabetic or asked for insulin.

414.     Because Harris County detention officers were and are still not trained to notify medical providers when a detainee discloses they are a Type 1 diabetic or request insulin, it was and remains common for no one to notify medical personnel of this information and for Type 1 diabetic detainees in the Harris County Jail to be denied insulin.

415.     In March 2022, Harris County did not train its detention officers to recognize the signs or symptoms of diabetic ketoacidosis or that Type 1 diabetics denied insulin will develop and die from diabetic ketoacidosis if denied insulin within mere hours to days.

416.     Because Harris County detention officers were and are still not trained to recognize the signs or symptoms of diabetic ketoacidosis or the understand that diabetic ketoacidosis will result quickly from denying a Type 1 diabetic insulin, it was and remains common for Type 1 diabetics in the Harris County Jail to be denied insulin, experience diabetic ketoacidosis, and for this condition to go unrecognized and untreated for hours to days.

417.     In March, 2022, none of Harris County's detention officers were trained to notify any medical personnel if and when a Type 1 diabetic skipped or ate only partial meals.

418.     Because Harris County detention officers were and are still not trained to notify medical personnel when a Type 1 diabetic detainee skips or misses meals, it was and remains common for no one to notify medical personnel of this information and for Type 1 diabetic detainees to miss or skip meals when they do not receive the insulin they need to properly digest the meals.

419.     In March 2022, none of Harris County's detention officers were trained to notify medical personnel if a Type 1 diabetic in a single cell missed his hour out of his cell due to reported or obvious signs of serious illness.

420.     Because Harris County detention officers were and are still not trained to notify medical personnel if a Type 1 diabetic in a single cell mises their hour out of their cell due to reported or obvious signs of serious illness, it was and remains common for no one to notify medical personnel when Type 1 diabetics in single cells are too sick to leave their cells to shower, make phone calls, or us the kiosk to submit requests for help.

421.     As Harris County's and Harris Health employees and contractees were not trained to notify providers when detainee blood glucose readings were high, when detainees were asking for insulin, were exhibiting signs of diabetic ketoacidosis, did not arrive to the Clinic after being given a pass, were too sick to leave their cells, or when diabetic detainees were skipping meals, diabetic detainees at the Harris County Jail were routinely denied life-saving insulin and necessary blood-glucose monitoring.

422.     For example, one month after Mr. Shelton's death, Kristan Smith was booked into the Harris County Jail on April 27, 2022. Like Mr. Shelton, she required insulin and medication for blood pressure.

423.     On May 20, 2022, Harris County Detention Officers found Ms. Smith unresponsive on her bunk. On information and belief, in the days before she was found, Harris County and Harris Health employees or contractees, following the same policies, practices, and training identified above, had failed or refused to give Ms. Smith insulin or monitor her blood glucose.  She died on May 28, 2022 at the age of 38 from complications of her diabetes.

424.     Other examples of deaths caused by Harris County's and Harris Health's routine custom of denying life-saving insulin and glucose monitoring to diabetic detainees include:

        a.    Antelmo Lara who died in the Jail on September 2, 2021 from diabetes mellitus and related health conditions.

b.  Edward Lewis who died in the Jail on March 8, 2020 from diabetes mellitus and related health conditions. Mr. Lewis had been booked into Harris County Jail less than two weeks before his death.

c.  Donald Mathes who died on July 22, 2016 in the Jail from diabetes mellitus and related health conditions.

d.  Ed Phillips, aged 47, who died in the Jail on March 13, 2015, two months after he was booked in. Mr. Phillips cause of death was complications from his diabetes mellitus.

e.  Derek Franklin who died in the Jail on November 30, 2013 at age 49 from complications of diabetes mellitus.

425.    In addition to these deaths, in the ten years before Mr. Shelton's death an additional nine diabetic detainees died in the Harris County Jail from other medical conditions for which their diabetes was a contributing factor.  On information and belief, Harris County's and Harris Health's routine custom of denying life-saving insulin and regular glucose monitoring to diabetic detainees contributed to their deaths. These detainees include:

a.  Alejandro Tillman, a diabetic detainee who died in the Jail on March 25, 2021, less than two months after he was booked into the Jail.

b.  Stephen Windsor, a diabetic detainee who died only three weeks after being booked into the Jail. Mr. Windsor died on January 1, 2021.

c.  Carlos Romero, who died after a single day in the Jail, on October 4, 2019.

d.  Donald Robinson, a diabetic detainee who died on July 29, 2019, only five weeks after being booked into the Jail.

e.  Roger Dansby, aged 49, who died in the Jail on February 9, 2019.

f.  Floyd Rachelle who died on November 15, 2018. Mr. Rachelle was only 30 years-old at the time of his death and had been in the Jail less than three months.

g.  Rodney Butler who died on March 27, 2017, less than six weeks after being booked into the Jail.

h.  Danny Neelys, who was only 40 years old when he died in the Jail on September 16, 2015.

> i. Frank Gomez, 46, who died on November 12, 2013, after only two months in the Jail.

426. As is shown by the extensive history above, Harris County and Harris Health routinely deny life-sustaining medications and regular glucose monitoring to diabetics and such denial causes a pattern of diabetic detainee injuries and deaths in the Jail.

427. Nor was this pattern a secret—as detailed above, the Department of Justice warned the Jail in 2009 that its constitutionally deficient medical care had caused detainee deaths including at least one Type 1 diabetic death and was likely to cause more if the Jail did not immediately implement changes to ensure detainees with chronic medical conditions like diabetes had accurately documented medical records, were assessed and periodically reassessed, and were prescribed and provided appropriate medication and lab work, among other changes.

428. In 2015, former detainee and Type 1 diabetic Ahmed Elsweisy's experience in the Jail was publicized in the Houston Chronicle in an article in which both the Harris County Commissioner's Court and the Sheriff's Office gave quotes. Some of the Sheriff's Office quotes were in direct response to Mr. Elsweisy's experience.

429. In 2016, Sheriff Ed Gonzalez spoke directly to the too-frequent deaths and injuries in the Harris County Jail during the televised debate for his position. Just two years later, in 2018, high risk medication practices like failing or refusing to provide life-sustaining medications like insulin and failing or refusing to order related, necessary tests like blood glucose monitoring continued at the Jail, prompting both Harris Health and the Harris County Sheriff's Office to study transitioning Jail medical care to Harris Health.

430. In late 2018 and early 2019, the HMA report made clear to Harris Health, Sheriff Gonzalez, and the Harris County Commissioner's Court that there was insufficient oversight over

detainees with chronic diseases like Type 1 diabetes and the Jail pharmacy was not providing needed support to providers managing detainees with chronic diseases like Type 1 diabetes.

431.    Throughout 2020 and 2021, the Harris County Commissioner's Court, Sheriff Gonzalez, and Harris Health continued to study transitioning healthcare from Harris County's direct responsibility to Harris Health's and approved plans for the transition.

432.    In June 2021, Harris Health hired Dr. Egins to help lead the transition. After his hire, on information and belief, he learned about the 2009 DOJ Report, the 2018 HMA report, the December 2020 Commission citation for dangerous medication practices, and the 2021 April HMA supplemental report. He also began working on-site at the Jail to study the Jail's policies, practices, and training in advance of Harris Health's takeover of Jail medical care nine months later.

433.    On information and belief, Sheriff Gonzalez was personally involved with the transition and either already knew or became aware of each the Jail's regular policies, practices, and training that affected Type 1 diabetics in the Harris County Jail described herein.

434.    Sheriff Gonzalez and Dr. Egins, as policymakers for Harris County and Harris Health, were aware that it was the policy or practice of providers to write single-dose orders of insulin for as long as a detainee remained in the JPC, when though Type 1 diabetics need insulin on a repeating, multiple-times-a-day basis to survive.

435.    Harris County and Harris Health's policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022, yet refused or failed to change the obviously dangerous policies and electronic health record until December 2022, at the earliest.

436.    Harris County and Harris Health's policymakers ratified this policy or practice when they failed or refused to train or re-train staff to order life-sustaining insulin as repeating or

maintenance orders for Type 1 diabetics until after December 2022, nine months after Mr. Shelton's death.

437.     Sheriff Gonzalez and Dr. Egins, as policymakers for Harris County and Harris Health, were likewise aware that it was the policy or practice of providers to wait to write a repeating order for insulin until after the detainee was ready to move into Jail housing, even though there was no reason to delay writing a repeating order for insulin as Type 1 diabetics need insulin on a repeating, multiple-times-a-day basis to survive.

438.     Harris County and Harris Health's policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022, yet refused or failed to change the obviously dangerous policies and electronic health record until December 2022, at the earliest.

439.     Harris County and Harris Health's policymakers ratified this policy or practice when they failed or refused to train or re-train staff to order life-sustaining insulin as repeating or maintenance orders for Type 1 diabetics until after December 2022, nine months after Mr. Shelton's death.

440.     Sheriff Gonzalez and Dr. Egins, as policymakers for Harris County and Harris Health, were aware that it was the policy or practice of providers to order single-instance or short term, e.g., not more than three days, orders for blood glucose monitoring for as long as a detainee remained in the JPC, despite Type 1 diabetics needing ongoing, regular monitoring to live.

441.     Harris County and Harris Health's policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022, yet refused or failed to change the obviously dangerous policy or practice.

442.     Sheriff Gonzalez and Dr. Egins, as policymakers for Harris County and Harris Health, were likewise aware that it was the policy or practice of providers to wait to order daily blood

glucose monitoring until a detainee was ready to move into Jail housing, even though there was no reason to delay writing a repeating order for blood glucose monitoring as Type 1 diabetics need ongoing, regular monitoring to live.

443.     Harris County and Harris Health's policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022, yet refused or failed to change the obviously dangerous policy or practice.

444.     Harris County and Harris Health's policymakers ratified this policy or practice when they failed or refused to train or re-train staff to order blood glucose monitoring as repeating or maintenance orders for Type 1 diabetics after March 1, 2022.

445.     Sheriff Gonzalez and Dr. Egins were aware that it was the policy or practice at the Harris County Jail to limit providers' orders for blood glucose monitoring to no more than twice a day for Type 1 diabetics, despite knowing Type 1 diabetics need such monitoring more often than twice a day.

446.     Harris County and Harris Health's policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022.

447.     Harris County and Harris Health's policymakers ratified this policy or practice when they failed or refused to train or re-train staff that they could order necessary blood glucose monitoring more frequently than twice a day for Type 1 diabetics after March 1, 2022.

448.     Sheriff Gonzalez and Dr. Egins were aware that it was the policy or practice at the Harris County Jail to treat blood glucose between 300 mg/dL and 350 mg/dL as "normal" blood glucose that did not require insulin, further blood glucose testing, or evaluation by a provider.

