United States Courts
Southern District of Texas
FILED

*September 26, 2024*

Nathan Ochsner, Clerk of Court

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **SARAH BORCHGREVINK as REPRESENTATIVE OF THE ESTATE OF MATTHEW RYAN SHELTON and MARIANNA RUTH THOMPSON, wrongful death beneficiary of MATTHEW RYAN SHELTON** § § § § § § § § **Plaintiffs,** § § **v.** § § **HARRIS COUNTY, TEXAS and HARRIS COUNTY HOSPITAL DISTRICT d/b/a HARRIS HEALTH SYSTEMS,** *et al.* § § § § § § **Defendants.** § § | **Civil Action No. 4:23-cv-03198** |

<u>**PLAINTIFFS' UNOPPOSED MOTION FOR LEAVE TO FILE CONSOLIDATED RESPONSE AND EXCEED PAGE LIMIT FOR RESPONSE IN OPPOSITION TO REMAINING INDIVIDUAL DEFENDANT DETENTION OFFICERS' MOTIONS TO DISMISS**</u>

# Exhibit 1

## Plaintiffs' Response in Opposition to Remaining Individual Defendant Detention Officers' Motions to Dismiss

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SARAH BORCHGREVINK as REPRESENTATIVE OF THE ESTATE OF MATTHEW RYAN SHELTON and MARIANNA RUTH THOMSON, wrongful death beneficiary of MATTHEW RYAN SHELTON | § § § § § § § | |
| | | Civil Action No. 4:23-cv-03198 |
| Plaintiffs, | § § § | |
| v. | § § | |
| HARRIS COUNTY, TEXAS, et al. | § § | |
| Defendants. | § § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO REMAINING INDIVIDUAL DEFENDANT DETENTION OFFICERS' MOTIONS TO DISMISS**

The Court should deny the motions to dismiss filed by thirteen individual defendant detention officers in this case: Brayan Silva, Lonnie Brooks, Timothy Owens, Kalin Stanford, Amalia Ruiz, and Alejandro Nieto, (Doc. 132); Garrett Woods, Paulino Olguin, and William Russell (Doc. 133); and Amber Bailey, Allyson Hurd, Dentrell Woods, and Bryan Collins (Doc. 134).[1]

## I.    SUMMARY OF THE ARGUMENT

The Court should deny each of the thirteen individual defendant detention officers'

---

[1] Defendants Charley Lauder and Elizabeth Garcia filed a separate motion to dismiss, Doc. 129, to which Plaintiffs filed a response on September 13, 2024. Doc. 140. The thirteen detention officers who filed motions to dismiss on September 4 - 6, 2024 are all of the remaining detention officers who have appeared in the case to date. All references to "the detention officers" in this response refer to these thirteen defendants.

i

motions to dismiss for four reasons.

First, the officers' 12(b)(1) motion is utterly meritless. Plaintiff Borchgrevink has capacity to sue on behalf of Shelton's estate as the court-appointed independent administrator.

Second, each of the officers was personally aware of Shelton's serious medical needs because they each were told by a nurse that he needed immediate medical care and personally observed obvious and alarming symptoms of medical distress, yet did not attempt to obtain any kind of medical help for him and ignored his dire condition. Instead, they doubled down on their indifference and deliberately refused to monitor Shelton to confirm he was still suffering serious medical distress. This conduct constituted deliberate indifference.

Third, dismissal of Plaintiffs' claims is not appropriate because Plaintiffs have identified the individual acts each defendant detention officer committed.

Finally, Shelton's right to not have his serious medical needs be met with deliberate indifference, that is, to not have detention officers with knowledge of his obvious symptoms of severe medical distress ignore his condition and do nothing to help him, has been clearly established for decades.

## <u>TABLE OF CONTENTS</u>

I.    Summary of the Argument ..................................................................... i

II.   Statement of Facts Common to All Defendants ..........................................1

III.  Standard of Review ............................................................................2

IV.   Argument ........................................................................................4

  A.  The Court should deny Defendants' 12(b)(1) motion to dismiss out of hand. .........4

  B.  Shelton's right to not have his serious medical needs met with deliberate indifference by the detention officers was well-established. ...........................................5

  C.  The thirteen individual detention officers were each deliberately indifferent to Shelton's rights............................................................................10

    1.  Defendant Silva was deliberately indifferent to Shelton's serious medical needs.
       ........ ………………………………………………………………11

    2.  Defendant Brooks was deliberately indifferent to Shelton's serious medical needs…….......................................................................... 15

    3.  Defendant Owens was deliberately indifferent to Shelton's serious medical needs. ............................................................................ 19

    4.  Defendant Stanford was deliberately indifferent to Shelton's serious medical needs. ............................................................................ 23

    5.  Defendant Ruiz was deliberately indifferent to Shelton's serious medical needs. ………………………………………………………………25

    6.  Defendant Nieto was deliberately indifferent to Shelton's serious medical needs. ........ ………………………………………………………………30

    7.  Defendant Garrett Woods was deliberately indifferent to Shelton's serious medical needs. ............................................................... 33

    8.  Defendant Olguin was deliberately indifferent to Shelton's serious medical needs. ............................................................................ 40

    9.  Defendant Russell was deliberately indifferent to Shelton's serious medical needs. ............................................................................ 44

    10. Defendant Bailey was deliberately indifferent to Shelton's serious medical needs.. .………………………………………………………………46

    11. Defendant Hurd was deliberately indifferent to Shelton's serious medical needs…….......................................................................... 49

    12. Defendant Dentrell Woods was deliberately indifferent to Shelton's serious medical needs. ............................................................... 51

    13. Defendant Collins was deliberately indifferent to Shelton's serious medical needs…………… ............................................................... 53

iii

D.  Plaintiffs' allegations concerning common conduct do not eliminate the detention officers' individual constitutional violations...................................................................56

E.  The individual defendant detention officers are not entitled to qualified immunity as it was clearly established their conduct was unconstitutional. ..................................59

F.  If the Court would deny Plaintiffs' motion for any reason, they should be afforded the opportunity to amend. ..............................................................................................61

V.  Conclusion.........................................................................................................................62

# TABLE OF AUTHORITIES

**Cases**

*Abshure v. Caddo Par. Sheriff's Off.,* No. 06-2031, 2009 WL 1649300 (W.D. La. June 10, 2009) ...................................................................................................................9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................3

*Brown v. Strain,* 663 F.3d 245 (5th Cir. 2011) ........................................................... passim

*Bruner-McMahon v. Jameson*, 566 Fed. Appx. 628 (10th Cir. May 7, 2014) ....................6

*Converse v. City of Kemah, Tex.*, 961 F.3d 771 (5th Cir. 2020)...........................................7

*Crisp v. Dutton*, No. A-15-CV-0431-LY-ML, 2015 WL 7076483 (W.D. Tex. Nov. 12, 2015) (Lane, Mag. J) .................................................................................................62

*Domino v. Tex. Dep't of Crim. Justice,* 239 F.3d 752 (5th Cir. 2001) ....................... passim

*Drake v. City of Holtom City*, 106 Fed. App'x 897 (5th Cir. 2004)..............................7, 57

*Dyer v. Houston*, 964 F.3d 374 (5th Cir. 2020).........................................................5, 60, 61

*Easter v. Powell*, 467 F.3d 459 (5th Cir. 2006)........................................................... passim

*Estate of Allison v. Wansley*, 524 Fed. App'x. 963 (5th Cir. May 15, 2013) ..................6, 8

*Estate of Cheney v. Collier*, 560 Fed. App'x 271 (5th Cir. March 24, 2014) .................6, 7

*Estate of Cheney v. Collier,* No. 4:09-cv-111-MV, 2021 WL 1952272 (N.D. Miss. May 30, 2012) ...............................................................................................................7

*Estelle v. Gamble,* 429 U.S. 97 (1976).............................................................................10

*Farmer v. Brennan,* 511 U.S. 825 (1994) ................................................................. passim

*Ford v. Anderson Cnty., Tex.*, 102 F.4th 292 (5th Cir. 2024) ..................................... passim

*Gobert v. Caldwell*, 463 F.3d 339 (5th Cir. 2006)..............................................................5

*Green v. Harris Cnty., Tex.*, No. CV-H-16-893, 2019 WL 2617429 (S.D. Tex. June 26, 2019) .................................................................................................................7, 8

*Jacobs v. W. Feliciana Sheriff's Department*, 228 F.3d 388 (5th Cir. 2000) ....................57

*Jolly v. Klein*, 923 F.Supp. 931 (S.D. Tex. 1996) ................................................................57

*Laurence v. Atzenhoffer Chevrolet*, 281 F.Supp.2d 898 (S.D. Tex. 2003) (Rainey, J.) ........3

*Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616 (5th Cir. 2018) .......................................7

*Martinez v. City of Richland Hills,* 846 Fed. Appx. 238 (5th Cir. 2024) ...........................58

*McCoy v. Texas Dep't of Crim. Justice*, C.A. No. C-05-370, 2006 WL 2434289 (S.D. Tex. Aug. 21, 2006) (Jack, J.) .......................................................................................... passim

*Miller v. Kuykendall,* No. 6:07-cv-161, 2007 WL 2385384 (2017 WL 9286990) (E.D. Tex. Mar. 13, 2017), *report and recommendation adopted by* 2017 WL 1251105 (E.D. Tex. Mar. 31, 2017) ................................................................................................9

*Morgan v. Hubert*, 335 Fed. App'x. 466 (5th Cir. 2009) ......................................................3

*Payne v. Orange Cnty. Sheriff*, No. 1:09CV322, 2010 WL 11530319 (E.D. Tex. Mar. 25, 2010) (Clark, J) ...........................................................................................................10

*Randle v. Lockwood*, No. 6:15-cv-084-RP, 2017 WL 892493 (W.D. Tex. Mar. 6, 2017) (Pitman, J.) ...........................................................................................................4, 56, 57

*Richardson v. Axion Logistics, L.L.C.,* 780 F.3d 302 (5th Cir. 2015) ...................................3

*Salcido as Next Friend of K.L. v. Harris Cnty., Tex.*, No. H-16-2155, 2018 WL 6618407 (S.D. Tex. Sept. 28, 2018) (Lake, J.) ..............................................................................56

*Self v. City of Mansfield, Tex.*, 369 F.Supp.3d 684 (N.D. Tex. 2019) ..................................8

*Sims v. Griffin*, 35 F.4th 945 (5th Cir. 2002) .............................................................. passim

*Smith v. Wellpath Recovery Solns. LLC*, C.A. No. 2:21-cv-00235, 2022 WL 4534997 (S.D. Tex. Aug. 25, 2022) (Ramos, J.) ................................................................... passim

*Southwestern Bell Tel. Co. v. Fitch*, 643 F.Supp.2d 902 (S.D. Tex. 2009) (Atlas, J.)..........3

*Stacks v. City of Bellmead*, No. 6:16-cv-00140-RP-JCM, 2016 WL 11397888 (W.D. Tex. Oct. 4, 2016) *report and recommendation approved* 2016 WL 6837167 (W.D. Tex. Nov. 21, 2016) (Pitman, J.) .............................................................................................3

*Stewart v. Murphy*, 174 F.3d 530 (5th Cir. 1999) .............................................................57

*Thompkins v. Belt*, 828 F.2d 298 (5th Cir. 2017) .............................................................57

*Thompson v. Upshur County,* 245 F.3d 447 (5th Cir. 2001) ........................................60, 61

*Trevino v. Hinz,* 751 Fed. Appx. 551 (5th Cir. 2018) .........................................................7

*Turner v. Pleasant*, 663 F.3d 770 (5th Cir. 2011)...........................................................2, 3

*Williams v. Treen*, 671 F.2d 892 (5th Cir. 1982) *cert denied* 459 U.S. 1126 (1983).. passim

**Statutes**
Tex. Penal Code § 37.10 ........................................................................................ passim

**Regulations**
37 Tex. Admin. Code § 275.1 ................................................................................ passim

**Rules**
Fed. R. Civ. P. 8 ...........................................................................................................3, 57

Fed. R. Civ. P. 15 .............................................................................................................62

## II.    STATEMENT OF FACTS COMMON TO ALL DEFENDANTS

Matthew Shelton was a Type 1 diabetic who died on March 27, 2022 as a result of being deprived the insulin and monitoring he needed to survive for four-plus days in the Harris County Jail. Doc. 72, p. 7, ¶ 27. The thirteen individual detention officers, though charged with monitoring Shelton at least every sixty minutes for symptoms of precisely the kind of medical emergency that killed him, intentionally and deliberately chose not to seek medical attention for him when confronted with his serious medical symptoms and ignored his pleas for help in violation of his constitutional rights. *Id*. at pp. 126-128, ¶¶ 645, 646, 648, 650-652, 654. Their deliberate indifference to his obvious and known medical needs led to his death. *Id*. at p. 129, ¶ 656.

Each of the individual defendant detention officers also chose not to monitor Shelton for these symptoms of his serious medical needs. This intentional refusal to monitor detainees was part of a longstanding practice wherein the detention officers charged with monitoring detainees instead falsified observation rounds. *Id*. pp. 88-100, ¶¶ 478-536. Mere months before Shelton died, detention officer whistleblowers acknowledged this practice of falsifying observation rounds in the *Doe* complaint where they also directly admitted they were not observing detainees for symptoms of medical distress as required to do by state regulations. *Id*. at pp. 94-96, ¶¶ 508-516. This dangerous practice was firmly entrenched when Shelton surrendered to the jail on March 22, 2022. *Id*. at p. 9, ¶ 39.

Though Shelton needed insulin multiple times a day, every day, to survive as a Type 1 diabetic, the last time he received insulin was on March 23, 2022 at 3:45 a.m. *Id*. at pp. 9, 21, ¶¶ 38, 106. Later that same morning Harris County and Harris Health (the County

1

Defendants) moved him out of the jail's processing center and into the 1200 Baker building on the 2L1 unit where the thirteen individual detention officers were obligated to monitor detainees face-to-face at least every sixty minutes for signs of medical distress. *Id*. at pp. 21, 22, ¶ 111; 37 TEX. ADMIN. CODE § 275.1.

Though the County Defendants housed Shelton without orders for ongoing administrations of insulin and blood-glucose monitoring, during his first day and night in 1200 Baker, there was a short-term order for LVNs to measure his blood glucose. *Id.* at pp. 23, 26, ¶¶ 121, 135. Pursuant to this order, County Defendants' LVN, Samuel Ogunsanya, came to Shelton's unit around 1:50 a.m. on March 24, 2022. *Id*. at p. 26, ¶ 135. Ogunsanya informed the detention officer with him that Shelton needed to go to the clinic right then, but none took him.