449.     Harris County and Harris Health's policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022.

450.     Harris County and Harris Health's policymakers ratified this policy or practice when they failed or refused to train or re-train staff to not to consider blood glucose between 300 mg/dL and 350 mg/dL as "normal" blood glucose that did not require insulin, further blood glucose testing, or evaluation by a provider.

451.     Sheriff Gonzalez and Dr. Egins were aware that it was the policy or practice at the Harris County Jail not to notify a provider if a detainee had a blood glucose between 300 mg/dL and 350 mg/dL.

452.     Harris County and Harris Health's policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022.

453.     Harris County and Harris Health's policymakers ratified this policy or practice when they failed or refused to train or re-train staff to not to notify a provider if a detainee had a blood glucose between 300 mg/dL and 350 mg/dL.

454.     Sheriff Gonzalez and Dr. Egins were aware that it was the policy or practice for providers in the provider pool in the Harris County Jail electronic medical record to not check messages containing detainee lab work results immediately or even within the same business day.

455.     Harris County and Harris Health's policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022.

456.     Harris County and Harris Health's policymakers ratified this policy or practice when they failed or refused to train or re-train providers to check messages with detainee lab work results immediately or within the same business day.

457.     Sheriff Gonzalez and Dr. Egins were aware that it was the policy or practice for medical personnel to not relay that a detainee identified that they were a Type 1 diabetic and

requested insulin to a provider either orally or through documentation in the electronic medical record.

458.     Harris County and Harris Health's policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022.

459.     Harris County and Harris Health's policymakers ratified this policy or practice when they failed or refused to train or re-train medical personnel to relay that a detainee identified that they were a Type 1 diabetic and requested insulin to a provider either orally or through documentation in the electronic medical record, or both.

460.     Sheriff Gonzalez and Dr. Egins were aware that it was the policy or practice for detention officers to not relay that a detainee identified that they were a Type 1 diabetic and requested insulin to medical personnel.

461.     Harris County and Harris Health's policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022.

462.     Harris County and Harris Health's policymakers ratified this policy or practice when they failed or refused to train or re-train detention officers to relay that a detainee identified that they were a Type 1 diabetic and requested insulin to medical personnel.

463.     Sheriff Gonzalez and Dr. Egins were aware that it was the policy or practice for Harris County not to train its detention officers to recognize the signs or symptoms of diabetic ketoacidosis or to understand the grave danger posed by diabetic ketoacidosis if a Type 1 diabetic does not receive insulin.

464.     Harris County and Harris Health's policymakers likewise knew it was the policy or practice of medical personnel at the jail to rely on detention officers as a go-between to report signs and symptoms of detainee illness or injury to medical personnel.

465. Harris County and Harris Health's policymakers ratified these policies or practices when they continued them after Harris Health took over on March 1, 2022.

466. Harris County and Harris Health's policymakers ratified these policies or practices when they failed or refused to train or re-train detention officers to recognize signs of symptoms of diabetic ketoacidosis or the grave danger posed by diabetic ketoacidosis if a Type 1 diabetic is not given insulin and continued to rely on detention officers as go-betweens to report signs or symptoms of diabetic ketoacidosis.

467. Sheriff Gonzalez and Dr. Egins were aware that it was the policy or practice for Harris County not to train its detention officers to report when a Type 1 diabetic detainee skipped or missed meals to medical personnel.

468. Harris County and Harris Health's policymakers ratified these policies or practices when they continued them after Harris Health took over on March 1, 2022.

469. Harris County and Harris Health's policymakers ratified these policies or practices when they failed or refused to train or re-train detention officers to report when a Type 1 diabetic skipped or missed meals, despite medical personnel's reliance on detention officers as go-betweens to report such information.

470. Sheriff Gonzalez and Dr. Egins were aware that it was the policy or practice for Harris County not to train its detention officers to report to medical personnel when a Type 1 diabetic in a single cell was too sick to leave their cell during their hour out.

471. Harris County and Harris Health's policymakers ratified these policies or practices when they continued them after Harris Health took over on March 1, 2022.

472. Harris County and Harris Health's policymakers ratified these policies or practices when they failed or refused to train or re-train detention officers to report to medical personnel

when a Type 1 diabetic in a single cell was too sick to leave their cell during their hour out to shower, make phone calls, or submit requests on the kiosk for help, despite the fact that detention officers served as a go-between for medical personnel and detainees.

473. Each of these individual policies and practices are related to and contributed to the ultimate policy and practice of Harris County and Harris Health in place at the time of Mr. Shelton's death—intentionally or deliberately denying Type 1 diabetics life-sustaining insulin and at-least daily blood glucose monitoring.

474. Harris County and Harris Health's policymakers were aware that their employees and contractees were intentionally or deliberately denying Type 1 diabetics life-sustaining insulin and at-least daily blood glucose monitoring in the years before Mr. Shelton's death.

475. Harris County and Harris Health's policymakers ratified this policy or practice when they continued it after Harris Health took over on March 1, 2022.

476. Harris County and Harris Health's policymakers ratified this policy or practice when they failed or refused to train or retrain their employees and contractees to provide diabetic detainees with the insulin they needed to survive and to regularly monitor their blood glucose.

477. As a direct and proximate result of their policies and practices, Harris County and Harris Health employees and contractees denied Mr. Shelton his life-sustaining insulin, causing his death.

### F. Harris County Has Failed to Monitor Detainees and Understaffed its Jail for Years.

478. The repeated failures and refusals of the Defendant Detention Officers and Defendant Sergeants to observe Mr. Shelton at least every sixty minutes between March 23 – 27, 2022 were par for the course in Harris County Jail where the Sheriff has understaffed the Jail and detention

officers have failed or refused to observe and monitor detainees for over a decade, resulting in well-publicized detainee deaths and injuries.

479.    In March 2013, detainee Alex Guzman died by suicide while detention officers Dustin Grant and Fidel Sosa charged with checking him every thirty minutes instead ate pizza and studied online classes for their jailer's licenses.

480.    After Mr. Guzman was found, the two officers fabricated observation rounds to cover for their missed checks. Though officers Grant and Sosa were removed from their jobs after the false checks were discovered, on information and belief, the Harris County Sheriff later agreed to hire Grant back, despite his fabricating records.

481.    In a December 2015, in another Houston Chronicle article,[7] the president of the Harris County Deputies Organization identified Mr. Guzman's death as a "symptom" of the Jail's overworking detention officers and lack of sufficient staffing.

482.    Seven months after Mr. Guzman's untimely death, on October 10, 2013, Commission inspectors on site at the Harris County Jail found detainee Terry Goodwin in a single cell with no working toilet, surrounded by trash, swarms of bugs, and his own feces after not being let out of his cell for almost two months.

483.    While Mr. Goodwin survived his ordeal, it was determined that detention officers Ricky Pickens-Wilson and John Figaroa had faked observation checks, documenting that they had personally observed Mr. Goodwin and that everything was fine. Like Defendant Detention Officer Lauder, detention officers had simply been dropping food through Mr. Goodwin's door while doing nothing to check on him.

---

[7] St. John Barned-Smith, "Calls for training, better cell checks follow Harris County Jail suicides," HOUSTON CHRONICLE (Dec. 1, 2015) *available at* *https://www.houstonchronicle.com/news/houston-texas/houston/article/Calls-for-training-better-cell-checks-follow-6666190.php*

484. On June 2, 2015, the Harris County Commissioner's Court approved a settlement with Mr. Goodwin for the extreme neglect he suffered in the Jail while officers fabricated checks.

485. In October 2014, detainee Andre Bonier died in the mental health unit of the Harris County Jail in a single cell. As with Mr. Shelton, Harris County documented his death as resulting from "natural" causes. In Mr. Bonier's case, the cause of death was untreated pancreatitis, a painful but treatable condition that also causes severe pain, nausea, and vomiting.

486. It was later determined two Harris County Jail employees, Pius Ikuopenikan and Jane Emeharole, had falsified observation checks indicating that they had personally observed Mr. Bonier every fifteen minutes in the hours before he died when they had not checked on him at all for hours.

487. Like Mr. Guzman's death and Mr. Goodwin's ordeal, the death of Mr. Bonier received extensive media attention. On information and belief, Sheriff Gonzalez was aware of each of these deaths and the fabricated observation checks when he became Sheriff.

488. In the same November 2015 news article raising unsafe and unhealthy conditions at the Harris County Jail and the experience of Ahmed Elsweisy, the Houston Chronicle identified at least 35 instances where detention officers failed to complete and/or fabricated observation checks, including for detainees in single cells, in just the previous nine months.

489. On February 13, 2017, after Sheriff Gonzalez took over as Sheriff of the Harris County Jail, another detainee, Vincent Young, died by suicide after detention officers failed to check on him for over an hour.

490. On information and belief, the Texas Rangers determined that Detention Officer Abraham Romero, the detention officer charged with observing Mr. Young, fabricated 21 observation checks. When he was caught by the investigating Rangers, he blamed a lack of other

detention officers to escort staff visiting detainees in infirmary cells as causing him to not have enough time to conduct observation rounds. On information and belief, as the Sheriff, Ed Gonzalez was notified of the Texas Rangers' findings concerning fabrication of records.

491.    On April 3, 2017, the Commission again cited the Harris County Jail, this time for failing to observe two detainees for ten hours. In reality, the two detainees were locked inside of a transit van.

492.    News reports indicated the detention officers had not realized the two detainees were missing, despite the requirement that they observe them face-to-face every sixty minutes. Instead, the detainees were found when passersby notified the Jail that detainees were banging to be let out of the van. On information and belief, the detention officers charged with monitoring these two detainees fabricated the sixty-minute observation checks during the ten hours the detainees were missing.

493.    Detention officers also failed to monitor Cavalas Prater, a mentally ill inmate found not guilty by reason of insanity awaiting transfer to a state hospital. As a result of detention officers' failure to monitor him, Mr. Prater was able to obtain a razor and sever his penis. On information and belief, the Sheriff was aware of this serious and horrific incident as well as the monitoring failures that led to it.

494.    On December 1, 2017, detainee Maytham Alsaedy died by suicide after he had blocked the window in his cell with paper. Though a detention officer marked that he had completed an observation round, this was impossible as Mr. Alseady's window covering prevented the officer from actually observing him as he walked by.

495. The Commission cited the Jail on December 19, 2017 for failing to properly observe Mr. Alsaedy after video surveillance revealed the detention officer fabricated the observation of Mr. Alseady.

496. On August 15, 2018, detainee Debora Ann Lyons left her cell to go to the Clinic in the Jail. She then found an empty meeting room and, unfortunately, hung herself. Despite Ms. Lyons not being on her unit, the detention officer charged with observation checks fabricated an observation round indicating that he had observed her in her cell during this time.

497. On August 23, 2018, the Commission again cited Harris County for violating minimum jail standards for observation checks, raising the detention officer's marking an observation check for Ms. Lyons when she was missing as cause for the citation.