As detailed below, over the next four days, Shelton tried his best to survive. He did not eat meals, he pled for help, he moaned in agony, vomited, and struggled to breathe. Each of the detention officers stopped to hear Shelton's pleas, saw his desperate condition, knew that not getting him medical attention would be dire, and yet each to a person ignored his pleas for help, refused to get him medical treatment, and otherwise acted with a wanton disregard for his constitutional rights.

## III.    STANDARD OF REVIEW

In evaluating motions to dismiss, the Court must both accept as true all of the factual allegations contained in the complaint and construe them in favor of the plaintiff. *Turner v. Pleasant*, 663 F.3d 770, 773 n.1, 775 (5th Cir. 2011) (citations omitted). Accordingly, dismissal is appropriate "only if the complaint fails to plead 'enough facts to state a claim

to relief that is plausible on its face.'" *Id.* at 775 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). "A complaint is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Richardson v. Axion Logistics, L.L.C.,* 780 F3d 302, 306 (5th Cir. 2015). "This standard simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements." *Morgan v. Hubert*, 335 Fed. App'x. 466, 470 (5th Cir. 2009) (unpub) (citation omitted).

The Federal Rules of Civil Procedure expressly authorize a plaintiff to plead alternative statements of a claim, even if the alternative statements are inconsistent. FED. R. CIV. P. 8 (d) (2), (3); *see also Southwestern Bell Tel. Co. v. Fitch*, 643 F.Supp.2d 902, 908-09 (S.D. Tex. 2009) (Atlas, J.) (denying motion to dismiss brought on grounds that one of alternatively pled theories of recovery was inconsistent). If any one of the alternative statements is determined sufficient to statement a claim on a motion to dismiss, then the pleading is sufficient. FED. R. CIV. P. 8 (d)(2). In other words, "[u]ntil an action has actually reached the point of entering a judgment, Rule 8 allows a plaintiff to explore alternative, mutually exclusive theories." *Laurence v. Atzenhoffer Chevrolet*, 281 F.Supp.2d 898, 900 (S.D. Tex. 2003) (Rainey, J.) (citation omitted).

As long as Plaintiffs have alleged a plausible version of facts under which a named defendant could be liable, dismissal is inappropriate on the grounds that they would not be liable under other, alternative, theories. *See Stacks v. City of Bellmead*, No. 6:16-cv-00140-RP-JCM, 2016 WL 11397888, *6-*7 (W.D. Tex. Oct. 4, 2016) *report and recommendation approved* 2016 WL 6837167 (W.D. Tex. Nov. 21, 2016) (Pitman, J.) (denying motion to

dismiss against plaintiff who alleged three theories of recovery where defendant was official policymaker for only one alternative claim as that plaintiff sufficiently alleged a plausible theory under which that defendant could be liable); *Randle v. Lockwood*, No. 6:15-cv-084-RP, 2017 WL 892493, *16 (W.D. Tex. Mar. 6, 2017) (Pitman, J.) (denying jail nurse's motion to dismiss where those plaintiffs plausibly alleged decedent's mother called jail and spoke to a nurse and the defendant was one of two nurses who worked at the jail).

## IV.   ARGUMENT

### A.  The Court should deny Defendants' 12(b)(1) motion to dismiss out of hand.

The Court should reject the thirteen individual detention officers' specious incorporation of the County Defendants' Rule 12(b)(1) motion to dismiss. Docs. 132, pp. 12-13; Doc. 133, pp. 15-16; Doc. 134, p. 5, ¶ 20. By the time each of these defendants filed their motions to dismiss on September 4 and 6, 2024, the order reinstating Plaintiff Borchgrevink as administrator of Matthew Shelton's estate had been on file in the Court record for over a month.[2] Nonetheless, each of the individual defendants incorporated this meritless argument.

Plaintiffs respectfully incorporate their response to the County Defendants' 12(b)(1) motion herein as if fully restated. *See* Doc. 136, pp. 45, 47, 48; *see also* Ex. 1. As Plaintiff Borchgrevink was and is the duly appointed independent administrator of the Estate of Matthew Ryan Shelton, she has standing and capacity to bring these claims against the detention officers for their deliberate indifference to her brother's constitutional rights.

---

[2] *See* Docs. 110-3 and 111-3, July 1, 2024 Order to Reinstate Letters of Administration in Cause No. 512551 in the Probate Court Number One of Harris County, Texas (attached here as Ex. 1).

**B. Shelton's right to not have his serious medical needs met with deliberate indifference by the detention officers was well-established.**

As a pretrial detainee, Matthew Shelton had the right not to have his serious medical needs met with the deliberate indifference of the thirteen defendant detention officers. *See Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020). Plaintiffs sufficiently plead deliberate indifference when a complaint alleges a detention officer "knows of and disregards an excessive risk to inmate health or safety;" that is, the officer is "aware of facts from which the inference could be drawn that a substantial risk of harm exists and he must also draw the inference." *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006) (citation omitted). Where, as here, the risk of harm is obvious, the Court can infer the detention officer had knowledge of the substantial risk. *Id*. Detention officers evince deliberate indifference to detainees' serious medical needs when they "refuse[] to treat him, ignore[] his complaints, intentionally treat[] him incorrectly, or engage[] in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Tex. Dep't of Crim. Justice,* 239 F.3d 752, 756 (5th Cir. 2001). A "serious medical need" is one for which treatment has been recommended or which even a layperson would recognize requires care. *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006). When a detention officer knows about or strongly suspects that a detainee has a serious, unmet medical need and yet intentionally refuses to verify those underlying facts or declines to confirm inferences of risk that he strongly suspects exist, he does not escape liability by burying his head in the sand but rather acts with deliberate indifference. *See Farmer v. Brennan,* 511 U.S. 825, 843 n.8 (1994).

While this case is only at the motion to dismiss stage, courts in the Fifth Circuit have routinely denied summary judgment to detention officers who claimed qualified immunity yet ignored prisoners' pleas for help and obvious signs of medical distress like repeatedly vomiting or struggling to breathe, concluding a jury could reasonably find them deliberately indifferent to detainees' serious medical needs. *See, e.g., Ford v. Anderson Cnty., Tex.*, 102 F.4th 292, 314 (5th Cir. 2024) (jury could find detention officers who were in area where they could have heard detainee's pleas for help and saw she was repeatedly vomiting yet did nothing deliberately indifferent); *Sims v. Griffin*, 35 F.4th 945, 950 (5th Cir. 2002) (where there was evidence detainee asked for help and to go to the hospital, vomited black liquid multiple times, and had gotten visibly worse while in the jail, jury could find officers were deliberately indifferent); *McCoy v. Texas Dep't of Crim. Justice*, C.A. No. C-05-370, 2006 WL 2434289, *4-*5 (S.D. Tex. Aug. 21, 2006) (Jack, J.) (detainee who was gasping for air and shaking during asthma attack exhibited symptoms so severe it was obvious that he required medical attention and jury could find staff who delayed rendering aid deliberately indifferent).

The cases that Baily, Hurd, Dentrell Woods, and Collins rely upon to suggest Shelton's serious medical needs were not obviously serious to the detention officers are easily distinguished. *See* Doc. 134, pp. 12-14. First, one is an unpublished 10th Circuit case and four of the six were decided on summary judgment. *See id.* (discussing *Estate of Cheney v. Collier*, 560 Fed. App'x 271 (5th Cir. March 24, 2014); *Estate of Allison v. Wansley*, 524 Fed. App'x. 963 (5th Cir. May 15, 2013); *Bruner-McMahon v. Jameson*, 566 Fed. Appx. 628 (10th Cir. May 7, 2014); *Green v. Harris Cnty., Tex.*, No. CV-H-16-893,

2019 WL 2617429 (S.D. Tex. June 26, 2019)). The Fifth Circuit is consistently critical of defendants arguing that cases determined on summary judgment or the merits support dismissal at this earlier stage. *See Converse v. City of Kemah, Tex.*, 961 F.3d 771, 776 n.3 (5th Cir. 2020) (citing *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 629 n.8 (5th Cir. 2018), *Drake v. City of Holtom City*, 106 Fed. App'x 897, 900 (5th Cir. 2004)).

Second, each is factually distinguishable. In *Trevino*, those plaintiffs themselves alleged the prisoner's symptoms were initially ambiguous and that she only vomited and shook while otherwise carrying on a conversation with the officers. *Trevino v. Hinz,* 751 Fed. Appx. 551, 556 (5th Cir. 2018). In *Estate of Cheney v. Collier*, a trained medical professional evaluated that plaintiff and made an error in medical judgment. 560 Fed. Appx. 271, 274 (5th Cir. Mar. 24, 2014). The detention officers here did not have any authority or training to diagnose Shelton and so cases concerning medical treatment decisions made by those who do have that training and authority are irrelevant to the question of whether a defendant detention officer should simply have gotten medical help in the face of a sick detainee pleading for it—indeed, a detention officer may have done precisely that in the *Estate of Cheney* case. *See Estate of Cheney v. Collier,* No. 4:09-cv-111-MV, 2021 WL 1952272, *3 (N.D. Miss. May 30, 2012) (in response to the prisoner's request for medical attention, detention officer called the nurse).

The detention officers in *Estate of Allison v. Wansley,* unlike the detention officers here, "closely monitored" that intoxicated detainee at 15-to-30-minute intervals and reasonably believed she was sleeping off her intoxication until they realized she was not moving or breathing less than three hours later. 524 Fed. Appx. 963, 967 (5th Cir. May 15,

2013). In contrast, Plaintiffs directly allege that Shelton's symptoms were so severe they could not have been mistaken for sleeping and, if the detention officers in this case had been monitoring Shelton closely enough to realize he had not moved in a mere three hours and then got help, he would not have died. *See* Doc. 72, p. 39, 100, ¶¶ 204, 536. The officer in *Green* was presented with a detainee who vomited, did not ask for medical attention, said he was "okay," and then fell twice, at which point the officer immediately started trying to provide him with medical attention. *Green v. Harris Cnty., Tex.*, No. CV-H-16-893, 2019 WL 2617429, *2-*3, *15 (S.D. Tex. June 26, 2019). The summary judgment evidence showed that detention officer had, in fact, monitored the detainee every thirty minutes in the hours before he collapsed. *Id.* at *15. *Green* is obviously inapposite to the case here where Plaintiffs allege, as detailed below, that these detention officers were deliberately indifferent to Shelton's known serious medical needs and then intentionally chose not to monitor him.

Further, the defendants fundamentally misstate the holding of *Self v. City of Mansfield, Texas*, which granted a motion to dismiss filed by the city's policymakers who had no personal involvement in the care of the detainee whatsoever. 369 F.Supp.3d 684, 699 (N.D. Tex. 2019). That court did not hold, as defendants claim, that detention officers were not deliberately indifferent for mistaking the detainee's inability to walk for drunkenness, just that the policymakers who were entirely unaware this was occurring were not indifferent. *Compare id.* with Doc. 134, p. 13.

Instead, this case is strikingly similar to *Smith,* another Southern District of Texas case where the court denied a motion to dismiss filed by a detention officer who saw a

diabetic who was denied insulin for three days exhibiting many of the same hallmark signs of diabetic ketoacidosis Plaintiffs allege Matthew Shelton exhibited and that the defendant detention officers saw here: vomiting, acting disoriented, and saying he did not feel well. *Smith v. Wellpath Recovery Solns. LLC*, C.A. No. 2:21-cv-00235, 2022 WL 4534997, *3-*4, (S.D. Tex. Aug. 25, 2022) (Ramos, J.). There, the court specifically found that the detention officer's interactions with the diabetic put him on notice that there was a substantial risk of harm if he did not get help and yet the detention officer failed to act, thus he was deliberately indifferent. *Id*. at *4. In denying the officer qualified immunity, the court highlighted several cases where there was no deliberate indifference to the serious medical needs of diabetics, noting that in each of those cases, the detainee was rushed to the hospital once they showed signs of ketoacidosis like vomiting, shortness of breath, and weakness. *Id*. at *8 (citing *Abshure v. Caddo Par. Sheriff's Off.,* No. 06-2031, 2009 WL 1649300, *1 (W.D. La. June 10, 2009); *Miller v. Kuykendall,* No. 6:07-cv-161, 2007 WL 2385384, *2 (2017 WL 9286990) (E.D. Tex. Mar. 13, 2017), *report and recommendation adopted by* 2017 WL 1251105 (E.D. Tex. Mar. 31, 2017)). Where no such action was taken by the officer in *Smith* and having found that the diabetic's right not to have his serious needs met with deliberate indifference was clearly established in 2019, that court found the officer was alleged to have acted with deliberate indifference and denied qualified immunity to that detention officer. *Id.* at *9.

Finally, it is inherently and fundamentally dangerous to intentionally choose not to monitor detainees in jail cells for days at a time. Texas state regulations required the officers in this case to monitor detainees at least every sixty minutes specifically for symptoms of

medical distress. 37 TEX. ADMIN. CODE § 275.1; Doc. 72, pp. 21, 22, ¶ 111; *see also Williams v. Treen*, 671 F.2d 892, 899 (5th Cir. 1982) *cert denied* 459 U.S. 1126 (1983) (detention officers are charged with knowing and following their relevant regulations). The detention officers in this case knew they could come across people who were sick in the Harris County Jail; indeed, this was obvious. *See Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976) (detention officers have an obligation not to deny or delay medical care when they come across detainees who need it). Indeed, officers in this case were trained—not on Type 1 diabetes—but how to recognize other medical emergencies that can befall a detainee rapidly like asthma attacks, seizures, and anaphylaxis, necessarily imparting to them the knowledge that detainees can fall ill and develop life-threatening emergencies quickly. *See id.* at p. 22, ¶ 112. Because detainees can fall ill or develop a life-threatening emergency at any time and detention officers know this, it is not an accident, a "minor oversight," or "mere negligence" for a detention officer to intentionally and deliberately log that he or she has observed a detainee face-to-face for signs of medical distress when they have not actually done so; it is a crime. *See Payne v. Orange Cnty. Sheriff*, No. 1:09CV322, 2010 WL 11530319, *5 n.3 (E.D. Tex. Mar. 25, 2010) (Clark, J); TEX. PENAL CODE § 37.10 (a)(1).  It is well-settled and obvious that detention officers cannot knowingly violate the law.

### C. The thirteen individual detention officers were each deliberately indifferent to Shelton's rights.

Despite this clearly established law, each of the defendant detention officers asks the Court to dismiss Plaintiffs' claims against them. Docs. 132, 133, 134. In doing so, each

fundamentally misstates Plaintiffs' claims against them, minimizing or, in some instances, entirely disregarding Plaintiffs' well-pled facts against them. The Court should deny each officer's motion as Plaintiffs sufficiently alleged both the requisite knowledge and conduct on the part of each officer for the Court to infer they were deliberately indifferent to Shelton's serious medical needs.