498. On July 29, 2019, detainee Natividad Flores began seizing after Harris County denied him epilepsy medication for two days and a low bunk. After multiple seizures on July 29 and 30, 2019, Mr. Flores fell from his top bunk and suffered a serious head injury.

499. In August 2020, Mr. Flores sued Sheriff Gonzalez for violations of his Fourteenth Amendment rights. Mr. Flores specifically alleged that Harris County detention officers failed to monitor him in addition to denying him medical care. On May 23, 2022, Harris County settled Mr. Flores's claim.

500. Sheriff Gonzalez was aware of this pattern of falsifying and not completing observation checks.

501. On information and belief, in 2020, the Sheriff did away with paper documentation of observations and implemented CorreTrak electronic monitoring in part because he acknowledged that paper records were subject to manipulation and were being manipulated.[8] But

---

[8] *See* December 8, 2021 Press Conference of Ed Gonzalez addressing issues at the Harris County Jail at 9:09 (discussing history of implementing CorreTrak), *available at* https://tinyurl.com/yjjvbj3r.

Sheriff Gonzalez failed to correct the real problem – officers not doing their job and endangering detainees. Thus, the implementation of CorreTrak did not stop Harris County detention officers' practices of failing to monitor detainees and fabricating observation checks.

502.     In December 2020, the Commission again cited Harris County Jail for failing to conduct face-to-face observations on detainees every sixty minutes on detainees and every thirty minutes on detainees known to be suicidal.

503.     On February 21, 2021, a Defendant Detention Officer was caught with another detention officer sitting in the pod control center of her assigned unit, playing on her phone rather than conducting observation rounds. Over two hours had passed since Defendant Detention Officer had observed detainees in their cells.  Harris County and Sheriff Gonzalez did not even formally suspend the Defendant Officer for this failure to monitor.

504.     On April 6, 2021, the Commission cited Harris County Jail again during its investigation of the death of detainee Jaquaree Simmons who, like Mr. Shelton, had not been checked for hours before he died, despite minimum jail standards requiring sixty-minute checks. On information and belief, it would later be determined that detention officers falsified not only the observation checks but also the use of force reports to cover that Mr. Simmons had been beaten by officers.

505.     On May 11, 2021, detainee Rory Ward Jr. was found unresponsive in his single cell in the Harris County Jail with obvious facial bruising and swelling. He was taken to Harris Health's Ben Taub Hospital where he died the following day of a head injury sustained on May 8th in the Jail.

506.     Though detention officers almost certainly knew Mr. Ward had been beaten, they failed to observe him at least every thirty or sixty minutes as required by Texas regulations.

Accordingly, he deteriorated and died from a brain hemorrhage over the course of three days without a single officer offering him any help.

507.     As the Sheriff, Sheriff Gonzalez was aware of each of the above citations from the Commission for violating minimum jail standards as well as the facts, circumstances, failures to monitor, and fabrication of records associated with each citation. He was likewise aware of each of the above injuries and deaths, and the monitoring failures that lead to them and the massive fraud that followed, even when they did not result in Commission citation.

508.     On September 20, 2021, two Harris County detention officer whistleblowers filed suit against Sheriff Gonzalez and the members of the Harris County Commissioner's Court on behalf of a putative class of Harris County detention officers raising complaints about conditions at the Harris County Jail.[9]

509.     In their original complaint, these Harris County detention officers relayed that throughout 2021, there was insufficient staffing to complete observation rounds, accompany nurses onto units, escort detainees to the clinics, respond to emergencies, and complete other assigned duties.

510.     Whistleblower Detention Officer John Doe 5 stated when the complaint was filed, "[t]he CorreTrak rounds only allow for a few minutes a round per pod and that just does not allow enough time for the D[entention] O[fficers] to talk to the inmates, address problems, or to do tasks to meet their needs. Just simple stuff like getting an inmate toilet paper or an extra blanket cannot be done with these low staffing numbers."[10]

---

[9] *See, John Doe 1 & John Doe 2 v. Harris County, Texas, et al.*, Cause No. 4:21-cv-03036 in the United States District Court for the Southern District of Texas, Doc. 1, Plaintiffs' Original Complaint for Declaratory Judgment and Injunctive Relief.
[10] Id. at pp. 78-79, ¶ 183.

511.     Whistleblower Detention Officer Jane Doe 7 similarly admitted that she could not do rounds fast enough to stay in compliance—and the ones she could complete were done by "going to each CorreTrak scanner and scanning the round, not taking the time to look at the inmates or have any meaningful inspection of the inmate's condition."[11]

512.     Whistleblower Detention Officer John Doe 34 agreed that detention officers "only have time to go in and scan the rounds but they do not have time to do the rounds right."[12]

513.     Whistleblower Detention Officer Jane Doe 1 admitted that "the staffing reports transmitted to the Texas Jail Commission are always incorrect and are essentially fabricated" to suggest the Jail was meeting minimum staffing ratios when it was not, a mere six months before the Defendant Detention Officers failed or refused to monitor Mr. Shelton.

514.     Whistleblower Detention Officer John Doe 15, an eight year veteran Harris County Detention Officer identified in the complaint that "it is impossible for one person to do all the rounds on a floor in a shift….Now rounds are conducted using a cell phone like device called CorreTrak. There is no accounting of these machines or of who is logged in during the rounds…There are not enough devises [sic] for each detention officer, so the CorreTraks are passed around from officer to officer and there is no accounting for who is doing a round."[13]

515.     Whistleblower Jane Doe 4, a Jail supervisor, disclosed after retiring in 2021 "that the [Sheriff's office] forced the employees who work the jail to lie on a daily basis about the [staffing] ratio and to not put in the reason for a round to be late, the staff [are] told to lie about the reason and to not report the real reason, which is understaffing."

---

[11] *Id*. at p. 94, ¶ 210.
[12] *Id*. at p. 105, ¶ 232.
[13] *Id*. at p. 89, ¶ 202.

516. As a defendant, Sheriff Gonzalez received a copy of the *Doe* complaint in September 2021 which served to put him on notice of a fact he already knew: detention officers were still not actually observing detainees during rounds and instead were falsifying rounds and staffing reports. As the Sheriff, he was already well aware that the Jail was severely understaffed. Yet he failed to correct the abuse and left jail detainees at grave risk.

517. In November 2021, the Commission again cited the Jail for failing to observe detainees, noting stretches of 90 to 144 minutes where detention officers failed to observe detainees as required. That same report documented lack of sufficient staffing at the Harris County Jail to perform necessary duties. As Sheriff, Sheriff Gonzalez was aware of this citation and did nothing to correct the danger.

518. During a December 8, 2021 press conference discussing the November Commission citation and a sexual assault at the Jail, Sheriff Gonzalez described issues with staffing in the summer of 2021 as "desperation mode," leaving the Jail "scrambling" to ensure sufficient staffing.[14] While he denied that the Jail was below minimum staffing during the press conference, he acknowledged that more staff were needed at the Jail and specifically cited observation rounds as things that could continue to be missed with the Jail's minimum staffing.[15]

519. Because of the ongoing lack of staffing in the Jail in the months before Mr. Shelton's death, Sheriff Gonzalez also knew that each of the Defendant Detention Officers and Defendant Sergeants were forced to work mandatory overtime, contributing to the practice of rushing through observation checks and failing to monitor detainees for signs of medical distress.

---

[14] December 8, 2021 Press Conference of Ed Gonzalez addressing issues at the Harris County Jail beginning at 41:03, *available at* https://tinyurl.com/yjjvbj3r.
[15] *See id.* beginning at 37:45.

520.     The ease and comfort with which the Defendant Detention Officers in this case falsified who was walking by Mr. Shelton's cell during rounds and fabricated observation rounds out of whole cloth is indicative of the pervasive nature of this practice in place when Mr. Shelton died.

521.     Indeed, the fact that Internal Affairs investigators belatedly found that no fewer than eight "observation" rounds completed by five of the Defendant Detention Officers and Sergeants during the hours when Mr. Shelton lay obviously dying and then developing rigor mortis in his cell met the Sheriff's standards for observation rounds is indicative of the practice of insufficient monitoring of detainees in place prior to and in March 2022.

522.     Likewise, the non-observation rounds completed by the two Defendant Sergeants in this case, charged with supervising the other Defendant Detention Officers and the quality of their rounding, speaks to the widespread acceptance of this practice in the Jail in March 2022.

523.     Following Mr. Shelton's death, in June 2022, the whistleblower detention officers affirmed in the *Doe* amended complaint that fabrication of CorreTrak rounds had continued unabated after September 2021.[16]

524.     Harris County's pattern of insufficient monitoring and lack of staff continued after Mr. Shelton's death, with the Commission citing the Jail for fabricated staffing records on March 3, 2023 and again for failing to monitor on April 17, 2023 after detainee Fabian Cortez died by suicide after being unobserved for 88 minutes in the JPC.

525.     As of the filing of this amended complaint, Harris County remains out of compliance with minimum jail standards for minimum staffing and detainee monitoring.

---

[16] *See, John Doe 1 & John Doe 2 v. Harris County, Texas, et al.*, Cause No. 4:21-cv-03036 in the United States District Court for the Southern District of Texas, Doc. 25, First Amended Complaint for Declaratory Judgment and Injunctive Relief, p. 19, ¶ 79.

526.     This extensive history shows that, when Mr. Shelton died in March 2022, Harris County had a long-standing policy of insufficient staffing and an equally long-standing practice of detention officers' routinely failing to monitor detainees that was known but deliberately not remedied by Sheriff Gonzalez. The routine failure to monitor is highlighted by the Jail's pattern of fabricated observation checks usually discovered only when detainees died or were seriously harmed.

527.     Sheriff Gonzalez knew he was understaffing his Jail and detainees were not being observed, as evidenced by the numerous deaths, documented instances of fabricated detainee monitoring, repeated citations by the Commission in the five years before Mr. Shelton died, the *Doe* detention officer admissions, and his own December 8, 2021 press conference addressing staffing following a brutal sexual assault in the Jail.

528.     As policymaker for Harris County, Sheriff Gonzalez enacted, continued, and failed to remedy the policy of understaffing the Jail. He knew that his policy of understaffing had caused serious injuries and deaths of detainees. He likewise knew that his policy of understaffing and effectively condoning fraud had contributed to or outright caused detention officers to not have enough time to observe detainees during observation rounds.

529.     Despite knowing it was obviously dangerous to understaff his Jail, that doing so had caused detainee deaths and serous injuries in the past, and that understaffing continued to pose a grave risk to detainees, Sheriff Gonzalez intentionally and deliberately did not change his policy but continued to understaff his Jail and retain officers he knew had endangered detainees in March 2022.