### 1. *Defendant Silva was deliberately indifferent to Shelton's serious medical needs.*

The Court should deny Silva's motion to dismiss as Plaintiffs sufficiently pled that Silva was subjectively aware of Shelton's serious medical needs, that he recognized Shelton's symptoms meant Shelton required medical assistance, that he knew the consequences of ignoring these needs were dire, and yet he intentionally failed or refused to get help. Specifically, Plaintiffs pled that Silva was the detention officer who accompanied LVN Ogunsanya on Shelton's unit on March 24, 2022 at 1:55 a.m. and was told directly by the LVN that Shelton needed medical attention "right away" and saw the LVN give Shelton the white clinic pass.[3] Doc. 72, pp. 21, 27, 28, ¶¶ 135, 146-148. Though Silva knew Shelton needed to be taken to the clinic for medical care immediately, both because the LVN told him and because he knew that a white Clinic pass meant the detainee needed to be escorted to the clinic at the time it was issued, and knew the consequences of failing to do so would be dire, Silva intentionally did not take Shelton to the clinic or even ensure another detention officer took him. *Id*. at p. 28, ¶¶ 150, 151. Instead, he returned

---

[3] Silva's assertion that the "only" references to him in the entire motion are paragraphs 209 -210 is thus flat wrong. *Compare* Doc. 132, p. 11 *with* Doc. 72, pp. 28, 39, 40, 126-130, ¶¶ 148, 205, 206, 211, 212, 646, 648, 650-652, 654, (directly mentioning or referring to Silva). *See also* Doc. 72, pp. 26-29, 41, ¶¶ 135, 136, 146, 147, 149-152, 214, 217, 218 (referring to Silva in the alternative).

Shelton to his cell.

Alternatively, Silva was one of the other detention officers assigned to monitor detainees face-to-face at least every sixty minutes and address detainee's needs overnight from March 23 to March 24, 2022 on Shelton's unit.[4] *Id.* at p. 28, ¶ 149. Silva was told by the defendant detention officer who was escorting LVN Ogunsanya that the LVN had given Shelton a white pass and had indicated Shelton needed to go to the clinic "right away." *Id.* at p. 28, ¶¶ 149. Though it was the duty of officers assigned to Shelton's unit to escort detainees to the clinic if an LVN informed them of a serious medical need, as happened here, Silva intentionally did not escort Shelton to the clinic. *Id.* at ¶ 150. He knew Shelton needed immediate medical treatment; indeed, he had been told as much, yet he intentionally did not take him to get that treatment or ensure any other officer assigned to work on Shelton's unit did either. *Id.* at ¶ 151. He did not even phone the clinic to notify them that Shelton had a pass but he was not bringing him down. *Id.* at pp. 28, 29, ¶ 152.

Silva's deliberate refusal to get medical care for Shelton on March 24, 2022 when he knew it was necessary and knew failing to do so placed Shelton at serious risk of harm constituted deliberate indifference to a serious medical need. *See Domino*, 239 F.3d at 756; *see also Easter,* 467 F.3d at 464; *Brown v. Strain,* 663 F.3d 245, 250 (5th Cir. 2011). Indeed, the Court can infer the risk to Shelton was obvious where even a layperson would

---

[4] The motion filed by Silva, Brooks, Owens, Stanford, Ruiz, and Nieto accuses Plaintiffs of including these six officers merely because they were "clocked in at the Jail," on March 24, 2022, *see* Doc. 132, p.8, but this ignores Plaintiffs' actual allegations. Plaintiffs allege that the defendant detention officers who were informed that the LVN gave Shelton a pass and said he needed to go to the clinic right away where those assigned to Shelton's unit to meet the needs of detainees. *See* Doc. 72, p. 28, ¶ 150 (identifying them as officers with a duty to escort him).

understand he needed medical care if a nurse told them to get him to the clinic "right away." *See Easter*, 467 F.3d at 463.

Silva worked the twelve-hour dayshift on Shelton's unit on March 26, 2022 where he and three other officers were charged with ensuring Shelton and the other detainees on the unit were observed at least every sixty minutes face-to-face. *Id*. at p. 21, 22, 39, ¶¶ 111, 205. By this time, Shelton had been without insulin for over three days. *Id*. at p. 21, ¶ 106. He was in severe and obvious pain, struggling to breathe, rapidly gasping for air, and becoming increasingly disoriented. *Id*. at p. 39, ¶ 203. Consistent with Silva's duty to observe Shelton, one of the sixty-minute checks was logged in CorreTrak under Silva's name. *Id*. at ¶ 206. During this round (or another that Silva conducted under another defendant detention officer's name during the twelve-hour shift), when Silva walked by Shelton's cell, Shelton told him directly that he was a Type 1 diabetic, that he needed insulin, that he was feeling ill, and that he would die without insulin. *Id*. at p.40, ¶ 210; *see also id.* at pp. 39, 40, ¶¶ 207-209. During this conversation, Shelton was in obvious medical distress—he was physically weak, confused, alarmingly flushed, and rapidly gasping for air. *Id*. Despite actually recognizing that Shelton needed to go to the clinic for these alarming symptoms, knowing Shelton had a medical condition that the LVN indicated required urgent medical care not two days earlier, and knowing that the consequences of failing to ge help for a sick detainee could be dire, Silva intentionally did not even contact the clinic to ask for help. *Id* at pp. 28, 40, 41, ¶¶ 150, 212.

It is well-settled that ignoring a prisoner's pleas for help and obvious signs of medical distress like difficulty breathing as Silva did on March 26, 2022 constitutes

deliberate indifference. *See, e.g., Ford,* 102 F.4th at 314; *Sims,* 35 F.4th at 950; *McCoy,* C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

Plaintiffs additionally and in the alternative pled that Silva was responsible for conducting more than one of the observation rounds during his twelve-hour shift on Shelton's unit on March 26, 2022, and (consistent with Harris County detention officers' long-standing practice) falsified the round to indicate that Shelton was checked when no one had set foot on the unit. Doc. 72, p. 40, ¶ 209. Silva was well aware that state regulations required him to monitor Shelton face-to-face every sixty minutes specifically to look for signs of medical distress and that failing to monitor was inherently dangerous. Doc. 72, pp, 21, 22, 126-128, ¶¶ 111, 646, 650, 651; 37 TEX. ADMIN. CODE § 275.1. Where Silva knew his conduct violated state regulations, any belief that his conduct was lawful was unreasonable. *Williams*, 671 F.2d at 899. Silva's intentional choice not to monitor was a choice to avoid re-confirming what he had already seen earlier in the day—that Shelton was suffering and had serious medical needs that he had not addressed. This constituted deliberate indifference. *See Farmer,* 511 U.S. at 843 n.8 (1994). In fact, this intentional and deliberate refusal to monitor Shelton face-to-face during the additional rounds after being told by the LVN that Shelton had a condition that required emergent care less than two days earlier, seeing Shelton's dire condition for himself that same day, and knowing to a certainty that failing to monitor endangered Shelton, was not only deliberately indifferent, it was also a knowing criminal offense. *See Payne,* No. 1:09CV322, 2010 WL 11530319, at *5 n.3; *see also* TEX. PENAL CODE § 37.10 (a)(1).

Finally, Plaintiffs plausibly allege that during the late afternoon or early evening, officers working on March 26, 2022 offered Shelton his hour of his cell for the day but saw that Shelton was too weak, sick, and disoriented to leave his cell and recgonized that his condition required medical treatment. *Id*. at p. 41, ¶¶ 217, 218. As one of the detention officers assigned to monitor and meet the needs of detainees on Shelton's unit on March 26, the Court can reasonably infer that Silva again saw Shelton's condition when he was offered his time out, recognized he needed immediate medical attention, knew the failure to get him this attention could have dire consequences, and yet intentionally and deliberately did not get it for him. *Id*. at pp. 28, 41, 42, ¶¶ 150, 218. Here again, Silva's intentional failure to obtain medical care for Shelton constituted deliberate indifference. *See, e.g., Ford,* 102 F.4th at 314; *Sims*, 35 F.4th at 950; *McCoy*, VA No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith*, No. 2:21-cv-00235, 2022 WL 4534997, at *4.

Where Silva was aware of Shelton's serious medical needs—having been informed of them by a nurse and having seen them himself at least once on Marc 26, 2022—and yet intentionally chose not to get him any medical help despite knowing that doing so would have grave consequences, Silva acted with deliberate indifference.

>    *2. Defendant Brooks was deliberately indifferent to Shelton's serious medical needs.*

Plaintiffs pled sufficient facts for the Court to find that Defendant Lonnie Brooks was personally aware of Shelton's serious and obvious need for medical attention, recognized ignoring this need would have grave consequences, and yet deliberately and indifferently refused to get him that attention. Specifically, Plaintiffs allege Brooks was the

defendant detention officer responsible for escorting LVN Ogunsanya on March 24, 2022 at approximately 1:55 a.m. and, in the course of doing so, saw the LVN give Shelton a pass to the clinic and was directly told by the LVN that Shelton needed to go to the clinic "right away." Doc. 72, pp. 26- 28, ¶¶ 135, 146, 148. Despite knowing Shelton had an emergent need for medical care because he has just been told so by the LVN and knowing the consequences of failing to follow this direction would be grave, Brooks made the intentional choice not to get Shelton that care himself, ensure someone else got it for him, or even call the clinic to let them know Shelton needed care but no one was bringing him to the clinic. *Id*. at pp. 27, 28 ¶¶ 147, 150, 151.

Alternatively, Brooks was one of the defendant detention officers assigned to Shelton's unit on March 24, 2022 and though it was his duty to observe detainees and meet their needs (including by escorting detainees who needed medical care to the clinic), he intentionally refused to escort Shelton to the clinic or ensure another detention officer took him, even after being told that the LVN gave Shelton a clinic pass and said that he needed to go to the clinic immediately. *Id*. at p. 28, ¶¶ 149, 150.

This intentional refusal to get Shelton medical care when he subjectively knew it was necessary because an LVN had informed him that it was and knew that this refusal would have dire results constituted deliberate indifference to Shelton's serious medical needs. *See Domino*, 239 F.3d at 756; *see also Easter,* 467 F.3d at 464; *Brown,* 663 F.3d at 250. Again, the Court can infer the risk to Shelton was obvious where even a layperson would understand he needed medical care if a nurse told them to get him to the clinic "right away." *See Easter,* 467 F.3d at 463.

Brooks next worked the dayshift on May 25, 2022. By the time dayshift started, Shelton had been without insulin for over two days and was experiencing obvious symptoms of medical distress that are the hallmark of diabetic ketoacidosis and which clearly indicated, even to a layperson, that he needed medical attention. *Id*. at pp. 21, 32, ¶¶ 106, 168, 171. These included nausea, severe thirst, obvious pain, a red and flushed face, and labored breathing. *Id*. Brooks was one of four officers obligated to conduct face-to-face sixty-minute observation rounds on Shelton's unit during his twelve-hour shift. *Id*. at pp. 21, 22, 32, 33, ¶¶ 111, 169, 174. During one of these observation rounds or while Brooks was delivering breakfast or lunch, Shelton directly informed Brooks that he was a Type 1 diabetic, needed insulin, needed to see a doctor, and that his symptoms were from diabetic ketoacidosis. *Id*. at pp. 32, 33, ¶¶ 168, 169; *see also id.* at p. 34, ¶ 178 (noting Shelton had received lunch earlier in the day). Yet Brooks ignored Shelton's pleas for medical attention and his obvious signs of medical distress and intentionally chose not to get Shelton any help, though he knew medical attention was necessary and that failing to provide it would have dire consequences. *Id*. at pp. 28, 32, ¶¶ 150, 171. In fact, he didn't even explain to Shelton how to submit his own request for medical attention. *Id*. at p. 33, ¶ 172. Courts in the Fifth Circuit have consistently found that ignoring a prisoner's plea for help and obvious signs of medical distress as Brooks did on March 25, 2022 constitutes deliberate indifference. *See, e.g., Ford,* 102 F.4th at 314; *Sims*, 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

Despite having seen Shelton's dire condition and being told only a day before by

17

the LVN that Shelton needed immediate medical care, Brooks intentionally chose not to observe Shelton face-to-face every sixty minutes as was part of his duties on March 25, 2022. *Id*. at pp. 33, 34, ¶¶ 175-177. Brooks knew state regulations required him to observe Shelton every sixty minutes for the signs of medical distress he had already seen Shelton experiencing and knew that his decision to skip observations on Shelton was both unreasonable and dangerous. Doc. 72, pp, 21, 22, 126-128, ¶¶ 111, 646, 651, 651; 37 TEX. ADMIN. CODE § 275.1; *see also Williams,* 671 F.2d at 899. In fact, consistent with Harris County detention officers' longstanding practice, during some of these checks he intentionally and deliberately falsified them—completing rounds under the names of other officers and without actually stopping to see Shelton, committing a knowing criminal offense. Doc. 72, pp. 33-36, ¶¶ 177, 184, 187; *see Payne,* No. 1:09CV322, 2010 WL 11530319, at *5 n.3; TEX. PENAL CODE § 37.10 (a)(1). It was not "mere negligence" but deliberate indifference when Brooks didn't look at Shelton while he was conducting observation rounds when he knew what he would see if he had looked: Shelton was in dire straits and deteriorating rapidly. Doc. 72, pp. 35, 36, ¶¶ 185-187; *Farmer*, 511 U.S. at 843 n.8.

Plaintiffs also allege that, in the alternative, Brooks, recognizing the obvious—that Shelton needed to go to the clinic—completed a red transit pass for him to go to the clinic on March 25, 2022, but then did not escort Shelton to the clinic or find another detention officer to do so, rendering the pass worthless. *Id*., p. 56, ¶ 295. This act of giving Shelton a worthless pass was akin to a medical professional recognizing treatment is necessary and yet intentionally providing no treatment, and constituted deliberate indifference. *See*

*Domino*, 239 F.3d at 756.

Finally, Brooks saw Shelton when he was offered time out of his cell during the afternoon or early evening of March 25, 2022 and saw that he was too sick, in too much pain, and too confused to leave his cell for his hour out. *Id*. at p. 36, ¶ 190. Brooks again intentionally chose not to report Mr. Shelton's obvious symptoms of a serious medical issue to the clinic or otherwise take any steps to get him the medical attention he obviously needed despite knowing this choice would have grave consequences. *Id.* at pp. 28, 36, ¶¶ 150, 191. Brooks' refusal to get medical help for Shelton when he knew Shelton needed it by issuing only a useless pass and then intentionally refusing to call for medical attention constituted deliberate indifference. *See, e.g., Ford,* 102 F.4th at 314; *Sims*, 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

The Court should thus deny Brooks' motion to dismiss where Plaintiffs pled that he was subjectively aware of Mr. Shelton's serious medical needs and the dire consequences of ignoring them and yet, with deliberate indifference, intentionally chose not to get him any medical attention, in violation of clearly established law.