530.     He likewise knew that his policy of understaffing the Jail and the resulting pressure this placed on detention officers had led to the widespread and obviously dangerous practices of

detention officers' failing to actually observe detainees during rounds, falsifying rounds activity reports, and fabricating observation rounds when no rounds were done. The *Doe* detention officers admitted as much to him, though the numerous deaths resulting during periods where detainees went unmonitored had put him on notice well before September 2021.

531.     Sheriff Gonzalez was also aware that detention officers were fabricating observation rounds, even after he implemented CorreTrak. In just the five years before Mr. Shelton died, at least five detainees died, at least two more were injured, and two more were locked in a van for ten hours after detention officers fabricated observation rounds—and these are only the incidents that were uncovered publicly.

532.     Sheriff Gonzalez actually knew that the practices in the Jail of detention officers' not observing detainees, falsifying rounds, and fabricating checks entirely were extremely dangerous, had caused death and injury to detainees in the past, and were all but guaranteed to cause more deaths and injuries if they continued, yet he intentionally and deliberately did nothing to stop them, even after whistleblowers unequivocally admitted that they were not observing detainees. Instead, he was deliberately indifferent to the known and obvious consequences of these practices and chose to allow them to continue.

533.     Each of these individual policies and practices were known to Sheriff Gonzalez, directly led to violations of the Constitution and ADA/Rehab Act and caused Mr. Shelton's death.

534.     Pursuant to these policies and practices, each of the Defendant Detention Officers and Defendant Sergeants deliberately and intentionally failed to observe Mr. Shelton for signs of medical distress with several going so far as to document that everything was fine on Mr. Shelton's unit as he lay dying.

535.     Accordingly, none of the Defendant Detention Officers or Sergeants noticed Mr. Shelton's obvious medical distress, or alternatively, just did not care, and none sought help for Mr. Shelton until it was far too late and Mr. Shelton was dead.

536.     As a direct and proximate result of these policies and practices and the deliberate indifference of Sheriff Gonzalez and his detention officers, Harris County failed to observe and disregarded Mr. Shelton's serious medical needs, causing his death.

### G. Plaintiffs' Notices to Preserve Records and Harris County's Destruction of Responsive Records Constitutes Textbook Spoliation.

537.     On April 26, 2022, less than thirty days after Mr. Shelton's shocking death, Plaintiffs' counsel John Flood submitted a Texas Public Information Act Request to Harris County specifically asking for "all jail records" of Matthew Ryan Shelton specifically including but not limited to all photographs and video depicting Mr. Shelton in the jail.

538.     When Harris County received this request, it was already anticipating litigation concerning Mr. Shelton's death and had already stored some but not all of the records related to Mr. Shelton's death in an online drive called "CJC Litigation." On information and belief, CJC stands for Criminal Justice Command.

539.     On information and belief, on April 26, 2022 when Harris County received the request, none of the surveillance video footage of Mr. Shelton in the Harris County Jail had been deleted, nor had the full CorreTrak Rounds Activity reports.

540.     Under Texas laws and regulations, if a public information act request, litigation, or other claim is pending when the retention period for a local government record runs, the record cannot be destroyed until the action is resolved along with all issues that arise from it. 13 TEX. GOV'T CODE § 7.125(a)(5); *see also* TEX. GOV'T CODE § 441.158(a) - (b) (requiring the Texas

State Library and Archives Commission set a retention schedule with mandatory minimum retention periods for local governments.)

541.     Harris County had a duty on April 26, 2022 to immediately ensure all of Mr. Shelton's records including but not limited to all video surveillance and CorreTrak Rounds Activity records were preserved.

542.     Though Plaintiffs' April 26, 2022 request was unambiguous, at Harris County's request for clarification, on May 18, 2022, Plaintiffs' counsel John Flood confirmed the original request for Mr. Shelton's records specifically included all papers, documents, notes, photographs, and *all audio and video recordings of Mr. Shelton*.

543.     In lieu of providing these records, Harris County requested an opinion from the Texas Attorney General's Office to determine whether it was required to release the records under the Texas Public Information Act. Harris County was required to preserve all of the requested records during this period.

544.     Though Harris County already reasonably anticipated litigation in April 2022, Plaintiffs' counsel also notified the Harris County Commissioner's Court and the Harris County's Sheriff's Office by certified letter dated August 30, 2022 of the County's duty to preserve evidence including all photographs, videos, audio recordings, daily logs, and other records of Matthew Shelton while in the Harris County Jail. The Commissioner's Court received this letter on September 1, 2022 and the Sheriff's Office on September 6, 2022.

545.     Despite Harris County's being on notice to preserve video, rounds activity logs, and other records, Harris County destroyed these records.

546.     The CorreTrack records showing when detention officers logged observation checks on Mr. Shelton from the morning of March 23, 2022 until 3:24 p.m. on March 25, 2022 were destroyed on May 17, 2023.

547.     All video surveillance of Mr. Shelton alive at the Jail was destroyed on an unknown date after April 26, 2022. At a minimum, this video surveillance included (a) surveillance footage of Mr. Shelton in the JPC on March 22 and 23, 2022; (b) surveillance footage of Mr. Shelton being transferred from the JPC to 1200 Baker on the morning of March 23, 2022; (c) surveillance footage of Mr. Shelton arriving on the 2L1 unit and being placed into his cell on the morning of March 23, 2022; (d) surveillance footage from March 23, 2022 when LVN Esapa measured Mr. Shelton's blood glucose in the dayroom of the 2L1 unit accompanied by an unknown Harris County detention officer at 4:48 p.m.; (e) surveillance footage from March 24, 2022 when LVN Ogunsanya measured Mr. Shelton's blood glucose in the dayroom and told the unknown Harris County detention officer Mr. Shelton needed to go to the medical clinic at 1:54 a.m.; and (f) video surveillance footage of Mr. Shelton's phone call to his sister at approximately 9:45 p.m. on March 24, 2022 in the dayroom and any other footage of Mr. Shelton from this time out of his cell.

548.     This video surveillance footage would also have included (a) surveillance footage on March 25, 2022 if Mr. Shelton was able to leave his cell for his designated hour out of his cell; (b) surveillance footage on March 26, 2022 if Mr. Shelton was able to leave his cell for his designated hour out of his cell; (c) surveillance footage of Mr. Shelton attempting to speak to Harris County detention officers, including the Defendant Detention Officers, during any sixty-minute checks on March 23 – 26, 2022 that were actually done; and (d) surveillance footage showing the Defendant Detention Officers did not do observation checks as required in keeping with the pattern evidenced herein; and e) other unknown footage.

549. Video surveillance of officers conducting rounds activity from the morning of March 23 – 26, 2022 was also destroyed, as was video surveillance that would show these checks were not, in fact, completed at all.

550. The only reason video surveillance exists from observation checks on March 27, 2022 and of Mr. Shelton's body as Defendants removed him from his cell is that Harris County was required to produce these videos to the Commission. Harris County took no steps to preserve this video or any other video in response to Plaintiffs' requests or notices though it knew it had an obligation to do so. Rather, it knowingly and purposefully destroyed material evidence of potentially criminal, blatantly unconstitutional, and discriminatory conduct by Harris County detention officers.

## IV. CAUSES OF ACTION

### A. Americans With Disabilities Act and Rehabilitation Act of 1973 against Defendants Harris County and Harris Health

551. Plaintiffs incorporate the foregoing as if fully restated herein and further state that Harris County and Harris Health are recipients of federal funds to run, albeit in a patently dangerous fashion, the Harris County Jail.

#### 1. Insulin and blood glucose monitoring are necessary and reasonable accommodations Type 1 diabetics require in the Harris County Jail.

552. Title II of the ADA and the Rehab Act require public entities, like Harris County and Harris Health, to reasonably accommodate people with disabilities in all their programs and services for which people with disabilities are otherwise qualified. These accommodations ensure detainees with disabilities have equal access to and can obtain the same benefit from the Jail's programs and services.

553.     Type 1 diabetes, particularly in the Jail environment where Harris County and Harris Health control access to insulin, blood glucose monitoring, food, and housing, is a disability under the ADA and Rehab Act.

554.     Jail housing and classification, recreation programs, vocational programs, meals, supervision, phone calls, sick call and grievance requests, showers, and even detention so that a person can be brought to court are programs, services, and activities offered by Harris County to all detainees at the Jail for purposes of the ADA and the Rehab Act.

555.     Type 1 diabetics, like Mr. Shelton, require regular administrations of insulin and blood glucose monitoring before meals in order to access these services and obtain the same benefit enjoyed by non-disabled detainees in the Jail. Insulin, blood glucose monitoring, and low carbohydrate diets are thus reasonable accommodations under the ADA and Rehab Act.

556.     Without insulin and blood glucose monitoring, Type 1 diabetic detainees at the Jail are unable to digest meals provided to detainees. This is true even if Type 1 diabetics receive special diabetic meals—while they are easier to digest, a Type 1 diabetic still must receive insulin and blood glucose monitoring in order to derive the same benefit from meals as non-disabled detainees.

557.     Without the reasonable accommodations of insulin and blood glucose monitoring, Type 1 diabetic detainees quickly become too weak, suffer too much pain, and become too ill to engage in vocational programming and recreation programs.

558.     In fact, like Mr. Shelton, when Type 1 diabetics are denied the reasonable accommodations of insulin, blood glucose monitoring, and special meals, they become too ill and sick to leave their cells so that, unlike non-disabled detainees, they do not have access to make phone calls, submit requests for help to Harris Health and/or Harris County, or even shower.

559.     Likewise, when a Type 1 diabetic is denied reasonable accommodations of insulin and blood glucose monitoring and inevitably develops diabetic ketoacidosis, they become too ill to go to court and are denied this service provided to non-disabled detainees.

560.     As a Type 1 diabetic denied insulin and blood glucose grows sicker from diabetic ketoacidosis, they not only suffer torturous pain they also lose the benefit of their safe housing.

561.     Increased observation and monitoring of Type 1 diabetic detainees, especially in single cells, is a reasonable and obvious accommodation Harris County was required to provide to Mr. Shelton.

562.     Of course, when a Type 1 diabetic is denied the reasonable accommodations of insulin and blood glucose monitoring until they die of diabetic ketoacidosis, the detainee loses all access to all Jail services and programs. Unlike non-disabled detainees, a Type 1 diabetic who dies of diabetic ketoacidosis after being denied reasonable accommodations never receives the benefit of the detention to bring them to trial.

563.     Medical care is also a service offered to all detainees by Harris County and Harris Health at the Harris County Jail for purposes of the ADA Title II and the Rehab Act.

564.     Insulin and blood glucose monitoring are themselves reasonable and necessary accommodations for a Type 1 diabetic to receive further medical care. A Type 1 diabetic in ketoacidosis from being denied insulin for several days cannot access the Clinic for medical care like non-disabled detainees, even for care unrelated to diabetes. They cannot ask for help, they cannot access the kiosk, and they cannot go to the Clinic, though non-disabled detainees can do all of these things.