### 3. Defendant Owens was deliberately indifferent to Shelton's serious medical needs.

Plaintiffs allege sufficient facts for the Court to infer that Defendant Timothy Owens was likewise subjectively aware of Shelton's serious medical needs, the dire consequences of not meeting them, and yet intentionally refused to get him the medical attention he obviously needed. Plaintiffs identify that Owens was the officer assigned to the overnight

shift from March 23 – March 24, 2022 who escorted LVN Ogunsanya around the unit with the insulin cart. Doc. 72, pp. 26, 28, ¶¶ 135, 148. He observed the LVN give Shelton a white pass to go to the clinic, knew this was a pass for immediate medical care, and was directly told Shelton needed to go "right away." *Id*. at pp. 27, 28, ¶ 146. Yet he did not escort Shelton, ensure someone else escorted Shelton, or even call the clinic to tell them Shelton needed help but an officer would not be bringing him to the clinic, despite knowing that the consequence of this choice would be grave. *Id*. at p. 28, ¶¶ 150, 151. Alternatively, Plaintiffs allege Owens was assigned to Shelton's unit to conduct face-to-face rounds and address detainee needs on March 24, 2022 and was directly told that the LVN had given Shelton a pass and said he needed to be taken to the medical clinic immediately, yet Owens did not take him or ensure anyone else took him to the clinic, though it was his duty to do so. *Id.* at p. 28, ¶ 150. This intentionally refusal to get Shelton the medical care he had been personally told an LVN said was necessary constituted deliberate indifference to Shelton's serious medical needs where he knew ignoring this direction would have dire consequences. *See Domino*, 239 F.3d at 756; *see also Easter,* 467 F.3d at 464; *Brown,* 663 F.3d at 250. The risk to Shelton was obvious as even a layperson would understand Shelton needed medical care if a nurse told them to get him to the clinic "right away." *See Easter,* 467 F.3d at 463.

Owens next worked the night shift two nights later from March 26 – 27, 2022. Doc. 72, p. 42, ¶ 219. He was one of six officers, supervised by Defendant Nieto, who was responsible for conducting monitoring rounds on Shelton's unit and meeting detainee needs. *Id*. Plaintiffs allege that around the time Owens came on duty, the officers assigned

to Shelton's unit on March 26, 2022 (of which Owens was one) offered Shelton time out of his cell but Shelton was too weak, sick, and disoriented to leave his cell. *Id*. at p. 41, ¶ 217. Owens was on-duty, on Shelton's unit and saw Shelton's condition when he was offered time out and recognized he needed medical attention and that ignoring him could have dire consequences. *Id*. at pp. 28, 41, ¶¶ 150, 217. Owens's intentional failure to seek obviously necessary medical care for Shelton 's concerning medical symptoms when he knew the consequences of ignoring them would be dire constituted deliberate indifference. *See, e.g., Ford,* 102 F.4th at 314-15; *Sims*, 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

From the time Owens came on duty at 6 p.m. until midnight, he and the fellow officers assigned with him logged six rounds, including at least one by Owens. *Id*. at ¶ 220. By this time, Shelton had been without insulin for almost four days and was experiencing noticeable and alarming symptoms of diabetic ketoacidosis including being in obvious pain, vomiting, breathing in rapid gasps, and having an unnaturally flushed red face. *Id.* at p. 43, ¶ 224. Six food containers were already piling up in his cell, indicating something was plainly wrong. *Id*. at p. 41, ¶ 214. By 1:30 a.m., there would be blood or vomit on the floor of his cell if it wasn't there already. *Id*. at p. 44, ¶ 230.

Yet despite knowing Shelton needed immediate medical care just days earlier (when he left his cell under his own power to come see LVN Ogunsanya in the dayroom) and seeing that he was now in much worse condition as he was unable to leave his cell, and actually recognizing that the consequences of ignoring Shelton's serious medical needs would be dire, Owens went out of his way not to check on Shelton for signs of medical

distress that he knew, from seeing them earlier in the evening when Shelton was offered time out of his cell, Shelton was experiencing. Specifically, at 2:58 a.m., Owens conducted another "observation" round and intentionally walked by Shelton's door without stopping, intentionally refusing to re-confirm what he knew to be true—Shelton needed immediate medical attention. *Id*. at pp. 44, 45, ¶ 233.  Just two hours later, when it was again his duty to observe Shelton for signs of medical distress, he conspired with Defendant Olguin to falsify an observation round logged under Owens's name. *Id*. at p. 45, ¶ 235. He knew Shelton needed medical attention, yet he did not go check on him or have Olguin actually check on him; instead, Olguin did exactly what Owens did earlier and walked by Shelton's cell without observing him. *Id*. at ¶ 236.

Owens's intentional failure to monitor and refusal to re-confirm facts that he knew to be true—that Shelton's obviously deteriorated medical state indicated he needed medical attention immediately and that ignoring this would have dire consequences—constituted deliberate indifference to Shelton's serious medical needs. *See Farmer*, 511 U.S. at 843 n.8. Owens knew it was extremely dangerous to leave detainees who could suffer medical emergencies—like Shelton was on March 26-27, 2022—unmonitored, yet he deliberately did it anyway. *See* Doc. 72, pp, 21, 22, 126-128, ¶¶ 111, 646, 650, 651; 37 TEX. ADMIN. CODE § 275.1. His knowing false entry in a government document also constituted a crime, belying any argument that he could believe his actions were reasonable or even merely negligent. *See Payne,* 1:09CV322, 2010 WL 11530319, at *5 n.3; TEX. PENAL CODE § 37.10 (a)(1).

The Court should thus deny Owens's motion to dismiss as Plaintiffs have stated a

claim against him for his deliberate indifference to Shelton's serious medical needs in violation of clearly established law.

> ### 4. Defendant Stanford was deliberately indifferent to Shelton's serious medical needs.

Defendant Kalin Stanford also subjectively knew Shelton had serious medical needs that required immediate medical attention, knew ignoring these needs would have grave consequences, and yet he intentionally and deliberately refused to get him this care, in violation of clearly established law. Plaintiffs allege Stanford was the detention officer responsible for escorting LVN Ogunsanya around the jail with the insulin cart overnight on the March 23 – March 24 shift. Doc. 72, pp. 26, 28, ¶¶ 135, 148. Accordingly, he saw the nurse give Shelton the white pass for the clinic, knew this pass meant Shelton needed to go to the clinic straight away, and was in fact told directly by the LVN that Shelton needed to go "right away." *Id*. at pp. 27, 28, ¶¶ 146, 150. Alternatively, Stanford was one of the officers obligated to conduct rounds on Shelton's unit overnight and meet detainee needs, like providing an escort to the clinic, if necessary, and was told that Shelton needed to go to the clinic immediately according to the nurse. *Id*. at p. 28, ¶ 149. Despite knowing the nurse said Shelton needed immediate medical attention, knowing ignoring this direction would have dire consequences, and having the duty to get him there, Stanford made the intentional choice not to escort Shelton to the clinic, ensure another officer escorted Shelton there, or even call the clinic to notify them a detainee who needed to go to the clinic would not be brought down. *Id*. at ¶¶ 150-151. The intentional refusal to get medical attention for a detainee whom the officer is told by a medical professional needs it when the officer

23

knows ignoring the direction will have grave results, constitutes deliberate indifference to a serious medical need; indeed, the need was obvious in this situation. *See Domino*, 239 F.3d at 756; *see also Easter,* 467 F.3d at 463-64; *Brown,* 663 F.3d at 250.

Stanford also worked on March 26, 2022 and came on shift around 6:00 p.m. that day. *Id*. at p. 42, ¶ 219. As an officer whose duties were to observe the detainees on Shelton's unit and meet their needs, the Court can infer that Stanford saw Shelton when he was offered time of out his cell that evening and saw that he was in obvious medical distress—he was too sick, weak, and disoriented to leave his cell. *Id*. at p. 41, ¶ 217. In fact, by this time Shelton had been without insulin for almost four days—he was breathing in rapid gasps, his face was flushed red, he was in obvious pain, and he was vomiting. *See id.* at p. 21, 40, 43, ¶¶ 106, 210, 224. Despite seeing Shelton's obvious medical distress and the "red flag" of six meals building up in Shelton's cell, and knowing that ignoring Shelton's distress would have dire consequences, Stanford did nothing—he called no one for help and did nothing to get Shelton to the clinic. *Id*. at pp. 28, 40, 41, ¶¶ 150, 212. This intentional refusal to get medical help for a detainee in obvious medical distress states a claim for deliberate indifference to Shelton's serious medical needs. *See, e.g., Ford,* 102 F.4th at 314; *Sims*, 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

In the alternative and consistent with detention officers' practice of falsifying observation rounds, Plaintiffs allege that Stanford completed at least one of the observation rounds logged under Defendants Garcia's and Owens's name between 7:18 p.m. and 11:43 p.m. During this fabricated round, Stanford went out of his way to avoid confirming what

he knew based on his earlier observation—that Shelton needed immediate medical attention. Doc. 72, pp. 42, 43 ¶¶ 220-223. Instead, he deliberately walked by Shelton's cell without bothering to look in or, in the alternative, did not set foot on Shelton's unit and entirely fabricated the round. *Id*. In fact, consistent with this same practice, he conspired with Defendant Olguin to conduct a round under Stanford's name at 5:37 a.m. on March 27, 2022. *Id*. at pp. 45, 46, ¶ 237. Stanford's intentional fabrication of documents showing Shelton was monitored least every sixty minutes face-to-face is not "mere" negligence but a criminal offense and deliberate indifference when Stanford knew failing to monitor detainees was incredibly dangerous and, in fact, Shelton had a serious medical need he knew would have dire consequences if it was ignored and he was simply avoiding re-confirming this fact. *See* Doc. 72, pp, 21, 22, 28, 126-128, ¶¶ 111, 150, 646, 650, 651; 37 TEX. ADMIN. CODE § 275.1; *Farmer*, 511 U.S. at 843 n.8; *Payne*, No. 1:09CV322, 2010 WL 11530319, at *5 n.3; *see also* TEX. PENAL CODE § 37.10 (a)(1).

The Court should deny Stanford's motion to dismiss where Plaintiffs have plausibly pled that he was aware of Shelton's serious medical needs and the grave consequences of ignoring them and yet was deliberately indifferent to his needs by intentionally refusing to get help and then by sticking his head in the sand to avoid re-confirming Shelton's medical distress.

5.   *Defendant Ruiz was deliberately indifferent to Shelton's serious medical needs.*

Defendant Amalia Ruiz[5] subjectively knew Shelton had serious medical needs that

---

[5] Defendant Ruiz's motion refers to her as "Almalia Ruiz." *See* Doc. 132. Plaintiffs use the spelling found in Harris County's produced documents and incorporated into Plaintiffs' amended

were not being met and knew continuing to ignore them would have dire consequences, yet she intentionally and deliberately refused to get him medical attention. Her conduct violated Shelton's rights and clearly established law.

Plaintiffs allege Ruiz was the defendant detention officer who escorted LVN Ogunsanya on the unit at 1:55 a.m. on March 24, 2022 and thus she saw Ogunsanya issue Shelton a white pass and was directly told that Shelton needed to go to the clinic "right way." Doc. 72, pp. 26-28, ¶¶ 135, 146, 148. Despite knowing that Shelton needed to go to the clinic immediately for medical attention and that failing to get him there would have dire results, Ruiz intentionally did not escort Shelton there, ensure anyone else did, or even make a simple call to the clinic to notify them Shelton needed care but would not be escorted. *Id*. at p. 28, ¶¶ 150-151. Alternatively, she was one of the officers assigned to work on Shelton's unit overnight and had the duty to observe him face-to-face at least every sixty minutes and to meet detainees' needs—like escorting them to the clinic. *Id*. at p. 28, ¶ 149; 37 TEX. ADMIN. CODE § 275.1. Though she was told the nurse said Shelton needed to go to the clinic straight away, she knew ignoring this direction would have grave results, and despite it being her duty to take him or ensure he got there, she intentionally did nothing—she did not escort him, ensure anyone else escorted him, or call the clinic. Doc. 72, p. 28, ¶¶ 149, 150. This deliberate refusal to follow the direction of a medical professional to get immediate medical care for a detainee when she knew ignoring the direction would have dire consequences obviously constitutes deliberate indifference. *See*

---

complaint. Plaintiffs' "Amalia Ruiz" and defendants' "Almalia Ruiz" refer to the same defendant detention officer.

*Domino*, 239 F.3d at 756; *see also Easter,* 467 F.3d at 464; *Brown,* 663 F.3d at 250.

Ruiz returned to the jail around 6:00 a.m. on March 25, 2022 to work the twelve-hour dayshift on Shelton's unit with three other defendant detention officers. *Id*. at p. 32, ¶ 169. These four officers were charged with ensuring detainees on Shelton's unit were observed for signs of medical distress at least hourly and with meeting detainees' needs. *Id*. at pp. 21, 22, 32, 33, ¶¶ 111, 169, 174; 37 TEX. ADMIN. CODE § 275.1. During one of these rounds, or while she was delivering a meal to him, Shelton told her directly he was a Type 1 diabetic, he needed insulin, he needed a doctor, and he was experiencing diabetic ketoacidosis. Doc. 72, pp. 32, 34 ¶¶ 168, 169, 178. During this conversation he was experiencing obvious symptoms of ketoacidosis including nausea, headache, thirst, weakness, pain, a red and flushed face, and labored breathing. *Id*. at ¶ 168. Though she recognized that these obvious symptoms meant Shelton was in medical distress and needed medical care, and knew ignoring these symptoms would have grave consequences, she inexplicably and intentionally refused to get any for him—she did not escort him to the clinic, call the clinic, or even explain how he could submit a request for medical attention himself. *Id*. at pp. 28, 32, 33, ¶¶ 150, 171, 172.