565.     Where there are policies and practices in place that serve to deny Type 1 diabetics access to the Clinic, like a failure to follow up when a detainee who is expected in the Clinic does

not arrive, Harris County and Harris Health likewise have an obligation under the ADA and Rehab Act to make reasonable accommodations to these policies when necessary to ensure Type 1 diabetics have the same access to medical care.

566.     Training detention officers to recognize the signs and symptoms of low and high blood glucose and diabetic ketoacidosis and to understand the gravity of the situation when a Type 1 diabetic is denied insulin is also a reasonable accommodation under the ADA and Rehab Act, particularly where medical personnel rely on detention officers to raise medical concerns and spot detainees who are too ill to ask for help or don't know how to ask for help.

567.     Notifying medical personnel and detention officers that a detainee they are interacting with is a Type 1 diabetic is also a reasonable and necessary accommodation to ensure Type 1 diabetic detainees at the Harris County Jail are not denied equal access to the programs and services at the Jail.

### 2. Mr. Shelton was a qualified individual with a disability who requested accommodations for his diabetes.

568.     Mr. Shelton suffered from Type 1 diabetes and was insulin-dependent, requiring several doses of both short- and long-acting insulin and blood glucose monitoring at least daily to manage his diabetes.

569.     These impairments substantially limited Mr. Shelton's ability to carry out the normal operation of his endocrine system and digest food. Once Defendants intentionally and deliberately denied Mr. Shelton access to life-sustaining insulin, his diabetes affected his ability to maintain consciousness, breathe, and, ultimately, live.

570.     As a detainee in the Jail with physical impairments that substantially limited his ability to have a functioning endocrine system, digest food, maintain consciousness, breathe, and

live, Mr. Shelton was a qualified individual with a disability within the meaning of the ADA and the Rehab Act.

### 3. Defendants were aware of Mr. Shelton's disabilities and his need for accommodations.

571.     Mr. Shelton informed Harris County staff, Harris Health staff, and the individual Defendant Detention Officers and Sergeants that he was a Type 1 insulin-dependent diabetic. Harris County and Harris Health's staff confirmed that Mr. Shelton did in fact suffer from this disease. The individual Defendants all had easy access to his Jail records to confirm he was a Type 1 diabetic.

572.     Defendants Harris County and Harris Health and their staff were aware of the limitations imposed on Mr. Shelton by his diabetes, including his inability to have a functioning endocrine system and to digest food, as well as his inability to maintain consciousness, breathe, and live if not provided with insulin.  In fact, in the first few days of his incarceration, Harris County's and Harris Health's staff observed dangerously high blood glucose levels on numerous occasions – all of which mandated insulin for Mr. Shelton.

573.     Mr. Shelton asked Defendants for accommodations for his disability when he entered the Jail and when he repeatedly asked for insulin in the days before his death.

574.     To the extent Defendants claim they were unaware of Mr. Shelton's disabilities, Plaintiffs aver that Mr. Shelton's disabilities were obvious, as was his need for accommodations.

### 4. Defendants excluded Mr. Shelton from participation in and denied him the benefits of the Jail's services, programs, and activities by denying his reasonable accommodations.

575.     As a detainee in the Harris County Jail, Mr. Shelton was "qualified" to access each of these programs and services.

576.     Mr. Shelton was entitled to reasonable modifications to Harris County's and Harris Health's policies and practices—i.e. being provided with insulin and regular blood glucose monitoring—so that he could live to access the Jail's housing and classification, recreation programs, vocational programs, meals, supervision, phone calls, kiosk to submit requests, showers, and detention to be brought to court.

577.     Mr. Shelton was also entitled to reasonable modifications to Harris County's and Harris Health's policies and practices of denying insulin and blood glucose monitoring to diabetic detainees so that he could access ongoing medical care for his Type 1 diabetes and diabetic ketoacidosis.

578.     Mr. Shelton was also entitled to have Harris County and Harris Health make other reasonable accommodations to their policies and practices that prevented him from accessing the Jail's services and programs—like diabetes-specific training for detention officers, modifications to practices concerning follow up in the Clinic after a pass was issued, and notification and documentation of his requests for insulin and his missing or skipping meals.

579.     He was likewise entitled to have Harris County and Harris Health make reasonable accommodations for his disability by modifying the single-dose order policy practice, the short-term blood glucose order policy practice, and the no-more-than-twice-a-day blood glucose order policy or practice to ensure Mr. Shelton received insulin and blood glucose monitoring in time to access and benefit from the Jail's programs and services.

580.     In fact, Harris County and Harris Health acknowledged in their corrective action to the Commission that making regular, repeating dosages of medications the default order rather than single-dose orders would correct a deficiency that led to Mr. Shelton's death and was a modification they were easily able to make.

581. Similarly, Harris County's and Harris Health's employees and contractees notify medication prescribers and other medical personnel of other medical events and document the same in detainee medical records. Notifying medication prescribers and documenting when Mr. Shelton's blood glucose was measured over 300 mg/dL, when he requested insulin, and when he missed meals were reasonable and obvious modifications Defendants were easily able to make to their policies and practices.

582. Indeed, simply providing insulin and regular blood glucose monitoring to Mr. Shelton were reasonable accommodations Defendants could easily have made and knew were necessary to ensure his access to their regular jail programs, services, and activities.

### 5. *Defendants denied Mr. Shelton's reasonable accommodations, deliberately discriminated against him because of his disability, and caused his painful death.*

583. Instead of accommodating Mr. Shelton by giving him insulin and monitoring his blood glucose, as required under the ADA and Rehab Act, Defendants deliberately and intentionally failed to make these reasonable accommodations for Mr. Shelton's needs, thereby causing him to suffer more pain and punishment than non-disabled detainees. Because of Defendants' failures, Mr. Shelton could not regulate his blood glucose, suffered intolerable pain, and ultimately fell unconscious and died.

584. Defendants Harris County and Harris Health should have accommodated Mr. Shelton by

   a. Prescribing insulin as a repeating or maintenance medication;

   b. Ordering blood glucose monitoring on a repeating basis, rather than for only three days;

   c. Monitoring his blood glucose levels multiple times each day, including before meals not just twice;

   d. Notifying medical personnel and detention officers that he was a Type 1 diabetic;

e. Training detention officers to recognize signs and symptoms of Type 1 diabetes and to understand that a Type 1 diabetic must have insulin multiple times a day every day to survive;

f. Notifying providers when his blood glucose level was over 300 mg/dL;

g. Notifying providers when he asked for insulin;

h. Documenting his requests for insulin;

i. Following up when he did not arrive in the Clinic after receiving a white pass from medical personnel;

j. Requiring a Type 1 diabetic given a white pass by medical personnel to immediately receive a red transit pass and an escort to the Clinic;

k. Ensuring Type 1 diabetics understand how to submit sick call requests by explaining to them the process;

l. Monitoring Type 1 diabetics specifically for signs and symptoms of diabetic ketoacidosis;

m. Providing additional time and interactions during monitoring to ensure he was not in distress due to his Type 1 diabetes;

n. Requiring medical personnel in the JPC to confirm using medical records that a Type 1 diabetic has orders for insulin and blood glucose before indicating a detainee can be housed;

o. Notifying medical personnel when he missed or ate only partial meals; and

p. Documenting his missing meals.

585. Yet, Harris County and Harris Health deliberately failed or refused to make any of these reasonable modifications to their policies and practices despite knowing Mr. Shelton was a Type 1 diabetic and that he needed insulin and glucose monitoring in order to live and that the failure to provide these accommodations would kill him. Harris County and Harris Health's failures and the failures of their employees and contractees to make accommodations was intentional and illegal discrimination under the ADA, entitling Plaintiffs to compensatory relief.

586. As a direct and proximate result of Defendants' actions and deliberate disregard for Mr. Shelton's disability, Mr. Shelton died a horrific death and Plaintiffs suffered damages.

587.     On information and belief, Harris County and Harris Health accept federal funding for the programs, divisions, and personnel at issue in this lawsuit.

### B. Fourteenth Amendment § 1983 Monell Claim Against Defendants Harris County and Harris Health – Deliberate Indifference to Medical Care and Unconstitutional Conditions of Confinement

588.     Plaintiffs incorporate the foregoing for all purposes as if fully restated herein and further state:

589.     Defendants Harris County and Harris Health adopted dangerous conditions in the Harris County Jail that proximately caused the death of Mr. Shelton and the violation of his rights under the Fourteenth Amendment.

590.     Moreover, the actions of Defendants' employees and contractees described in this complaint constituted medical care so deficient and a denial of access to care so egregious that it amounted to deliberate indifference to Mr. Shelton's serious medical needs, in violation of the Fourteenth Amendment.

591.     At all material times, Defendants' employees and contractees whose actions and inactions are described herein acted under color of state law, as agents of Harris County and/or Harris Health.

592.     At all material times, Defendants' employees and contractees whose actions and inactions are described herein were acting within the scope of their duties at the time they denied Mr. Shelton his life-sustaining insulin and glucose monitoring.

593.     Defendant Harris Health's policymaker for all matters related to healthcare at the Harris County Jail was and still is Dr. O. Reggie Egins.

594.     Defendant Harris County's policymaker for all matters related to the Harris County Jail was and still is Sheriff Ed Gonzalez.

595.    Defendants Harris County and Harris Health had or ratified the following policies, practices, or customs in place when their employees and contractees denied Mr. Shelton his necessary insulin and glucose monitoring between March 22 and March 27, 2022:

a.  Prescribing insulin as a single-dose medication for Type 1 diabetics and not on a recurring basis;

b.  Training providers to order insulin as a single-dose order for Type 1 diabetics;

c.  Failing to train providers to prescribe insulin as a repeating or maintenance order for Type 1 diabetics and requiring the opposite;

d.  Ordering blood glucose monitoring of Type 1 diabetics as single-instance orders or for time periods no longer than three days, and not every day an individual was housed at the Jail;

e.  Training providers to order blood-glucose monitoring as single-instance orders or for no more than the three days;

f.  Failing to train medication prescribers to order blood glucose measures as repeating orders lasting longer than three days for Type 1 diabetics;

g.  Limiting blood glucose monitoring of Type 1 diabetics to no more than twice a day;

h.  Training providers to order blood glucose monitoring no more than twice a day;

i.  Failing to train providers to order blood glucose monitoring more frequently than twice a day for Type 1 diabetics;

j.  Not requiring medical personnel check medical records or receive a provider's clearance before affirming a Type 1 diabetic detainee is ready to be housed;

k.  Failing to train medical personnel to check medical records before confirming a detainee is ready to be housed;

l.  Treating blood glucose between 300 mg/dL and 350 mg/dL in a Type 1 diabetic as "normal," requiring no insulin, no further blood glucose monitoring, or further evaluation;

m.  Training medical personnel and providers to treat blood glucose between 300 mg/dL and 350 mg/dL as "normal," requiring no insulin, no further blood glucose monitoring, or further evaluation;