By the time she delivered the dinner meal to Shelton around 3:20 p.m. on March 25, 2022, this was the third meal container in Shelton's cell—yet she did nothing about this red flag that Shelton was unwell and not eating, even when Shelton told her he was sick from not receiving insulin and could not eat the meals or even live if he didn't receive it. *Id*. at p. 34, ¶ 178. Of course, Shelton could not heal himself and he had not received any insulin for over two days, so his alarming and obvious symptoms of medical distress from

the morning were still apparent during this conversation. *See id.* at pp. 21, 32, ¶¶ 106, 168. Despite having seen Shelton's alarming condition herself at least once during the day, having been told by him that he needed medical attention and, would in fact, die if he did not receive insulin, and knowing ignoring these symptoms and pleas would have dire consequences, Ruiz intentionally did nothing. *Id*. at p. 32, ¶ 171. Ruiz's intentional refusal to get medical attention for a person who directly pleaded with her for help and whose symptoms were so severe even a layperson would understand medical attention was necessary constituted deliberate indifference where she knew the consequences of this choice would be dire. *See, e.g., Ford,* 102 F.4th at 314; *Sims*, 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

To make matters worse, despite knowing Shelton was severely ill and needed medical attention no later than 3:20 p.m. on March 25, 2022, Ruiz fabricated observation checks, intentionally and deliberately failing to check on him at least four more times between 3:20 p.m. and 5:51 p.m., though it was her duty to do so in order to look for signs of serious medical distress that she knew for a fact he was already experiencing. *Id*. at pp. 21, 22, 34, 35, ¶¶ 111, 182-185, 187; 37 Tex. Admin. Code § 275.1. She did this herself, by intentionally walking by without bothering to look at Shelton or, alternatively, not even entering his unit. *Id*. at p. 35, ¶¶ 183, 184. She alternatively had another officer log a round under her name and, again, did not bother to observe him or ensure another officer did. *Id*. at pp. 35, 36, ¶ 187. This conduct constituted a knowing criminal offense, not mere "negligence." *See Payne,* No. 1:09CV322, 2010 WL 11530319, at *5 n.3; *see also* Tex.

PENAL CODE § 37.10 (a)(1). Where she made these choices despite knowing that ignoring Shelton's serious medical needs in this manner would have dire consequences, it was also deliberately indifferent. *Id*. at pp. 28, 35, ¶¶ 150, 183, 184; *see Farmer*, 511 U.S. at 843 n.8.

Despite Ruiz's protestations concerning Plaintiffs' allegations regarding how rounds were completed in the jail, none of the possible alternatives entitles her to dismissal. One option is that she knew Shelton needed medical attention yet deliberately avoided re-confirming this three more times between 4:20 p.m. and 5:51 p.m. Refusing to confirm a serious medical need one already knows about and knows will have dire consequences is not negligence but is deliberate indifference. *See Farmer*, 511 U.S. at 843 n.8. The second option is that Ruiz knew Shelton needed immediate medical attention, yet she conspired to deliberately falsify a government document—the rounds sheet—to indicate she completed a check she had not done, resulting in no one observing Shelton. Again, *Farmer* provides that this refusal to confirm what she already knew constituted deliberate indifference. 511 U.S. at 843 n.8. Finally, even if the Court disregards Plaintiffs' well-pleaded facts—as it should not do at this stage of proceedings, but for purposes of argument—then Ruiz personally observed Shelton again at 4:20 p.m., 5:16 p.m., and 5:51 p.m. when the rounds activity document indicates she did, saw that he was experiencing obvious fatigue and severe pain and was breathing at a noticeably rapid pace. *Id*. at p. 35, ¶ 186. Yet she intentionally did not get him help, despite it being obvious he needed it and that failing to do so would have dire consequences. This intentional refusal to obtain medical attention in response to an obvious serious medical need constituted deliberate indifference. *See, e.g.,*

29

*Ford,* 102 F.4th at 314; *Sims*, 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

Finally, Plaintiffs allege Ruiz realized on March 25, 2022 that Shelton needed to go to the clinic and even wrote him a partially-completed pass, but then did not escort him to the clinic, despite knowing he could not get there on his own and that failing to get him to the clinic would have grave consequences. *Id*. at pp. 28, 56, ¶¶ 150, 295. This action by Ruiz was akin to medical personnel providing deliberately wrong treatment, that is, no treatment at all. Of course, the pass itself makes clear Ruiz knew Shelton needed medical attention. *Id*. She recognized Shelton required medical care and knew that failing to provide it would have dire results, and yet she utterly and intentionally failed to ensure medical care was provided constituted deliberate indifference under *Domino*. 239 F.3d at 756; *see also Easter,* 467 F.3d at 464; *Brown,* 663 F.3d at 250.

In sum, under any alternative reading of Plaintiffs' complaint, Ruiz was deliberately indifferent to Shelton's known serious medical needs, in violation of his rights and clearly established law. The Court should thus deny her motion to dismiss.

*6. Defendant Nieto was deliberately indifferent to Shelton's serious medical needs.*

Defendant Sergeant Alejandro Nieto's knowledge of Shelton's serious medical needs and the dire consequences of ignoring them, yet intentional refusal to obtain help for him or ensure any of his officers got help constituted deliberate indifference to Shelton' serious medical needs in violation of clearly established law. Plaintiffs allege that on March 24, 2022, at 1:55 a.m., Nieto escorted LVN Ogunsanya onto Shelton's unit and retrieved Shelton from his cell for this blood glucose check. Doc. 72, pp. 26-28, ¶¶ 135, 146, 148.

As a result, Nieto saw the LVN give Shelton the white clinic pass and was told by the LVN that Shelton needed to go to the clinic "right away." *Id*. at p. 27, ¶ 146. Though it was his duty to meet detainee needs and supervise the officers assigned to the shift in their sixty-minute observations and other duties, Nieto did not escort Shelton to the clinic, nor did he direct any of the officers working under him that night to escort him their either, despite knowing that failing to follow the nurse's direction would have grave results. *Id*. at p. 28, ¶¶ 150, 151. In fact, he didn't even call the clinic to tell them Shelton needed medical care but was not being brought down. *Id*. at ¶ 151. Nieto's intentional decision to act directly contrary the nurse's direction to send Shelton to the clinic constituted deliberate indifference to Shelton's serious medical needs. *See Domino*, 239 F.3d at 756; *see also Easter,* 467 F.3d at 464; *Brown,* 663 F.3d at 250.

Nieto again worked on Shelton's unit on the overnight shift from March 26 – 27, 2022 where he was again charged with supervising the officers on the shift and with conducting some of the rounds himself. *Id*. at p. 42, ¶ 219. Plaintiffs allege that sometime in the late afternoon or early evening of March 26, 2022, the officers assigned to Shelton's unit offered him his time out, yet Shelton was too obviously sick, weak, and disoriented to take advantage of his time out. *Id*. at p. 41, ¶¶ 217. Nieto was responsible for supervising the officers who came on shift at 6:00 p.m. and so the Court can reasonably infer that he was aware Shelton was unable to leave his cell because he was too sick. Though Nieto was aware that Shelton's medical condition was serious enough that he could not leave his cell (and, of course, he knew Shelton needed emergent medical care only a few nights before), Nieto did not contact any medical personnel to see Shelton or direct any of his officers to

do so, though he knew that failing to get Shelton medical attention would have dire consequences. *Id*. at pp. 28, 41, 42, ¶¶ 150, 218.

Despite being on notice that Shelton was severely ill and needed medical attention, Nieto then intentionally and deliberately did not bother to observe Shelton during his supervisor's observation round at 3:52 a.m.; instead, he intentionally walked by Shelton's cell without actually looking at him, logging that all was fine on the observation round when this could not have been further from the truth. *Id*. at p. 45, ¶ 234. He personally knew that failing or refusing to monitor detainees for signs of medical distress was dangerous and ran the risk of violating Shelton's rights, yet he deliberately did it anyway. *See id.*, pp, 21, 22, 126-128, ¶¶ 111, 646, 650, 651; *see also* 37 TEX. ADMIN. CODE § 275.1. The deliberate refusal to confirm facts he already knew—that Shelton needed immediate medical attention and not providing it to him would have dire results—constituted deliberate indifference, not "mere" negligence. *See Farmer*, 511 U.S. at 843 n.8. With Nieto as a model, it is hardly surprising that the officers he supervised followed his lead and conducted rounds without actually observing Shelton.

Where Nieto refused to get medical attention for Shelton when a nurse told him it was necessary and he knew not providing medical attention to Shelton would have dire results, and then went out of his way to avoid confirming Shelton's medical distress, Nieto acted with deliberate indifference to the known and obvious risk of ignoring Shelton's serious medical needs. The Court should deny his motion to dismiss.

7. *Defendant Garrett Woods was deliberately indifferent to Shelton's serious medical needs.*

Plaintiffs have more than sufficiently pled facts from which the Court can infer that Defendant Garrett Woods knew about Shelton's serious medical needs and the dire consequences of ignoring them and yet acted with deliberate indifference to those needs. Plaintiffs allege Garrett Woods was the officer assigned to Shelton's unit on March 24, 2022 who escorted LVN Ogunsanya to Shelton's unit around 1:55 a.m. and retrieved Shelton from his cell for the blood glucose check. Doc. 72, pp. 26, 28, ¶¶ 135, 148. Garrett Woods saw the LVN give Shelton the white clinic pass and was directly told by the nurse that Shelton needed to go to the clinic "right away." *Id*. at p. 27, ¶ 146. Yet rather than escort Shelton to the clinic, ask one of the other officers assigned to Shelton's unit to escort him, or even notify the clinic Shelton would not be arriving but needed medical care, Garrett Woods intentionally did nothing though he understood the grave consequences of ignoring the LVN's direction. *Id*. at p. 28, ¶ 150. Alternatively, Garrett Woods was one of the officers assigned to Shelton's unit to monitor detainees and address their needs and was told by the officer accompanying Ogunsanya that Shelton needed to go to the clinic "right away." *Id*. at ¶ 149. Despite knowing Shelton needed immediate medical treatment, because he had just been told a nurse said this was the case, and knowing ignoring this direction would have dire results, Garrett Woods intentionally did nothing – he did not escort Shelton to the clinic, did not ensure another officer escorted him to the clinic, or even call the clinic. *Id*. at ¶ 150. Garrett Woods' failure to follow the direction of a nurse and get medical attention for a detainee constituted deliberate indifference. *See Domino*,

239 F.3d at 756; *see also Easter,* 467 F.3d at 464; *Brown,* 663 F.3d at 250.

Garrett Woods next worked on Shelton's unit during the twelve-hour dayshift on March 25, 2022, where he shared duties with three other officers, including the duty to observe detainees at least once every sixty minutes for signs of distress and meeting any detainee needs. *Id*. at pp. 21, 22, 32, 33, ¶¶ 111, 169, 174; *see also* 37 TEX. ADMIN. CODE § 275.1. In the course of completing one of the sixty-minute observation rounds, Garrett Woods talked to Shelton who told him that he was a Type 1 diabetic, needed insulin, needed a doctor, and was sick from ketoacidosis. *Id*. at ¶ 169. By the time dayshift arrived on March 25, Shelton had been without insulin for over two days and was nauseated; had a headache; and was thirsty, weak and in pain. Doc. 72, p. 32, ¶ 168. His face was deeply flushed and his breathing was noticeably labored. *Id.* These symptoms of medical distress were obvious to Garrett Woods during his conversation with Shelton, yet Garrett Woods intentionally did not contact the clinic or any medical professional to report Shelton's request for a doctor or his alarming symptoms or even explain to Shelton how to submit a request for a doctor himself, despite knowing the consequences of failing to ensure Shelton received medical attention would be dire. *Id.* at pp. 28, 32, 33, ¶¶ 150, 170-172.

At the time, it was the common practice of detention officers at the Harris County Jail to intentionally fail or refuse to individually monitor detainees for signs of medical distress and instead walk by their cell without actually observing them face-to-face, or to completely fabricate a check altogether. *Id*. at pp. 33-35, ¶¶ 175, 177, 182-185. Despite knowing from his earlier interaction with Shelton that he needed immediate medical attention, Plaintiffs allege that when Garrett Woods conducted other rounds later that same

day, he did so by intentionally not bothering to actually observe Shelton face-to-face and completed some without even entering the unit at all. *Id*. at pp. 33-35, ¶¶ 177, 182-185. These checks would only have served to confirm what Garrett Woods saw before—that Shelton was already in medical distress. *Id*. at pp. 32, 35, 36, ¶¶ 169, 171, 186, 188.

Later that same afternoon or early evening, Shelton was offered time out of his cell but was in too much pain and too confused to leave his cell. Doc. 72, p. 36, ¶ 190. As a detention officer charged with observing the detainees on Shelton's unit and meeting their needs, Garrett Woods saw him or was aware that Shelton was too sick to leave his cell, as he had been when Garrett Woods had talked to him earlier in the day. *Id*. Yet again, Garrett Woods intentionally did not get help for Shelton, despite knowing he needed medical attention for his alarming symptoms of diabetic ketoacidosis including difficulty breathing and increasing confusion and knowing that ignoring these symptoms would have dire results. *Id*. at pp. 28, 36, ¶¶ 150, 191, 188. This refusal to get medical attention for a detainee with difficulty breathing, confusion, and other serious signs of medical distress was deliberately indifferent. *See, e.g., Ford,* 102 F.4th at 314; *Sims,* 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

Garrett Woods returned to the jail and worked dayshift the following day, March 26, 2022, and was again responsible along with three other detention officers for monitoring detainees on Shelton's unit. *Id*. at pp. 21, 22, ¶¶ 111, 205. Garrett Woods logged that he had completed twelve of the thirteen checks completed by detention officers between 6:41 a.m. and 6:22 p.m. *Id* at p. 29, ¶ 206. During one of these rounds, Shelton again told Garrett

Woods as he came by his cell that he was a Type 1 diabetic, needed insulin, was feeling ill, and would die if he did not receive insulin. *Id*. at p. 40, ¶ 210. This was, of course, true—Shelton had been without insulin for over three days by this point and would die without insulin the following day. *Id*. at p. 21, 51, ¶¶ 106, 264. During this conversation with Garrett Woods, Shelton was in obvious and serious distress—his was obviously weak, in pain, and confused with a deeply flushed face and was rapidly gasping for air. *Id*. at p. 40, ¶ 210. Yet again, Garrett Woods intentionally refused to report these symptoms, despite having now seen for two days in a row that Shelton was suffering serious distress and had, in fact, gotten worse, and knowing that the refusal to get him help would have grave results. *See id.* at pp. 28, 32, 40, 41, ¶¶ 150, 168, 210, 212. This intentional refusal to call for medical attention in response to symptoms of medical distress so obvious a layperson would recognize medical attention was necessary and which Garrett Woods knew would be dire if ignored constituted deliberate indifference. *See, e.g., Ford,* 102 F.4th at 314; *Sims*, 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

During the remaining observation rounds that Garrett Woods "completed" that day, he did not observe Shelton face-to-face—instead he intentionally walked by without confirming that Shelton was still in medical distress (as he had gotten no treatment) and, in some instances, even intentionally logged a check when he had not come on the unit at all. Doc. 72 at p. 40, ¶¶ 208, 209. Making matters worse, Garrett Woods also had some of his dozen checks completed by other officers logged in as him, making it impossible to determine who actually completed checks under Garrett Woods' name on Shelton's unit

after Harris County intentionally destroyed video. *Id*. at p. 39, ¶ 207.