n.  Failing to train medical personnel and providers to continue to monitor Type 1 diabetics with blood glucose over 300 mg/dL and provide further insulin, blood glucose monitoring, and evaluation as necessary until blood glucose was under 300 mg/dL;

o. Not notifying providers when a Type 1 diabetic detainee has a blood glucose over 300 mg/dL;

p. Failing to train medical personnel to notify a provider when a Type 1 diabetic detainee has a blood glucose over 300 mg/dL;

q. Not notifying medical personnel or detention officers that a detainee was a Type 1 diabetic;

r. Denying medical personnel testing blood glucose on the Jail's units access to medical records or another way to identify Type 1 diabetics;

s. Failing to train detention officers to recognize the signs and symptoms of low and high blood glucose and diabetic ketoacidosis and the importance of Type 1 diabetics receiving insulin daily;

t. Failing to notify medical personnel or providers when a detainee is asking for insulin;

u. Failing to train medical and non-medical staff to notify providers when a detainee is asking for insulin;

v. Failing to document requests for insulin from a detainee in their medical record;

w. Failing to train medical and non-medical staff to document detainee requests for insulin;

x. Failing to notify medical personnel when a diabetic detainee skips or eats only partial meals;

y. Failing to train medical and non-medical staff to notify providers when a diabetic detainee skips or eats only partial meals;

z. Failing to document in a diabetic detainee's medical record when they skip or eat only partial meals;

aa. Failing to train medical and non-medical staff to document in a diabetic detainee's records when they skip or eat only partial meals;

bb. Denying Type 1 diabetic detainees life-sustaining insulin;

cc. Failing to train medical personnel to provide Type 1 diabetic detainees with insulin;

dd. Denying Type 1 diabetic detainees regular blood glucose monitoring; and

ee. Failing to train medical personnel to provide Type 1 diabetic detainees with regular blood glucose monitoring.

596.     Each of these dangerous policies and practices was enacted and continued by Sheriff Gonzalez and Dr. Egins without penological purpose.

597.     The above pervasive policies and practices, individually and collectively, violated Mr. Shelton's rights under the Fourteenth Amendment and constituted dangerous conditions of confinement that existed in the Jail with the knowledge of Sheriff Gonzalez. Despite knowing these dangerous conditions posed a substantial risk of serious harm to Type 1 diabetic detainees and had caused harm to and death of diabetic detainees in the past, Sheriff Gonzalez intentionally and deliberately disregarded the risk and intentionally and deliberately failed or refused to correct them.

598.     The above pervasive policies and practices, individually and collectively, violated Mr. Shelton's rights under the Fourteenth Amendment and constituted dangerous conditions of confinement that existed in the Jail with the knowledge of Dr. Egins as well. Despite knowing these dangerous conditions posed a substantial risk of serious harm to Type 1 diabetic detainees and had caused harm to and death of diabetic detainees in the past, Dr. Egins intentionally and deliberately disregarded the risk and intentionally and deliberately failed or refused to correct them.

599.     Harris Health's employees and contractees whose actions are described herein violated Mr. Shelton's constitutional rights when Dr. Egins failed to supervise them by failing to train them to order insulin as a repeating medication for Type 1 diabetics; to order blood glucose monitoring as repeating orders lasting longer than three days for Type 1 diabetics; to order blood glucose more frequently than twice a day for Type 1 diabetics; to confirm in medical records that a Type 1 diabetic detainee is ready to be housed; to treat a blood glucose over 300 mg/dL but under 350 mg/dL as high or abnormal and requiring further evaluation; to notify providers when a Type

1 diabetic has a blood glucose over 300 mg/dL; to notify providers when a detainee is asking for insulin; to document in their medical record when a detainee asks for insulin; to notify medical personnel and providers when a diabetic detainee skips or eats only partial meals; to document when a diabetic detainee skips or eats only partial meals; to provide insulin multiple times a day to Type 1 diabetic detainees; and to provide blood glucose monitoring multiple times a day to Type 1 diabetic detainees, all of which proximately caused the violations of Mr. Shelton's constitutional rights.

600.     Dr. Egins knew each of these policies, practices, and training programs was in place before March 1, 2022. He intentionally and deliberately chose to continue each of them after March 1, 2022 when Harris Health took over and ratified these policies, practices, and training as Harris Health's.

601.     Dr. Egins was deliberately indifferent to the known and obvious consequences of these policies, practices, training, and customs which he was aware of, authorized, and encouraged, rather than acting to correct them. Dr. Eggins was actually aware of facts from which any reasonable policymaker could draw the inference that a substantial risk of serious harm and violations of constitutional rights existed, and actually drew that inference.

602.     Dr. Egins was aware of the pattern of similar incidents that occurred before and after Harris Health's employees and contractees denied Mr. Shelton the insulin and blood glucose monitoring that he needed to survive, although it was also apparent and obvious that a constitutional violation was a highly predictable consequence of Harris Health's delineated policies.

603.     Dr. Egins was specifically aware that his employees and contractees had violated the constitution by providing medical care to diabetic detainees in the Harris County Jail that was so

deficient as to amount to deliberate indifference to their serious medical needs and unconstitutional conditions of confinement, and that no additional procedures, policies, training, or practices had been implemented that would resolve this ongoing risk of constitutional harm to diabetic detainees.

604.     Likewise, Dr. Egins knew that failing to train his employees and contractees to order insulin as a repeating medication for Type 1 diabetics; to order blood glucose monitoring as repeating orders lasting longer than three days for Type 1 diabetics; to order blood glucose more frequently than twice a day for Type 1 diabetics; to confirm in medical records that a Type 1 diabetic detainee is ready to be housed; to treat a blood glucose over 300 mg/dL but under 350 mg/dL as high or abnormal and requiring further evaluation; to notify providers when a Type 1 diabetic has a blood glucose over 300 mg/dL; to notify providers when a detainee is asking for insulin; to document in their medical record when a detainee asks for insulin; to notify medical personnel and providers when a diabetic detainee skips or eats only partial meals; to document when a diabetic detainee skips or eats only partial meals; to provide insulin multiple times a day to Type 1 diabetic detainees; and to provide blood glucose monitoring multiple times a day to Type 1 diabetic detainees would cause Harris Health employees and contractees to violate the constitutional rights of diabetic detainees in the Harris County Jail, like Mr. Shelton. Nonetheless, though Dr. Egins knew of these obvious deficiencies, he chose to retain this dangerously flawed training program.

605.     Similarly, Harris County's employees and contractees whose actions are described herein violated Mr. Shelton's constitutional rights when Sheriff Gonzalez failed to supervise them by failing to order insulin as a repeating medication for Type 1 diabetics; to order blood glucose monitoring as repeating orders lasting longer than three days for Type 1 diabetics; to order blood glucose more frequently than twice a day for Type 1 diabetics; to confirm in medical records that

a Type 1 diabetic detainee is ready to be housed; to treat a blood glucose over 300 mg/dL but under 350 mg/dL as high or abnormal and requiring further evaluation; to notify providers when a Type 1 diabetic has a blood glucose over 300 mg/dL; to notify providers when a detainee is asking for insulin; to document in their medical record when a detainee asks for insulin; to notify medical personnel and providers when a diabetic detainee skips or eats only partial meals; to document when a diabetic detainee skips or eats only partial meals; to provide insulin multiple times a day to Type 1 diabetic detainees; and to provide blood glucose monitoring multiple times a day to Type 1 diabetic detainees, all of which proximately caused the violations of Mr. Shelton's constitutional rights.

606.     Sheriff Gonzalez was deliberately indifferent to the known and obvious consequences of these policies, practices, training, and customs which he was aware of, authorized, and encouraged, rather than acting to correct them. Sheriff Gonzalez was actually aware of facts from which any reasonable policymaker could draw the inference that a substantial risk of serious harm and violations of constitutional rights existed, and actually drew that inference.

607.     As described herein, Sheriff Gonzalez was aware of the pattern of similar incidents that occurred before and after Harris County's and Harris Health's employees and contractees denied Mr. Shelton the insulin and blood glucose monitoring that he needed to survive, although it was also apparent and obvious that a constitutional violation was a highly predictable consequence of Harris County's delineated policies.

608.     Sheriff Gonzalez was specifically aware that his and Harris Health's employees and contractees had violated the constitution by providing medical care to diabetic detainees in the Harris County Jail that was so deficient as to amount to deliberate indifference to their serious medical needs and unconstitutional conditions of confinement, and that no additional procedures,

policies, training, or practices had been implemented that would resolve this ongoing risk of constitutional harm to diabetic detainees.

609.    Likewise, Sheriff Gonzalez knew that failing to train his and Harris Health's employees and contractees to order insulin as a repeating medication for Type 1 diabetics; to order blood glucose monitoring as repeating orders lasting longer than three days for Type 1 diabetics; to order blood glucose more frequently than twice a day for Type 1 diabetics; to confirm in medical records that a Type 1 diabetic detainee is ready to be housed; to treat a blood glucose over 300 mg/dL but under 350 mg/dL as high or abnormal and requiring further evaluation; to notify providers when a Type 1 diabetic has a blood glucose over 300 mg/dL; to notify providers when a detainee is asking for insulin; to document in their medical record when a detainee asks for insulin; to notify medical personnel and providers when a diabetic detainee skips or eats only partial meals; to document when a diabetic detainee skips or eats only partial meals; to provide insulin multiple times a day to Type 1 diabetic detainees; and to provide blood glucose monitoring multiple times a day to Type 1 diabetic detainees would cause Harris County's and Harris Health's employees and contractees to violate the constitutional rights of diabetic detainees in the Harris County Jail, like Mr. Shelton. Nonetheless, though Sheriff Gonzalez knew of these obvious deficiencies and a patter of devastating harm to diabetic detainees, he chose to retain this dangerously flawed training program.

610.    Rather, both Dr. Egins and Sheriff Gonzalez ratified their employees' and contractees' conduct and continued to approve their employees' and contractees' violations of diabetic detainee's constitutional rights.

611.    Each of the policies, practices, and customs delineated above was actually known, constructively known, approved, and/or ratified by Harris Health and its policymaker for

correctional healthcare, Dr. O. Reggie Egins, and was promulgated with deliberate indifference to Mr. Shelton's Fourteenth Amendment rights under the United States Constitution. Moreover, the known and obvious consequence of these policies, practices, or customs was that Harris Health employees and contractees would be placed in recurring situations in which the constitutional violations described in this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

612.     Each of the policies, practices, and customs delineated above was also actually known, constructively known, approved, and/or ratified by Harris County and its policymaker for the Harris County Jail, Sheriff Ed Gonzalez, and was promulgated with deliberate indifference to Mr. Shelton's Fourteenth Amendment rights under the United States Constitution. Moreover, the known and obvious consequence of these policies, practices, or customs was that Harris County employees and contractees would be placed in recurring situations in which the constitutional violations described in this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

613.     Consequently, the policies and conduct delineated above were a moving force of Mr. Shelton's and Plaintiffs' constitutional deprivations and injuries, including Mr. Shelton's torturous final days and ultimate death, and proximately caused him to suffer a painful death.