Garrett Woods' intentional refusal to re-confirm Shelton's serious medical needs that he was already aware of on March 25 and March 26, 2022 and that knew would have dire consequences if they were ignored does not somehow excuse him from liability but constituted deliberate indifference. *See Farmer*, 511 U.S. at 843 n.8. His protestations that he was merely negligent are particularly disingenuous where his acts in falsifying and fabricating the observation logs violated state regulations and constituted a criminal offense. *See* 37 TEX. ADMIN. CODE § 275.1; *Williams*, 671 F.2d at 899; *Payne,* No. 1:09CV322, 2010 WL 11530319, at *5 n.3; *see also* TEX. PENAL CODE § 37.10 (a)(1).

Like Ruiz, Garrett Woods takes issue with Plaintiffs' using the word "likely" concerning his falsification and fabrication of records but each of the alternatives constitutes deliberate indifference—he either intentionally faked the rounds by walking by without observing Shelton, intentionally hade other officers walk by without doing a face-to-face observation, or fabricated them from whole cloth without setting foot on Shelton's unit at all after having already seen Shelton's dire condition earlier in the day and knowing it would be dire if it was ignored or, contrary to Plaintiffs' allegations, he did complete the twelve observation rounds logged under his name and did view Shelton face-to-face while Shelton was rapidly gasping for air, flushed, weak, in obvious pain, and vomiting and yet did intentionally nothing despite knowing "nothing" would have grave results. Under any alternative he is deliberately indifferent where he knew Shelton had serious and unmet medical needs that would have dire consequences if they continued and yet did not get help. *See Ford,* 102 F.4th at 314; *Sims*, 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006

WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4; *Farmer*, 511 U.S. at 843 n.8.

As before, when officers working on the afternoon or early evening of March 26, 2022 offered Shelton time out of his cell, Shelton was too sick, weak, and disoriented to leave his cell. Doc. 72 at p. 41, ¶ 217. Garrett Woods, as an officer assigned to Shelton's unit to observe detainees and meet their needs, saw Shelton when this offer was made and so knew Shelton was still in medical distress that would have grave results if it continued, yet again, he deliberately and intentionally did nothing. *Id*. at pp. 28, 41, 42, ¶¶ 150, 217, 218. *See Ford,* 102 F.4th at 314; *Sims*, 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

Garrett Woods worked again on March 27, 2022 and arrived to work around 6:0 a.m. where he was assigned again to Shelton's unit to monitor detainees along with another detention officer. Doc. 72, p.46, ¶ 239.  At 12:31 p.m., shortly before Shelton died, Defendant Lauder intentionally marked a round "complete" under Garrett Woods name and with his permission though neither she nor Garrett Woods actually set foot on Shelton's unit. *Id*. at p. 50, ¶ 260. Alternatively, Garrett Woods himself fabricated this round and intentionally and deliberately did not monitor on Shelton's unit for over an hour. *Id*. at ¶ 261. Garrett Woods knew Shelton had been experiencing serious symptoms of medical distress that had only worsened over the least two days, that he had required medical attention three days earlier when a nurse told him to get Shelton to the clinic right away, knew the consequences of filing to get medical attention would be dire, and also knew that Shelton had not received this help at any point before 6:00 p.m. the previous day. It was

obvious and Garrett Woods knew that there was a substantial risk that Shelton was still experiencing serious medical needs that had not been addressed, yet Garrett Woods went out of his way to avoid confirming this by conspiring to fabricate or intentionally fabricating an observation round. *Id*. at p. 50, ¶¶ 261, 262. Garrett Woods' avoiding confirming that the serious risk to Shelton's health had continued unabated since he had last seen him twelve hours before when he knew the consequences of this risk would be grave was not mere negligence but deliberate indifference and a criminal act. *See Farmer*, 511 U.S. at 843 n.8; *Payne,* No. 1:09CV322, 2010 WL 11530319, at *5 n.3; *see also* TEX. PENAL CODE § 37.10 (a)(1).

When Defendant Lauder finally found Shelton in his cell hours after he had died, Garrett Woods conspired with her to forge a red transit pass dated March 25, 2022—the date he saw Shelton in serious medical distress, knew he needed to go to the clinic, knew the consequences would be dire if he didn't get there, and yet intentionally didn't send him—and leave it in Shelton's cell. Doc. 72, p. 55, ¶ 294. This pass confirms that Garrett Woods knew Shelton's needs were serious two days earlier and was done to hide his and others' criminal acts and indifference. In the alternative, the pass was real and it was issued by Garrett Woods on March 25, 2022, yet he intentionally did not escort Shelton to the clinic or ensure he got there at all, rendering the pass useless, despite the fact that he knew not getting Shelton to the clinic would have dire results. *Id*. at p. 56, ¶ 295. Garrett Woods' issuance of a useless pass was the equivalent of a medical professional acknowledging treatment was necessary and then refusing to provide any treatment and was thus deliberately indifferent. *See Domino*, 239 F.3d at 756; *see also Easter,* 467 F.3d at 464;

*Brown,* 663 F.3d at 250.

Because Garrett Woods was personally aware of Matthew Shelton's serious medical needs and the dire results of not meeting them and yet intentionally and deliberately did not get help for Shelton despite numerous opportunities to do so over the course of Shelton's last four days in the jail, the Court should deny his motion to dismiss.

    8. *Defendant Olguin was deliberately indifferent to Shelton's serious medical needs.*

Defendant Paulino Olguin was aware of Shelton's serious medical needs and the dire consequences of ignoring them and yet intentionally and deliberately failed or refused to get him help for several days. Specifically, Olguin was the defendant detention officer who accompanied the LVN on Shelton's unit on March 24, 2022 at 1:55 a.m. Doc. 72, pp. 26, 28, ¶¶ 135, 148. He saw the nurse give Shelton a clinic pass and was told directly by Ogunsanya that Shelton needed to go to the clinic "right away. *Id*. at p. 27, ¶ 146. Despite being directly told by a nurse exactly what to do—get Shelton to the clinic immediately— Olguin intentionally and deliberately did not do so despite knowing the consequences of this choice would be grave. *Id*. at p. 28, ¶ 150. He intentionally did not escort Shelton to the clinic, ensure another officer escorted him, or even call the clinic to notify them a nurse had issued a white pass but Shelton was not coming. *Id*. at ¶¶ 150, 151. Alternatively, Olguin was one of the officers obligated to observe detainees on Shelton's unit overnight on March 24, 2022 and was informed that a nurse stated Shelton needed to go to the clinic immediately but intentionally did not take any steps to get Shelton to the clinic himself or ensure another officer did, though again, he knew the consequences of this choice would

be grave. *Id*. at ¶¶ 149-151. This intentional and deliberate refusal to follow the direction of a medical professional who indicated emergent medical care was needed for Shelton despite knowing of dire consequences constituted deliberate indifference. *See Domino*, 239 F.3d at 756; *see also Easter,* 467 F.3d at 464; *Brown,* 663 F.3d at 250.

Olguin was next assigned to Shelton's unit overnight from March 25 – 26, 2022 and was again charged with observing Shelton and the other detainees on his unit for signs of medical distress along with four other officers. Doc. 72, pp. 21, 22, ¶¶ 111, 192. One of the thirteen checks between 6:47 p.m. on March 25, 2022 and 6:11 a.m on March 26, 2022 was completed under Olguin's name. *Id*. at p. 37, ¶ 194. During this round, Olguin talked to Shelton as he walked by his cell, and Shelton told him that he was a Type 1 diabetic, he was sick, and he would die without insulin. *Id*. at pp. 37, 38, ¶ 197. Shelton appeared to be in obvious medical distress during this conversation—he was flushed, noticeably weak and in pain, and was rapidly gasping for air. *Id*. Despite these alarming and obvious symptoms, Olguin intentionally did not call the clinic to report what Shelton had said or to ask for medical attention for him, though he obviously needed it and knew the consequences of not getting help would be dire. *Id*. at p. 38, ¶¶ 199, 201. He didn't even explain how Shelton could submit a request for a doctor. *Id*. at ¶ 202. Olguin's intentional choice not to call for medical help in response to Shelton's serious symptoms despite knowing this would have dire results constituted deliberate indifference. *See Ford,* 102 F.4th at 314; *Sims*, 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

Olguin worked again the following night, March 26 – 27, 2022 and shared the

41

responsibility for completing observation rounds with five other officers who logged six rounds complete between 7:18 p.m. and 11:43 p.m. on March 26th. Doc. 72, p. 42, ¶¶ 219, 220. Sometime that evening, Shelton was offered time out of his cell but was too sick, weak, and disoriented to leave his cell. *Id*. at pp. 41, ¶ 217. As an officer charged with observing detainees on Shelton's unit and meeting their needs, Olguin saw Shelton's condition prevented him from leaving his cell and yet intentionally did not get him any medical attention, though the need to do so was obvious and he knew the failure to do so would have grave consequences. *Id*. at pp. 28, 41, 42 ¶¶ 150, 218. In any event, Olguin was aware from his conversation with Shelton the night before that Shelton was in serious medical distress, knew he had not provided that care, knew no one else had logged Shelton out of his cell and at the clinic during that shift, and knew the consequences of not getting Shelton to the clinic would be grave. *See id*. at pp. 28, 37, 38, ¶¶ 150, 197; *see also id.* at 37, ¶¶ 195 (logging him present thirteen times in twelve hours on March 25, 2022). And yet, when Olguin conducted rounds on Shelton's unit during the early morning hours of March 26th, he intentionally did not even turn his head in the direction of Shelton's cell.

Specifically, at 12:39 a.m. on March 27, 2022, Olguin intentionally logged into CorreTrak as Defendant Garcia and marked a round "complete" on the unit though he deliberately did not even break stride long enough to actually look through Shelton's window to check his condition. *Id*. at p. 43, ¶¶ 226, 227. A few hours later he did it again— at 4:47 a.m., he intentionally logged in as Timothy Owens and fabricated a check under Owens's name, deliberately walking by Shelton's cell without stopping to observe him face-to-face for medical distress, though this was the point of such observations and Olguin

knew that and knew his actions were dangerous. *Id*. at pp. 21, 22, 45, 126, 127 ¶¶ 111, 235, 236, 646, 650; 37 TEX. ADMIN. CODE § 275.1. At 5:37 a.m. Olguin intentionally logged into CorreTrak as Kalin Stanford and falsified a round under his name, again deliberately not stopping to look at Shelton and confirm what he knew—Shelton was still suffering from the same medical distress as the night before. Doc. 72, pp. 45, 46, ¶¶ 237, 238. Olguin worked overtime into the dayshift on March 27, 2022 and logged checks complete at 6:26 a.m. and 7:19 a.m., this time under his own name, but still intentionally completed them without stopping to observe Shelton face-to-face. *Id*. at pp. 46, 47, ¶¶ 242, 243. Altogether, the limited video evidence Harris County preserved from only the day of Shelton's death confirmed Olguin falsified five of the last checks on Shelton. Olguin knew this was dangerous, both because it is inherently dangerous to not observe a detainee for hours at a time when they can suffer medical emergencies in cells and go unnoticed but also because he knew Shelton was in fact suffering a medical emergency less than 24 hours before that he had not bothered to seek help for despite knowing the dire consequences and so knew there was a serious risk Shelton still needed medical care. Olguin's repeated, intentional choice over the course of several hours not to re-confirm what he already knew or suspected was not negligence but five criminal acts and deliberate indifference. *See Farmer*, 511 U.S. at 843 n.8; *Payne,* No. 1:09CV322, 2010 WL 11530319, at *5 n.3; *see also* TEX. PENAL CODE § 37.10 (a)(1).

The court should thus deny Olguin's motion to dismiss where he knew Shelton had serious medical needs, knew ignoring those needs would be dire, yet got him no treatment, ignored his requests, and otherwise evinced a wanton disregard for Shelton's rights.

9. *Defendant Russell was deliberately indifferent to Shelton's serious medical needs.*

Defendant Russell is not entitled to dismissal as he had the requisite knowledge of Shelton's serious medical needs and the grave consequences of not meeting them, yet intentionally did not ensure they were met. Specifically, Plaintiffs allege Russell was the detention officer who escorted LVN Ogunsanya onto Shelton's unit on March 24, 2022 at 1:55 a.m. and so saw the LVN give Shelton the white clinic pass and was directly told by Ogunsanya to get Shelton to the clinic "right away." Doc. 72, pp. 26-28, ¶¶ 135, 146, 148. Despite this clear direction, Russell intentionally refused to follow it—he did not escort Shelton to the clinic, did not ensure any other officer assigned to Shelton's unit did, and did not even call the clinic. *Id*. at pp. 150, 151. Alternatively, Russell was one of the officers assigned to Sheltn's unit to observe the detainees at least hourly and meet any detainee needs that arose—like medical emergencies. *Id*. at p. 28, ¶ 149. Though he had a duty to take Shelton to the clinic or otherwise ensure he got there on March 24, 2022, Russell intentionally did not do so but instead did nothing, despite knowing the grave consequences of this dangerous choice. *Id*. at ¶ 150. Deliberately disregarding the direction of a medical professional to get medical help for a detainee when one knows doing so will have dire results constitutes deliberate indifference; indeed, the need for medical care in this situation was obvious. *See Domino*, 239 F.3d at 756; *see also Easter,* 467 F.3d at 464; *Brown,* 663 F.3d at 250.

Russell worked on Shelton's unit overnight again on March 26 – 27, 2022 when Shelton had been without insulin for four days. Doc. 72, ¶¶ 21, 42, ¶¶ 106, 219. Sometime

early that evening, Shelton was again offered time out of his cell by detention officers working on his unit—which included Russell—yet Shelton was too sick, weak, and disoriented to leave his cell. *Id*. at p. 41, ¶ 217. Though it was Russell's duty to observe detainees and meet their needs—including calling for help or taking them to the clinic— Russell intentionally did nothing about Shelton's medical distress, despite knowing the consequences of doing nothing would be severe. *Id*. at pp. 28, 41, 42, ¶¶ 150, 218.

Harris County's limited video confirms that when it was Russell's turn to conduct observation rounds on Shelton later that night, he intentionally falsified his check logged at 1:30 a.m. and deliberately walked by Shelton's cell without looking in and observing Shelton. *Id*. at p. 44, ¶¶ 229, 230. Russell knew this was dangerous both because it was obvious that a detainee like Shelton could suffer a medical emergency that would go unaddressed in a single cell, hence the requirement to monitor for signs of distress at least every sixty minutes, and also because he had been told only a few nights before that Shelton was apparently suffering a medical event that required he go to the clinic "right away" and knew failing to meet this kind of serious medical need would have dire consequences. *Id*. at pp. 21, 22, 27, 28, ¶¶ 111, 146, 150, 646, 650; 37 TEX. ADMIN CODE § 275.1. Even if he did not know what the condition was, he knew Shelton had a serious medical need that could arise without warning in the middle of the night and so his intentional choice not to actually monitor Shelton for signs of that same medical event was deliberately indifferent. *See Farmer*, 511 U.S. at 843 n.8. Falsifying that he had seen Shelton face-to-face when he obviously had not was a criminal offense, belying any argument that this was a simple negligent mistake. *Payne,* No. 1:09CV322, 2010 WL 11530319, at *5 n.3; *see also* TEX.