### C.  Fourteenth Amendment § 1983 Claims Against Defendant Harris County and Sheriff Gonzalez Individually– Deliberate Indifference to Safe Housing, Failure to Monitor, and Unconstitutional Conditions of Confinement

614.     Plaintiffs incorporate all of the foregoing in this section for all purposes as if fully restated herein and further state:

615. Defendants Harris County and Sheriff Gonzalez adopted dangerous conditions in the Harris County Jail that proximately caused the death of Mr. Shelton and the violation of his rights under the Fourteenth Amendment.

616. The actions of Harris County's employees described in this complaint constitute monitoring and supervision of detainees so deficient it amounted to deliberate indifference to Mr. Shelton's right to safe housing, in violation of the Fourteenth Amendment.

617. At all material times, Harris County's employees whose actions and inactions are described herein acted under color of state law, as agents of Harris County.

618. At all material times, Harris County's employees whose actions and inactions are described herein were acting within the scope of their duties at the time they intentionally and deliberately refused or failed to supervise and monitor Mr. Shelton.

619. Defendants Harris County and Sheriff Gonzalez had or ratified the following policies, practices, or customs in place when its employees failed to supervise or monitor Mr. Shelton between March 22 and March 27, 2022:

    a. Inadequate staffing;

    b. Grossly deficient and non-observation of detainees in violation of jail standards;

    c. Failing or refusing to staff the jail with sufficient numbers of detention officers to ensure adequate staffing to observe and monitor detainees, including to monitor detainees for signs of medical distress;

    d. Conducting rounds on detainees at the jail without observing each detainee face-to-face at least every sixty minutes for signs of medical distress;

    e. Not providing increased observation for Type 1 diabetics;

    f. Failing to train detention officers to individually observe each detainee during rounds for signs of medical distress;

    g. Training detainees to complete rounds without individually observing detainees for signs of medical distress;

h.  Not conducting rounds at least every sixty minutes for detainees in single cells;

i.  Failing to train detention officers to conduct rounds at least every sixty minutes;

j.  Falsifying observation rounds (i.e. fraud);

k.  Failing to adequately discipline detention officers;

l.  Retaining officers who falsified observation rounds;

m.  Falsifying staffing documentation indicating the jail was sufficiently staffed;

n.  Failing to provide any training on Type 1 diabetes or its consequences;

o.  Failing to review observation rounds using corresponding video surveillance for the hours and days preceding a detainee's death;

p.  Failing to train internal affairs and other investigators to review observation rounds using corresponding video surveillance for the hours and days preceding a detainee's death immediately after a detainee's death; and

q.  Training investigators to review a detainee's death without reviewing the earlier observation rounds.

620.  Each of these policies was enacted and continued by Sheriff Gonzalez without penological purpose.

621.  The above pervasive policies and practices, individually and collectively with the policies and practices identified above in Section IV.B, violated Mr. Shelton's rights under the Fourteenth Amendment and constituted dangerous conditions of confinement that existed in the Jail with the knowledge and approval of Sheriff Gonzalez. Despite knowing these dangerous conditions had caused deaths of and serious injuries to vulnerable detainees and that they continued to pose a substantial risk of serious harm to detainees, particularly those with vulnerabilities like Type 1 diabetes, Sheriff Gonzalez intentionally and deliberately disregarded the risk and intentionally and deliberately failed or refused to correct them.

622.  Harris County's employees' whose actions are described herein violated Mr. Shelton's constitutional rights when Sheriff Gonzalez failed to supervise them by failing to train

them to individually observe each detainee during rounds for signs of medical distress, to not falsify observation rounds, to not falsify staffing records, and to immediately review observation rounds preceding a detainee's death using corresponding video surveillance, all of which proximately caused the violations of Mr. Shelton's constitutional rights.

623.    Sheriff Gonzalez knew each of these deficient policies, practices, and training programs was in place before March 22, 2022. Nonetheless, he was deliberately indifferent to the known and obvious consequences of these policies, practices, training, and customs which he was aware of, authorized, and encouraged, rather than acting to correct them. Sheriff Gonzalez was actually aware of facts from which any reasonable policymaker could draw the inference that a substantial risk of serious harm and violations of constitutional rights existed, and actually drew that inference.

624.    Sheriff Gonzalez enacted, continued, and failed to correct the policy of understaffing the Jail, despite knowing, well before March 2022, that this policy had caused detainee suffering and deaths and would continue to do so if it was not corrected.

625.    Sheriff Gonzalez ratified the conduct of detention officers who falsified and fabricated observation rounds when he intentionally and deliberately failed or refused to discipline them. Though the obvious consequence of failing to discipline officers who falsify and fabricate observation rounds is that detention officers will continue to not observe detainees and will instead continue to falsify and fabricate rounds, Sheriff Gonzalez failed to do so. Instead, he ratified their conduct.

626.    Though Sheriff Gonzalez knew that his intentional and deliberate failure or refusal to require or train internal affairs or other investigators to timely review observation rounds in the days and hours preceding detainees' deaths and injuries to look for falsified and fabricated

observation rounds would encourage these practices to continue, he deliberately refused to correct this deadly training deficiency.

627. Sheriff Gonzalez knew that his continued policy of understaffing the Jail, intentional failure or refusal to correct the Jail's practices of not observing detainees and falsifying and fabricating rounds, and intentional choice not to require these detention officers be investigated, and, instead, ratification of these officers and their practices created an extreme risk that more vulnerable detainees at the Jail would die, as they had already. Nonetheless, Sheriff Gonzalez was deliberately indifferent to these known and obvious consequences and failed to correct the Jail's dangerous policies and practices.

628. Sheriff Gonzalez was aware of the pattern of similar instances that occurred before as a result of his policy of understaffing the Jail, although it was also apparent and obvious that a constitutional violation was a highly predictable consequence of understaffing the Harris County jail.

629. Likewise, Sheriff Gonzalez was aware of a pattern of similar instances resulting from detention officers' ongoing practices of not observing detainees, falsifying observation rounds, and fabricating rounds entirety, although it was also apparent and obvious that a constitutional violation was a highly predictable consequence of these practices. Nonetheless, Sheriff Gonzalez refused to correct them and instead ratified them.

630. Sheriff Gonzalez was specifically aware that his policy of understaffing the Jail had violated the constitution such that Jail staffing was so deficient as to amount to deliberate indifference to the safety and serious medical needs of detainees and unconstitutional conditions of confinement, and that no additional policies, training, or practices had been implemented that

would resolve this ongoing risk of constitutional harm to vulnerable detainees, like those with Type 1 diabetes.

631.    Sheriff Gonzalez was also specifically aware that his employees had violated the constitution by failing to observe and monitor detainees in the Jail such that the monitoring and supervision of detainees in the Jail was so deficient as to amount to deliberate indifference to the safety of detainees and unconstitutional conditions of confinement, and that no additional policies, training or practices had been implemented that would resolve this ongoing risk of constitutional harm to vulnerable detainees, like those with Type 1 diabetes.

632.    Likewise, Sheriff Gonzalez knew that failing to train his employees to individually observe each detainee during rounds for signs of medical distress, to not falsify observation rounds, to not falsify staffing records, and to immediately review observation rounds preceding a detainee's death using corresponding video surveillance would cause Harris County employees to violate the constitutional rights of vulnerable detainees in the Harris County Jail, like Mr. Shelton. Nonetheless, though Sheriff Gonzalez knew of these obvious deficiencies, he chose to retain this dangerously flawed training program.

633.    Instead, Sheriff Gonzalez ratified his employees' conduct and continued to approve his employees' violations of diabetic detainees' constitutional rights.

634.    Sheriff Gonzalez was aware that these policies, practices, training, and customs delineated above individually and collectively (including collectively with policies practices, training, and customs identified in Section IV.B) had created dangerous conditions of confinement that had already caused death and injury to other vulnerable detainees in the Harris County Jail and that persisted in March 2022.

635. Each of the policies, practices, and customs delineated above was actually known, constructively known, approved, and/or ratified by Harris County and its policymaker for the Harris County Jail, Sheriff Ed Gonzalez, and was promulgated with deliberate indifference to Mr. Shelton's Fourteenth Amendment rights under the United States Constitution. Moreover, the known and obvious consequence of these policies, practices, or customs was that Harris County employees and contractees would be placed in recurring situations in which the constitutional violations described in this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

636. Consequently, the policies and conduct delineated above were a moving force of Mr. Shelton's and Plaintiffs' constitutional deprivations and injuries, including Mr. Shelton's ultimate death, and proximately caused him to suffer a painful death.

### D. Denial of Access to Courts Against Defendants Harris County and Sheriff Gonzalez Only under 42 U.S.C. § 1983

637. Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

638. By intentionally authorizing and ratifying the destruction of evidence and intentionally failing to preserve video recordings, observation rounds activity reports, and other records related to Matthew Shelton's incarceration and death that it alone had access to, Harris County and Sheriff Gonzalez denied Plaintiffs the opportunity to present to the judiciary allegations and evidence concerning violations of Mr. Shelton's fundamental constitutional rights.

639. Here, Sheriff Gonzalez, with full knowledge that Mr. Shelton had died after being denied insulin for days and ignored by correctional officers over that time, permitted and authorized or permitted the county to destroy and not preserve the video recordings, observation rounds activity reports, and other records related to Matthew Shelton's incarceration and death.

Through this destruction of evidence, and the policy to do so even in the face of known potential litigation and requests to obtain the documents and an obligation to provide them, Harris County and its Sheriff deprived Plaintiffs of an adequate, effective, and meaningful opportunity to present all the available evidence regarding their claims.

640.     Plaintiffs' ability to bring their claims has been prejudiced by Harris County's intentional destruction of evidence (or directing or allowing the evidence to be destroyed). Depriving Plaintiffs of this evidence deprived them of their ability to present the best possible case to the Court, and deprives the Court of relevant evidence.

641.     Harris County and Sheriff Gonzalez was deliberately indifferent to the rights of litigants to all relevant evidence necessary for litigants to access the courts. Harris County knew that relevant evidence existed but did nothing to preserve the evidence though it was legally obligated to and had the ability to ensure it was preserved.

642.     Harris County and its Sheriff spoliated evidence it had a duty to preserve, intentionally breached that duty by either destroying the evidence or making it unavailable, and that breach has prejudiced Plaintiffs.