PENAL CODE § 37.10 (a)(1).

Where Russell knew Shelton had serious medical needs—because a nurse told him as much a few days earlier and he knew ignoring this direction would have grave results— and yet Russell intentionally and deliberately did not observe Shelton, Russell's conduct constituted deliberate indifference and he is not entitled to dismissal.

*10. Defendant Bailey was deliberately indifferent to Shelton's serious medical needs.*

Defendant Amber Bailey is also not entitled to dismissal as her deliberately indifferent response to Shelton's known and obvious serious medical needs and the knowledge that her choice to do nothing would have severe consequences precludes dismissal of Plaintiffs' claims. On March 24, 2022, Bailey was assigned to accompany LVN Ogunsanya onto Shelton's unit with the insulin cart and so she saw the LVN give Shelton the white clinic pass and was told directly by Ogunsanya that Shelton needed to go to the clinic "right away." Doc. 72, pp. 26-28, ¶¶ 135, 146, 148. Nonetheless, Bailey intentionally refused to follow this direction, ignore the dire consequences that she knew would result, and deliberately did nothing to ensure Shelton received any medical attention—either in the clinic or on his unit. *Id*. at p. 28, ¶¶ 150, 151. Alternatively, Bailey was one of the officers obligated to observe detainees on Shelton's unit and meet their needs (like escorting them to the clinic) and was told a nurse said Shelton should go to the clinic immediately, yet she intentionally did not fulfill her duty to get him there or ensure anyone else did, despite knowing the consequences of doing so would bee dire. *Id*. at ¶¶ 149-150. She didn't even call the clinic for help. *Id.* at ¶ 151. She intentionally disregarded LVN Ogunsaya's direction and, in the course of doing so, Shelton's health and safety as

well. This intentional choice was deliberately indifferent. *See Domino*, 239 F.3d at 756; *see also Easter,* 467 F.3d at 464; *Brown,* 663 F.3d at 250.

Bailey came on shift again for the night shift from March 25 – 26, 2022 and was responsible, along with a few other officers, for observing Shelton and the other detainees on his unit face-to-face at least every sixty minutes for signs of medical distress. Doc. 72, pp. 21, 22, 36, ¶¶ 111, 192; 37 TEX. ADMIN. CODE § 275.1. By this time, Shelton had been without insulin for almost three days and was vomiting, in severe pain, struggling to breathe, and becoming so disoriented that he could not leave his cell for his hour out after Bailey came on shift. *Id*. at pp, 21, 36, ¶¶ 106, 188, 190, 192. During one of the twelve observation rounds logged under her name, Bailey talked to Shelton at his cell and he told her he was a Type 1 diabetic, he was sick, and he would die without insulin. *Id*. at pp. 37, 38 ¶ 197. His physical condition indicated an obvious need for medical attention as he was flushed, struggling to breathe, weak, and in obvious pain. *Id*. at pp. 37, 38, ¶¶ 197, 201. Despite knowing that doing so would have dire consequences, Bailey intentionally did nothing to get Shelton medical attention though it was also obvious even to a layperson that it was necessary. *Id*. at pp. 28, 38, ¶¶ 150, 199. *See Ford,* 102 F.4th at 314; *Sims*, 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

Though eleven more checks were logged in Bailey's name, Plaintiffs allege she did not observe Shelton again the rest of the night. Doc. 72, pp. 36-38, ¶¶ 193, 195. As with Defendants Ruiz and Garrett Woods, though Bailey takes issue with Plaintiffs' description of what "likely" occurred during the observation rounds, under any alternative she is

47

deliberately indifferent. Twelve rounds were completed under Bailey's name—Plaintiffs allege alternately that Bailey completed these herself while intentionally not stopping to actually observe Shelton for the signs of medical distress, deliberately falsified checks without coming on Shelton's unit at all, or intentionally had others falsify the checks under her name—but in any scenario, she had seen Shelton and his medical distress for herself that same night and knew the consequences of continuing to ignore him were grave. *Id*. at pp. 28, 36-38, ¶¶ 150, 193, 195, 197. She cannot avoid liability by refusing to re-confirm what she already knew, particularly when no reasonable officer would believe criminally tampering with a government record (the CorreTrak records) in lieu of observing a detainee for medical distress was a constitutionally allowable course of action. *See Farmer*, 511 U.S. at 843 n.8; *Payne,* No. 1:09CV322, 2010 WL 11530319, at *5 n.3; *see also* TEX. PENAL CODE § 37.10 (a)(1); *see also Williams*, 671 F.2d at 899 (reasonable jailers know and follow applicable state regulations). The only other alternative, if the Court improperly disregard Plaintiffs' allegations, is that Bailey did complete the other eleven rounds under her name, did stop and see Shelton, and, each time, intentionally did not get any help for his obvious medical distress despite knowing the dire consequences of doing so. This too is deliberately indifferent. *See Ford,* 102 F.4th at 314; *Sims*, 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

Because Bailey was told by Shelton that he needed medical attention, she observed this to be clearly the case, and knew doing nothing would have dire consequences, yet she still intentionally did nothing to get him help, the Court should deny her motion to dismiss.

*11. Defendant Hurd was deliberately indifferent to Shelton's serious medical needs.*

Defendant Hurd subjectively knew Shelton was suffering serious and severe symptoms of medical distress, that a nurse directed he be taken to the clinic, and knew the consequences of failing to do so would be dire, yet she intentionally did nothing to ensure his serious medical needs were met. Plaintiffs allege Hurd was the detention officer accompanying Ogunsanya on March 24, 2022 at 1:55 a.m. on Shelton's unit and thus saw that the LVN gave Shelton a white pass and was told by the nurse directly that he needed to go to the clinic "right away." Doc. 72, pp. 26-28, ¶¶ 135, 146, 148. Nonetheless, Hurd intentionally failed or refused to follow this direction—she did not escort Shelton to the clinic, ensure he was escorted by another officer, or even call the clinic to ask for them to send another medical professional up to see him on the unit despite knowing that failing to get Shelton to the clinic would have grave results. *Id*. at p. 28, ¶¶ 150, 151. In the alternative, Hurd was assigned to Shelton's unit to monitor each detainee face-to-face at least every sixty minutes for signs of medical distress and to meet their needs, including escorting them to the clinic if necessary, and was told by the officer accompanying Ogunsaya what the nurse said, yet intentionally refused to take Shelton to the clinic at all, much less "right away." *Id*. at ¶ 150. She intentionally did not ensure anyone took him to the clinic or even call the clinic, despite knowing this choice would have dire consequences. *Id*. at ¶¶ 150, 151. Hurd's deliberately ignoring the nurse's direction to take Shelton to the clinic to receive emergent medical care when she knew the dire result of doing so constituted deliberate indifference. *See Domino*, 239 F.3d at 756; *see also Easter*, 467 F.3d at 464; *Brown,* 663 F.3d at 250.

Hurd was assigned to Shelton's unit again during the dayshift on March 26, 2022 where she was responsible along with three other officers for completing face-to-face observations on Shelton and the other detainees at least every sixty minutes as well as passing out the meal trays. Doc. 72, pp. 21, 22, 39, ¶¶ 111, 205. In the course of completing these or her other duties on the unit, Hurd encountered Shelton in his cell and he told her directly that he was a Type 1 diabetic, needed insulin, was feeling ill, and would die if he did not receive insulin. *Id*. at p. 40, ¶ 210. During this conversation, it was obvious to Hurd that Shelton was seriously ill—his face was alarmingly flushed, he was rapidly gasping for air, and he appeared weak, in pain, and confused. *Id*. Yet Hurd intentionally did nothing to get him the medical attention he obviously needed and that she knew failing to provide would have dire consequences. *Id*. at pp. 28, 40. 41, ¶¶ 150, 213. Ignoring Shelton's symptoms of medical distress like difficulty breathing and confusion despite knowing that doing so would have grave results constituted deliberate indifference to Shelton's serious medical needs. *See Ford,* 102 F.4th at 314; *Sims*, 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

Though nothing more is needed to state a claim against Hurd, Plaintiffs also allege, consistent with Harris County's longstanding practice, confirmed by the *Doe* officers and even the limited video preserved of Shelton's unit of just the date of his death, that Hurd likely completed rounds logged in as other officers, intentionally falsified and fabricated rounds, and generally deliberately failed or refused to observe Shelton face-to-face every sixty minutes though she knew it was dangerous not to, both because it was obvious and because she actually knew Shelton was in medical distress from having seen him earlier

50

and she knew the consequence of continuing to ignore him would be grave. Doc. 72, pp. 28, 39-41, 126, 127, ¶¶ 150, 207-209, 646, 650. Deliberately refusing to observe what she already knew to be true and intentionally doing nothing to address Shelton's serious medical needs despite the dire consequence of doing nothing constituted deliberate indifference. *See Farmer*, 511 U.S. at 843 n.8.

Hurd is not entitled to dismissal where Plaintiffs allege a nurse and Shelton both told her that he needed urgent medical assistance, she saw this for herself, and knew ignoring him would have grave results, yet she made the intentional choice not to provide him any help. The Court should deny her motion.

12. *Defendant Dentrell Woods was deliberately indifferent to Shelton's serious medical needs.*

Dentrell Woods also gained personal knowledge of Shelton's serious medical needs during the course of his duties on Shelton's unit and knew ignoring them would be dire, yet he too intentionally refused to get any help to address these needs. Plaintiffs identify Dentrell Woods as the officer escorting LVN Ogunsanya and the insulin cart on Shelton's unit on March 24, 2022 at 1:55 a.m. and thus he was personally aware of Shelton's need to go to the clinic, both because the nurse told him directly and because he saw the nurse give Shelton a white pass. Doc. 72, pp. 26-28, ¶¶ 135, 146, 148. But Dentrell Woods intentionally did not follow this direction and so neither Dentrell Woods nor anyone else took him to the clinic or even called the clinic, despite knowing of the dire consequences of refusing to do so. *Id*. at ¶¶ 150, 151. Alternatively, Plaintiffs allege Dentrell Woods was obligated to observe detainees and meet their needs on Shelton's unit that night, was told a

nurse said Shelton needed to go to the clinic "right away," knew ignoring this direction would have dire results, and had the duty to make sure Shelton got to the clinic, yet he deliberately did not fulfill that duty. *Id*. at ¶¶ 149-151. He intentionally did not take Shelton to the clinic, ensure anyone else did, or even call the clinic. *Id*. at ¶¶ 150, 151. This rejection of a medical professional's direction to get Shelton urgent medical care when he knew rejecting the direction would have dire consequences constituted deliberate indifference to Shelton's serious medical needs. *See Domino*, 239 F.3d at 756; *see also Easter,* 467 F.3d at 464; *Brown,* 663 F.3d at 250.

Dentrell Woods was again assigned to Shelton's unit, this time during the twelve-hour dayshift, on March 26, 2022 along with three other officers. Doc. 72, p. 39, ¶ 205. It was his duty that day to complete observation checks, pass out meals, and generally meet detainee needs. *Id*. In the course of completing these duties—either during a round, meal pass, or other time he was walking by Shelton's cell, Shelton had conversation with him in which Shelton told him directly that he was a Type 1 diabetic, was ill, needed insulin, and would die without it. *Id*. at p. 40, ¶ 210. As Shelton had not had insulin in over three days, he was experiencing diabetic ketoacidosis, including obvious weakness, pain, and confusion as well as being alarmingly flushed and rapidly gasping for air. *Id*. at pp. 21, 40, ¶¶ 106, 210. Despite this plea for help and obvious distress and despite knowing that doing nothing would have dire results, Dentrell Woods intentionally did nothing to get Shelton any medical help. *Id*. at pp. 28, 40, 41, ¶¶ 150, 211, 212. This intentional choice not to get medical help for a confused detainee struggling to breathe and asking for help despite knowing that doing nothing would have dire consequences was deliberately indifferent.

*See Ford,* 102 F.4th at 314-15; *Sims*, 35 F.4th at 950; *McCoy*, C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

Though nothing more is needed to state a claim against Dentrell Woods, Plaintiffs additionally allege that it is likely Dentrell Woods also intentionally falsified and fabricated observation rounds on Shelton's unit under the names of other officers without actually checking on Shelton to confirm what he had already seen earlier—Shelton was in dire condition and doing nothing would have grave results. Doc. 72, pp. 28, 39-41, 126, 127, ¶¶ 150, 207-209, 646, 650. This refusal to monitor Shelton to see what he already knew to be true constituted deliberate indifference and a criminal act. *See Farmer*, 511 U.S. at 843 n.8; *Payne*, No. 1:09CV322, 2010 WL 11530319, at *5 n.3; *see also* TEX. PENAL CODE § 37.10 (a)(1).

The Court should deny Dentrell Woods motion to dismiss where he was told by the LVN and then Shelton himself that he needed urgent medical care, saw this to be true, knew ignoring it would have grave consequences, and yet intentionally did nothing to address Shelton's serious medical needs.

13. *Defendant Collins was deliberately indifferent to Shelton's serious medical needs.*

Finally, Defendant Sergeant Bryan Collins was deliberately indifferent to Shelton's known and serious medical needs. Plaintiffs allege Sergeant Collins escorted LVN Ogunsanya on Shelton's unit on March 24, 2022, was told by the nurse Shelton needed to go to the clinic "right away," and saw the nurse give Shelton the white pass. Doc. 72, pp. 21, 26-28, ¶¶ 135, 146, 148. Despite this clear direction and knowing that ignoring this

direction would have dangerous and grave consequences, Sergeant Collins did not escort Shelton to the clinic or order any of his subordinates working on Shelton's unit that night to take him to the clinic or even simply call the clinic. *Id*. at pp. 28, ¶¶ 150, 151. In the alternative, another officer accompanied LVN Ogunsanya but Sergeant Collins was a supervisor working on Shelton's unit that night and was told that the nurse said to take Shelton to the clinic "right away." *Id*. at ¶ 149. Though it was his duty as well as the duty of his officers assigned to Shelton's unit that night to meet Shelton's serious medical needs, and he knew doing nothing to meet these needs would have grave consequences, he intentionally did nothing to ensure Shelton made it to the clinic—he did not take him himself, did not order another detention officer to do it, or call the clinic. *Id*. at ¶¶ 150, 151.