643.     No compelling state interest justified depriving Plaintiffs of this evidence.

644.     Harris County's actions directly and proximately caused violations of Plaintiffs' rights.

### E.  42 U.S.C. § 1983 Claims Defendant Individual Detention Officers and Sheriff Gonzalez.

645.     Plaintiffs incorporate by reference all of the foregoing and further allege as follows:

646.     Detention Officers Charley Lauder, Elizabeth Garcia, Paulino Olguin, William Russell, Garrett Woods, Timothy Owens, Kalin Sanford, Brayan Silva, Amber Bailey, Amalia Ruiz, Jeremiah Adebola, Allyson Hurd, Dentrell Woods, Kimberly Rossell, Marvin Perkins,

Lonnie Brooks, Sergeant Alejandro Nieto, and Sergeant Bryan Collins (the Individual Detention Officer Defendants), while acting under color of law, each intentionally and deliberately failed or refused to observe Matthew Shelton in accordance with basic standards for signs of medical distress, despite his being in a single cell and knowing they were obligated to do so to protect detainees like Mr. Shelton and to address medical needs and provide access to care.

647. Sheriff Gonzalez likewise knew that his detention officers were intentionally and deliberately failing or refusing to observe detainees for signs of distress yet he failed to correct training deficiencies and knowingly retained employees who had acted fraudulently and that he knew had endangered inmates. Sheriff Gonzalez encouraged, permitted, and ratified these dangerous and intentional choices made by his detention officers, including their failing to observe detainees in single cells and fraudulently falsifying that they had done so.

648. Each of the Individual Detention Officer Defendants, while acting under color of law, falsely documented rounds using CorreTrak, documenting that another officer was completing the round and/or documenting that an observation round was done when one was not, in fact, completed.

649. Sheriff Gonzalez also knew that his detention officers were intentionally and deliberately falsifying and fabricating CorreTrak records. Sheriff Gonzalez encouraged and ratified these dangerous choices and deliberate fabrications made by his detention officers.

650. Each of the Individual Detention Officer Defendants and Sheriff Gonzalez were subjectively aware that not performing observations of detainees and ignoring their needs, and failure to protect detainees endangered detainees, denied them access to safe housing and access to care and placed them in danger.

651. By failing to observe Mr. Shelton and by fabricating observation records, Defendant Lauder, Garcia, Olguin, Russell, G. Woods, Owens, Stanford, Silva, Bailey, Ruiz, Adebola, Hurd, D. Woods, Rossell, Perkins, Brooks, Nieto, and Collins were each deliberately indifferent to their duties to supervise and monitor Mr. Shelton to ensure he was safe and not experiencing medical distress.

652. Each of the Individual Detention Officer Defendants' actions, while acting under color of law, were patently unreasonable in light of established law, conscience shocking and were deliberately indifferent to Mr. Shelton's medical needs and rights to safe housing and to access care. Each intentionally and deliberately failed or refused to communicate Mr. Shelton's requests for insulin, disclosure that he was a Type 1 diabetic, failure to eat, and obvious signs of illness to medical personnel and, as a result, each deprived Mr. Shelton of his right to treatment for his medical needs.

653. Sheriff Gonzalez knew his detention officers were deliberately failing or refusing to communicate Type 1 diabetic detainee's requests for insulin, disclosures that they were Type 1 diabetics, failures to eat, and obvious signs of illness to medical personnel and that the result of this failure or refusal deprived Type 1 diabetics of treatment for their serious medical needs. Yet he did nothing to correct these obviously dangerous practices.

654. Defendant Lauder, Garcia, Olguin, Russell, G. Woods, Owens, Stanford, Silva, Bailey, Ruiz, Adebola, Hurd, D. Woods, Rossell, Perkins, Brooks, Nieto, and Collins were each deliberately indifferent to the substantial risk of serious harm to Mr. Shelton and denied him safe housing and access to medical care.

655. Thus, Sheriff Gonzalez failed to supervise his officers to prevent them from acting unconscionably with deliberate indifference to detainees' serious medical needs. Sheriff Gonzalez

was aware his officers were engaging in conduct very likely to violate the civil rights of detainees, but was deliberately indifferent to that risk, and not only refused to force his officers to comply with the Constitution but countenanced a pattern of endangerment and fraud – all alleged herein.

656. As a direct and proximate result of Defendants' actions, Mr. Shelton's well established constitutional rights were violated. As a result, he suffered and died.

## V.     DAMAGES

657. Plaintiffs incorporate all of the foregoing in this section for all purposes as if fully restated herein.

658. Plaintiff Borchgrevink, in her capacity as the representative of the Estate of Matthew Shelton, asserts a survival claim on behalf of the Estate. As a result of Defendants' acts and omissions set forth herein, the Estate suffered injuries and damages including without limitation the following:

A. Conscious pain and mental anguish;

B. Funeral and burial expenses;

C. Pre-judgment and post-judgment interest at the highest rates allowable under the law;

D. Exemplary and punitive damages as to Individual Defendants only;

E. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

F. All other economic damages to which Plaintiff may be entitled.

659. Plaintiff Marianna Ruth Thompson in her capacity as wrongful death beneficiary, asserts claims on her own behalf. Plaintiff Marianna Ruth Thompson has incurred damages including, but not limited to the following:

A. Expenses for psychological treatment incurred as a result of Defendants' conduct and Mr. Shelton's death;

B. Past and future mental anguish;

C. Past and future loss of companionship and society;

D. Past and future pecuniary loss, including loss of care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value;

E. Exemplary and punitive damages as to Individual Defendants only;

F. Pre-judgment and post-judgment interest at the highest rates allowable under the law;

G. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

H. All other economic damages to which Plaintiff may be entitled.

## VI. PUNITIVE DAMAGES
### (Against Individual Defendants in their individual capacities only)

660. Plaintiffs allege all of the foregoing as if restated herein and further allege as follows:

*A. Punitive Damages Against Individual Detention Officers Only*

661. The conduct of Defendant Detention Officer Charley Lauder justifies an award of punitive damages against her due to her extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Lauder acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

662. The conduct of Defendant Detention Officer Elizabeth Garcia justifies an award of punitive damages against her due to her extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Garcia acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

663. The conduct of Defendant Detention Officer Paulino Olguin justifies an award of punitive damages against him due to his extreme, outrageous, and unjustifiable conduct that

endangered and led to the death of Mr. Shelton. Defendant Olguin acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

664.    The conduct of Defendant Detention Officer William Russell justifies an award of punitive damages against him due to his extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Russell acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

665.    The conduct of Defendant Detention Officer Garrett Woods justifies an award of punitive damages against him due to his extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Garrett Woods acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

666.    The conduct of Defendant Detention Officer Timothy Owens justifies an award of punitive damages against him due to his extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Owens acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

667.    The conduct of Defendant Detention Officer Kalin Stanford justifies an award of punitive damages against him due to his extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Stanford acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

668.    The conduct of Defendant Detention Officer Brayan Silva justifies an award of punitive damages against him due to his extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Silva acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

669.    The conduct of Defendant Detention Officer Amber Bailey justifies an award of punitive damages against her due to her extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Bailey acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

670.    The conduct of Defendant Detention Officer Amalia Ruiz justifies an award of punitive damages against her due to her extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Ruiz acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

671.    The conduct of Defendant Detention Officer Jeremiah Adebola justifies an award of punitive damages against him due to his extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Adebola acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

672.    The conduct of Defendant Detention Officer Allyson Hurd justifies an award of punitive damages against her due to her extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Hurd acted with malice and acted

intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

673.     The conduct of Defendant Detention Officer Dentrell Woods justifies an award of punitive damages against him due to his extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Woods acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

674.     The conduct of Defendant Detention Officer Kimberly Rossell justifies an award of punitive damages against her due to her extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Rossell acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

675.     The conduct of Defendant Detention Officer Marvin Perkins justifies an award of punitive damages against him due to his extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Perkins acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

676.     The conduct of Defendant Detention Officer Lonnie Brooks justifies an award of punitive damages against him due to his extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Brooks acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

677. The conduct of Defendant Sergeant Alejandro Nieto justifies an award of punitive damages against him due to his extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Nieto acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

678. The conduct of Defendant Sergeant Bryan Collins justifies an award of punitive damages against him due to his extreme, outrageous, and unjustifiable conduct that endangered and led to the death of Mr. Shelton. Defendant Collins acted with malice and acted intentionally, recklessly, or with callous indifference to the unlawful deprivation of Mr. Shelton's constitutional rights.

*B. Punitive Damages Against Sheriff Gonzalez*

679. Sheriff Gonzalez intentionally and deliberately tolerated his detention officers' failure or refusal to observe detainees, deliberate falsification of observation rounds and staffing reports; deliberately refused to reprimand or remove dangerous officers; deliberately understaffed the Harris County Jail; and enacted and continued patently dangerous policies and practices with reckless disregard for Mr. Shelton's constitutional rights. Sheriff Gonzalez's conduct justifies an award of punitive damages against him individually.

## VII.   ATTORNEYS' FEES

680. Plaintiffs would show that they are entitled to recover reasonable and necessary attorneys' fees incurred as a result of prosecuting these claims, pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 794a(b), and 42 U.S.C. § 12205 and as otherwise allowed by law.

## VIII.   JURY DEMAND

681. Plaintiffs request that this case be tried by jury.

# IX.     PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that the Defendants be cited to appear and answer herein and that upon final hearing they have judgment against Defendants for

a.  Compensatory damages against all Defendants, jointly and severally;

b.  Punitive damages against Defendants Charley Lauder, Elizabeth Garcia, Paulino Olguin, William Russell, Garrett Woods, Timothy Owens, Kalin Stanford, Brayan Silva, Amber Bailey, Amalia Ruiz, Jeremiah Adebola, Allyson Hurd, Dentrell Woods, Kimberly Rossell, Marvin Perkins, Lonnie Brooks, Alejandro Nieto, Bryan Collins, and Sheriff Ed Gonzalez only;

c.  Attorneys' fees, including reasonable and necessary expenses (including expert fees);

d.  Costs of court;

e.  Pre-judgment and post-judgment interest at the highest rate allowable under the law; and

f.  All other relief, legal and equitable, to which Plaintiffs are justly entitled.


Date: March 21, 2024


Respectfully submitted,

_/s/ John Flood_____
John Flood, attorney-in-charge
State Bar No. 07155910
So. Dist. Bar No. 12593
OF COUNSEL:
Jeff Edwards
State Bar No. 24014406
jeff@floodtriallawyers.com

Lisa Snead
State Bar No. 24062204
lisa@floodtriallawyers.com
**JOHN T. FLOOD, L.L.P.**
819 N. Upper Broadway
Corpus Christi, Texas 78401
Tel. 361-654-8877
Fax. 361-654-8879
john@floodtriallawyers.com
irma@floodtriallawyers.com

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 5, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF filing system who sent a Notice of Electronic filing to my co-counsel and the following lawyers for Defendants:

John Strawn
Gregory Burnett
Rachel Fraser

_/s/ John Flood_____
John Flood