Sergeant Collins was again the supervisor assigned to Shelton's unit during the dayshift on March 26, 2022 and was charged with supervising the other officers on the unit and conducting at least one observation round himself. *Id*. at p. 39, ¶ 205. During this shift, during one of the two observation rounds he logged or at another time while on the unit, Sergeant Collins talked to Shelton directly who told him in no uncertain terms that he was a Type 1 diabetic, he needed insulin, he was ill, and he would die if he did not receive insulin. *Id*. at p. 40, ¶ 210. Shelton had now been without insulin for over three days and was on death's door—he was audibly struggling to breathe; was noticeably weak, in pain, and confused; and was flushed and red. *Id*. at pp. 21, 40, ¶¶ 106, 210. Despite hearing Shelton's plea for help and seeing for himself that Shelton needed medical attention and knowing that refusing to provide that attention would have dire consequences, Sergeant Collins intentionally did nothing to get it for him. *Id*. at pp. 28, 40, 41, ¶¶ 150, 211, 212.

Sergeant Collins' deliberate choice not to get medical attention when it was obviously necessary and he knew the results would be grave if he did not constituted deliberate indifference. *See Ford,* 102 F.4th at 314; *Sims,* 35 F.4th at 950; *McCoy,* C.A. No. C-05-370, 2006 WL 2434289, at *4-*5; *Smith,* No. 2:21-cv-00235, 2022 WL 4534997, at *4.

Sergeant Collins again supervised the officers assigned to Shelton's unit on March 27, 2022. *Id.* at p. 46, ¶ 239. Though it was his responsibility to ensure his detention officers completed rounds correctly, he did not even complete the one he conducted on March 27, 2022 correctly—he intentionally did not personally observe Shelton face-to-face when he walked by Shelton's cell at 1:50 p.m. *Id.* at pp. 51, 52, ¶ 268. He knew just the day before that Shelton was in serious medical distress, that he had not provided or ensured Shelton was provided with medical attention, and that refusing to provide medical attention would have dire consequences. When he intentionally walked by Shelton's cell without observing him, this was not negligence but a deliberate choice to avoid re-confirming what he strongly suspected to be true. *See Farmer*, 511 U.S. at 843 n.8. This intentional choice was deadly—Shelton died either shortly before or shortly after Sergeant Collins logged this round "complete." Doc. 72, pp. 51, 52, ¶ 268.

When Lauder found Shelton cold and stiff hours later, she conspired with Sergeant Collins to place a fraudulent red transit pass in his cell to suggest he had been given the means to get to the clinic on his own and hadn't gotten himself there, never mind that he could not have taken himself under the jail's rules at the time or in his deteriorated condition on March 25, 2022. *Id.* at p. 55, ¶ 294. This pass only serves to show that Lauder and

Sergeant Collins knew Shelton had needed medical care days earlier, when they intentionally had not ensured he received it.

Sergeant Collins is not entitled to dismissal where he personally knew of Shelton's serious medical distress, had a duty to get him medical help, knew there would be serious consequences if he did not get help, and instead, intentionally did nothing.

### D. Plaintiffs' allegations concerning common conduct do not eliminate the detention officers' individual constitutional violations.

As the immediately preceding section makes clear, the Court should reject each of the defendant detention officers' nearly identical claims that Plaintiffs have not alleged sufficiently specific, individual actions. *See* Doc. 132, pp. 8-10; Doc. 133, pp. 9-12; Doc. 134, p. 5.  It is simply not the case that the Court's obligation to evaluate the claims of each defendant separately means that the Court is somehow barred from determining that the individual detention officers were all personally involved in the deprivation of Mr. Shelton's rights in the same manner and can all be liable for their common conduct. *See Salcido as Next Friend of K.L. v. Harris Cnty., Tex.*, No. H-16-2155, 2018 WL 6618407, *34 (S.D. Tex. Sept. 28, 2018) (Lake, J.) (rejecting argument that court inappropriately considered their conduct as a group and denying summary judgment to group of officers who each participated in deadly restraint); *Randle,* No. 6:15-cv-084-RP, 2017 WL 892493, at *4 (in a case where numerous jail staff ignored detainee's complaints of priapism over several days resulting in permanent impotence, finding plaintiff sufficiently stated claims that they could all be personally involved and liable). None of the defendants' cases hold

otherwise[6] and indeed such a limit would lead to an absurd and unjust result where civil rights plaintiffs would be precluded from recovery any time more than one defendant was deliberately indifferent to their serious medical needs. *Randle,* No. 6:15-cv-084-RP, 2017 WL 892493, at *4; *see also* Fed. R. Civ. P. 8 (e) ("Pleadings must be construed so as to do justice."). In fact, *Jacobs v. W. Feliciana Sheriff's Department,* cited by most of the individual defendants, supports Plaintiffs' allegations, notwithstanding the fact that it was decided on summary judgment. There, the Fifth Circuit considered the actions of those jail defendants separately and still determined the sheriff and senior deputy could both be found to have acted with deliberate indifference as both placed or kept the suicidal detainee in a cell with a blind spot and tie-off points and both acted to provide her the sheet with which she ultimately hung herself. *Jacobs v. W. Feliciana Sheriff's Department*, 228 F.3d 388, 395, 397-98, (5th Cir. 2000).

Plaintiffs' allegations are specific to each individual detention officer's conduct even where other detention officers engaged in the same conduct. For example, it is entirely plausible that over the course of a twelve-hour shift, four to six detention officers would be

---

[6] The plaintiff in *Jolly v. Klein*, 923 F.Supp. 931, 943 (S.D. Tex. 1996) did sufficiently allege facts identifying personal involvement of the doctor at issue and is apparently cited only for the general proposition here. *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 2017) did not involve common conduct of multiple officers and was issued on appeal of a verdict. As noted above, the Fifth Circuit is consistently critical of defendants arguing that cases determined on summary judgment or the merits support dismissal at this earlier stage. *See Converse,* 961 F.3d at 776 n.3 (citing *Littell*, 894 F.3d at 629 n.8, *Drake,* 106 Fed. App'x at 900). Finally, *Stewart v. Murphy*, 174 F.3d 530, 537 (5th Cir. 1999) stands for the proposition that the negligent acts of multiple defendants cannot be considered cumulatively to add up to deliberate indifference. Plaintiffs do not ask the Court to consider the acts of the detention officers cumulatively when considering their individual liability (as opposed to liability of Harris County for its pattern where such cumulative consideration is appropriate) and have not alleged merely negligent acts. *Stewart* is inapposite.

charged at differing times with ensuring detainees on Shelton's unit were monitored, that each would encounter Shelton while conducting such rounds, that he would plead with each officer for insulin and appear sick to each officer as he had not had insulin in over two days, and each officer would independently but intentionally refuse to act on these requests. *See, e.g.,* Doc. 72, pp. 32, 33, ¶¶ 150, 170, 171, 172, 174 (specifically alleging this conduct as to "each of these four Defendant Detention Officers.").

Plaintiffs' allegations stand in stark contrast to the group allegations found insufficient in *Martinez v. City of Richland Hills,* 846 Fed. Appx. 238, 243 (5th Cir. 2024) cited by Silva, Brooks, Owens, Stanford, Ruiz, and Nieto. In *Martinez*, that plaintiff's only specific allegations were that one officer completed her intake form but did not otherwise fail to take any action he should have and that five of the officers sent an email mentioning her. 846 Fed. Appx. 238, 243-244 (5th Cir. 2021). She completely failed to make any specific allegations to eleven other defendants other than that they were working at the jail at some point during the days she was there. *Id*. In contrast, but for March 24, 2022 when Plaintiffs cannot yet identify who was specifically working on Shelton's unit because Harris County intentionally destroyed records in this case, Plaintiffs identify the four to six officers assigned to each shift on Shelton's unit between May 25 – 27, 2022 whose duties included observing him and the other detainees on the unit, and then plausibly allege— based on this duty to monitor detainees on Shelton's unit—that he told each of them during their shift that he needed help and/or they personally saw his serious medical distress.

Because Plaintiffs plausibly allege each of the thirteen detention officers gained the requisite knowledge of the substantial risk of serious harm posed to Shelton through their

personal observations and interactions with him, knew refusing medical attention would have grave results, and yet refused to get him medical treatment, ignored his complaints, and otherwise evinced a wanton disregard for his serious medical needs, Plaintiffs have stated a claim against each of them, notwithstanding that they were not unique in their deliberate indifference to Shelton's rights.

### E. The individual defendant detention officers are not entitled to qualified immunity as it was clearly established their conduct was unconstitutional.

It has been established for decades that a detention officer violates a detainee's right to not have his serious medical needs met with deliberate indifference when that officer "refuse[s] to treat him, ignore[s] his complaints, intentionally treat[s] him incorrectly, or engage[s] in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Easter,* 467 F.3d at 465 (quoting *Domino,* 239 F.3d at 756). *Easter* and *Domino* put each of the defendant detention officers on notice that they could not do precisely what they did here: intentionally refuse to get Mr. Shelton to the clinic for medical treatment when told by a nurse he needed medical attention, ignore his complaints of serious symptoms they also personally observed that he was experiencing, intentionally do the opposite of what the LVN said to do concerning his need for treatment, and engage in conduct—like repeatedly and intentionally over the course of several hours and days refuse to monitor him for signs of medical distress despite knowing the grave risk of doing so and having an obligation to monitor—that evinced a wanton disregard for his serious medical needs. As *Easter* and *Domino* put the detention officers in *Ford, Sims,* and *Smith,* discussed *supra* at p. 6, on notice that they could not engage in this conduct in 2018 and 2019, it

likewise put each of the officers on notice here. *See Ford,* 102 F.4th at 315; *Sims*, 543 F.Supp.3d at 444; *Smith,* C.A. No. 2:21-cv-00235, 2022 WL 4534997, at *7.

The *Smith* court likewise found that *Thompson v. Upshur County* and *Dyer v. Houston* put that defendant on notice in 2019 that he could not observe that detainee's obvious symptoms of diabetic ketoacidosis (vomiting, lying on the floor, having an altered mental state, saying he felt unwell, and asking for help) and do nothing. C.A. No. 2:21-cv-00235, 2022 WL 4534997, at *7. In *Thompson*, the Fifth Circuit denied qualified immunity at the summary judgment stage to a jailer who, over the course of eight hours, knew a detainee had a high blood alcohol level, was hallucinating and incoherent, was experiencing delirium tremens, and was harming himself, despite the fact that the jailer tried to call a hospital for medical advice. *Thompson v. Upshur County,* 245 F.3d 447, 463-64 (5th Cir. 2001). The *Smith* court noted the Nueces County detention officer who did not seek help for the diabetic "arguably exhibit[ed] even greater indifference" than the jailer in *Thompson* where he ignored the detainee rather than call for help despite the diabetic's obvious medical distress and inability to help himself. *Smith*, C.A. No. 2:21-cv-00235, 2022 WL 4534997, at *7.

Though *Dyer* concerned a detainee whose self-harm gave him a head injury that would prove fatal, the *Smith* court found it sufficiently put the Nueces County jailer on notice that "officers who, despite being aware of the detainee's dire condition did nothing to secure medical help at all were on fair warning that their behavior was deliberately indifferent." *Id*. at *8 (quoting *Dyer v. Houston*, 964 F.3d 374, 384-85 (5th Cir. 2020) (cleaned up)). Finally, the *Smith* court looked at persuasive authority to determine what

other jailers did in response to diabetic ketoacidosis or similar symptoms to inform whether a reasonable officer would understand that the Constitution required him to intervene and found two other Fifth Circuit district court cases, *Abshure* and *Miller,* where officers did respond to symptoms of diabetic ketoacidosis by seeking immediate medical attention. *Id*.

The logic of the *Smith* court applies equally to the individual defendant detention officers here. *Thompson* put them on notice that a "detainee's obvious medical distress and inability to help himself while in government custody…triggers a constitutional duty to attempt to provide some measure of assistance, rather than intentionally ignoring him." *Id.* at *7 (discussing *Thompson*, 245 F.3d at 463). Likewise *Dyer* gave them both fair notice that doing nothing despite being aware of a detainee's dire condition constituted deliberate indifference. *Id*. at *8 (discussing *Dyer*, 964 F.3d at 384-85). Finally, the fact that similarly situated jailers presented with similar detainees experiencing diabetic ketoacidosis sought immediate medical attention in *Abshure* and *Miller* demonstrates that a reasonable jailer would know they were required to seek medical care. *Id*.; *see also* 37 TEX. ADMIN. CODE § 275.1 (requiring at least hourly checks of detainees in single cells); *Williams*, 671 F.2d at 899 (reasonable jailers know and follow applicable state regulations). Likewise, it is well-settled that officers may not deliberately violate the law as Plaintiffs pled happened here. *See Payne*, No. 1:09CV322, 2010 WL 11530319, at *5 n.3; *see also* TEX. PENAL CODE § 37.10 (a)(1).

### F. If the Court would deny Plaintiffs' motion for any reason, they should be afforded the opportunity to amend.

Although the Court should deny the individual defendants' motions on their merits,

if the Court would grant any part of the motions, Plaintiffs request in the alternative that the Court grant Plaintiffs leave to amend. The individual detention officer defendants were added to the case in Plaintiffs' First Amended Complaint. *Compare* Doc. 1 *with* Doc. 72. Plaintiffs have not yet had an opportunity to amend their complaint as to their allegations concerning any of these defendants. Doing so would be consistent with the Federal Rules of Civil Procedure's direction that "[t]he court should freely give leave [to amend pleadings] when justice so requires." FED. R. CIV. P. 15 (a)(2).

In *Crisp v. Dutton*, a Western District of Texas court denied a motion to dismiss in an analogous situation, that is, a motion to dismiss filed by officers alleging that plaintiff had not sufficiently alleged specific acts attributable to individual defendants though he could not obtain such information without discovery that was otherwise unavailable before the motion to dismiss was decided. No. A-15-CV-0431-LY-ML, 2015 WL 7076483, *6-*7 (W.D. Tex. Nov. 12, 2015) (Lane, Mag. J). That court rejected this "heads I win, tails you lose" proposition, denied the motion to dismiss, and authorized limited discovery into the facts relevant to qualified immunity. *Id*.

As the *Crisp* court did, rather than grant any defendant's motion, the Court should, at minimum, deny the motion without prejudice until Plaintiffs have an opportunity to conduct discovery—specifically including written discovery to the individual officers and a deposition of each—and amend their complaint.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny the individual defendants' motions to dismiss. Docs. 132, 133, 134.

Dated: September 25, 2024.

Respectfully submitted,

John Flood, attorney-in-charge
State Bar No. 07155910
So. Dist. Bar No. 12593
OF COUNSEL:
Jeff Edwards
State Bar No. 24014406
jeff@floodtriallawyers.com
Lisa Snead
State Bar No. 24062204
lisa@floodtriallawyers.com
JOHN T. FLOOD, L.L.P.
819 Upper Broadway
Corpus Christi, Texas 78401
Tel. 361-654-8877
Fax. 371-654-8879
john@floodtriallawyers.com
irma@floodtriallawyers.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Southern District of Texas.

By     /s/ Lisa Snead
                    Lisa Snead