Case 4:23-cv-03198   Document 174   Filed on 03/06/25 in TXSD   Page 1 of 17

United States District Court
Southern District of Texas
**ENTERED**
March 06, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SARAH BORCHGREVINK, *et al.*, § | |
|     Plaintiffs, § | |
| § | |
| VS. § | CIVIL ACTION NO. 4:23-CV-03198 |
| § | |
| HARRIS COUNTY, TEXAS, *et al.*, § | |
|     Defendants. § | |

## MEMORANDUM OPINION AND ORDER

This civil rights action arises out of Matthew Shelton's death in Harris County Jail. Pending before the Court is Defendants Elizabeth Garcia and Charley Lauder's Motion to Dismiss and Assertion of Qualified Immunity (Dkt. 12). After carefully considering the motion, the response, the reply,[1] and the pleadings, the Court **DENIES** the motion.

### I.    FACTUAL BACKGROUND

Matthew Shelton ("Shelton") died of diabetic ketoacidosis while being held in Harris County Jail for just over five days. (Dkt. 72 at p. 16). Shelton voluntarily surrendered to the Harris County Jail on March 22, 2022, and was held for a failure to appear for a misdemeanor driving-while-intoxicated charge. *Id*. Being a Type 1 diabetic, Shelton brought to the jail with him "the diabetic supplies he needed to survive, including both short-acting and long-acting insulin." (*Id*. at p. 9). During the initial booking process, Shelton notified Harris County staff that he was a Type 1 diabetic. (*Id*. at p. 10). Harris

---

[1] Defendants Garcia and Lauder's Unopposed Motion for Extension of Time to File a Reply (Dkt. 146) is **GRANTED**.

County officials confiscated the diabetic supplies Shelton brought with him and noted in his jail record that he was an insulin-dependent diabetic. *Id*.

Upon booking, Shelton's blood glucose was tested, and he produced an alarmingly high result. *Id*. A doctor evaluated Shelton and ordered single doses of both long-acting and short-acting insulin for Shelton. (*Id*. at p. 11). He was then admitted into the medical Clinic. *Id*. After his blood glucose was under control, Shelton was discharged from the medical Clinic. *Id*. He completed the rest of the booking process later that evening. *Id*.

In the early-morning hours of March 23, Shelton's blood glucose was tested once more, and the results were again dangerously high. (*Id*. at p. 18). He was promptly sent back to the Clinic, and Shelton was given additional doses of short- and long-acting insulin. (*Id*. at p. 19). These doses of insulin, administered around 3:45 a.m. on March 23, 2022, were the last medications administered to Shelton while he was in Harris County Jail. (*Id*. at p. 21). Shelton returned to his cell from the Clinic on the same day. (*Id*. at p. 24).

Later, in the early-morning hours of March 24, a nurse and an "unidentified Harris County detention officer" removed Shelton from his cell and took his blood glucose level. (*Id*. at p. 26). Again, the reading was high. *Id*. Shelton asked the nurse for insulin, but the nurse replied that he was not on the list to receive the medication. *Id*. Instead, the nurse gave Shelton "a white medical pass to give to Harris County detention officers indicating that he needed to go to the Clinic." (*Id.* at p. 27). Plaintiffs allege that, "at the same time [the nurse] gave Mr. Shelton the pass, [the nurse] also directly told the unidentified Harris County detention officer accompanying him with the insulin cart that Mr. Shelton needed

to be taken to the Clinic right away." *Id*. Further, "[t]his detention officer saw [the nurse] fill out and give Mr. Shelton the white medical pass." *Id*. This was the last time anyone checked Shelton's blood glucose level before he died three days later. (*Id*. at p. 31).

In order to go to the Clinic, Shelton needed an additional pass from a detention officer to supplement the white medical pass—a red transit pass. (*Id* at p. 27). At no point did a Harris County detention officer follow the nurse's instructions and issue Shelton the necessary pass to go to the Clinic. *Id*. Plaintiffs allege that the detention officer who failed to issue the red transit pass and escort Shelton was Defendant Charley Lauder ("Lauder"). (*Id*. at p. 28). Plaintiffs allege in the alternative that this detention officer was Defendant Elizabeth Garcia ("Garcia")—or one of sixteen other detention officers who could have been on duty at the time. *Id*.

The following day, on March 25, Shelton began to refrain from eating in an attempt to control his blood glucose. (*Id*. at p. 31). Plaintiffs allege that—by the time Harris County detention officers delivered breakfast that morning—Shelton was beginning to suffer the effects of diabetic ketoacidosis, "including but not limited to nausea, headache, thirst, weakness, pain, a red and flushed face, and labored breathing." (*Id*. at p. 32). Throughout the day, Shelton allegedly told Lauder and three other detention officers that "he was a Type 1 diabetic, needed insulin, needed a doctor, and had symptoms of diabetic ketoacidosis." *Id*. Still, "no provider or medical personnel was told that a detainee who said he was a Type 1 diabetic was missing or skipping meals or that [] Shelton needed immediate help for his serious condition." (*Id*. at p. 34).

Shelton continued to suffer through March 26, his fourth full day in Harris County Jail, and he again attempted to mitigate the symptoms of his diabetic ketoacidosis by refusing to eat. (*Id*. at p. 41). That evening, Garcia and five other detention officers came on duty. *Id*. Six observation checks were logged in the system during this time—five of which were under Garcia's name. (*Id*. at p. 42). Plaintiffs allege that Garcia did not actually complete these checks herself, but instead that these "checks were falsified with Detention Officer Garcia's … knowledge." *Id*. Had any detention officer checked on Shelton by the evening of March 26, "they would have seen [he] was in obvious pain, weak, vomiting, and rapidly gasping for air with an unnaturally flushed red face." (*Id*. at p. 43).

The next day, on March 27, a detention officer again falsely logged a check as Garcia. *Id*. Plaintiffs allege that "[t]his check was falsified with [] Garcia's knowledge" and that she did so to intentionally fail to check on Shelton. *Id*. Plaintiffs allege checks were falsely logged multiple times before Garcia was relieved by the dayshift. *Id*. By this point, Shelton had been denied insulin for almost four full days. (*Id*. at pp. 43 – 44). His diabetic ketoacidosis symptoms after so long without insulin were torturous; Shelton "would die within hours." (*Id*. at p. 44). At no point did Garcia retrieve medical assistance for Shelton before being relieved by the dayshift. *Id*.

The dayshift was staffed by Lauder and one other detention officer. (*Id*. at p. 46). Soon after coming on shift, Lauder fabricated an observation check and did not enter the building housing Shelton. (*Id*. at 47). On the next check, Lauder did walk by Shelton's cell—but she did not look inside. *Id*. If she had, Plaintiffs allege, she would have seen that

Shelton was clearly near death—"[h]e was gasping for air and deeply flushed with blood coming from his nose and vomit or blood on the floor in front of his head." (*Id*. at p. 48). Throughout the day, Lauder and the other detention officer continued to both fabricate hourly checks and conduct improper hourly checks. *Id*.

At lunch time on March 27—the day of Shelton's death—a trustee distributing food placed a container on the shelf of Shelton's cell. (*Id*. at p. 48). Lauder witnessed Shelton's food resting on the shelf untouched. (*Id.* at p. 48 – 49). She picked it up, put her arm through the cell's panhole, and dropped the food on the floor of Shelton's cell. *Id*. At no point on March 27 did Lauder retrieve medical assistance for Shelton. *Id*.

Shelton ultimately died of diabetic ketoacidosis around 1:00 p.m. on March 27, 2022. (*Id*. at p. 51). Having been denied insulin for over four days, Shelton suffered an agonizing death. *Id*. He died lying on his left side on his bed, facing the door, with his legs hanging off his bunk—thus, the right side of Shelton's face and body were clearly visible from his door. *Id*. Furthermore, blood had pooled along Shelton's front left side. *Id*. Still, though Lauder logged several checks over the course of the next two hours, she never sought medical assistance for Shelton. (*Id*. at p. 52). It wasn't until Lauder investigated Shelton's untouched dinner around 4:00 p.m. that she discovered his corpse. *Id*. By that time, rigor mortis had already set in. (*Id*. at p. 53).

It took Lauder twenty-five minutes to alert the clinic staff that she had found Shelton unresponsive in his cell. (*Id*. at p. 55). Plaintiffs allege that, during these twenty-five minutes, Lauder forged a red transit pass for the Clinic. *Id*. When Shelton's cell was

photographed after his death, the pass was "found neatly placed on top of several containers of uneaten food on [Shelton's] desk." *Id*. The pass was blank as to the time the transit pass was entered, the time the transit pass was issued, and the time the holder arrived at and returned from the Clinic. *Id*. However, the pass did reflect two entries: the date of March 25, 2022, and Lauder's initials. *Id*. Plaintiffs allege that Lauder "intentionally and deliberately forged" the red transit pass and left it to be discovered along with Shelton's corpse. *Id*.

Plaintiffs bring claims against Lauder and Garcia (collectively, "Detention Officers") in their individual capacities for violations of Shelton's constitutional rights under 42 U.S.C. § 1983. (Dkt. 72 at pp. 126 – 129). Plaintiffs allege that the Detention Officers were deliberately indifferent to Shelton's serious medical needs. *Id*. The Detention Officers argue that they are protected by qualified immunity. *See* (Dkt. 129).

## II.     LEGAL STANDARDS AND APPLICABLE LAW

### A.     Rule 12(b)(6)

Rule 8 of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests a pleading's compliance with this requirement and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). A complaint can be dismissed under Rule 12(b)(6) if its well-pleaded factual allegations—when taken as true and viewed in the light

most favorable to the plaintiff—do not state a claim that is plausible on its face. *Amacker v. Renaissance Asset Mgmt., LLC*, 657 F.3d 252, 254 (5th Cir. 2011); *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

When considering a motion to dismiss, a district court generally may not go outside the pleadings. *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010). The Court's review is limited to the complaint, any documents attached to the complaint, any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint, and matters subject to judicial notice under Federal Rule of Evidence 201. *Allen v. Vertafore, Inc.*, 28 F.4th 613, 616 (5th Cir. 2022); *George v. SI Group, Inc.*, 36 F.4th 611, 619 (5th Cir. 2022).

### B.   Qualified Immunity

The motion to dismiss filed by the Detention Officers invokes qualified immunity. The doctrine of qualified immunity protects government officers from civil liability in their individual capacities if their conduct does not violate clearly established federal statutory or constitutional law. *Kisela v. Hughes,* 138 S. Ct. 1148, 1152 (2018). This inquiry requires a two-prong analysis, in which the court determines (1) whether the official violated a statutory or constitutional right, and (2) whether the unlawfulness of the official's conduct was "clearly established" at that time. *District of Columbia v. Wesby,* 138 S. Ct. 577, 589 (2018); *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

Once raised as a defense, plaintiff has the burden to demonstrate that qualified immunity should be pierced. *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). At

the motion-to-dismiss stage, "a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). If "the pleadings are insufficient to overcome [qualified immunity], the district court must grant the motion to dismiss without the benefit of pre-dismissal discovery." *Carswell v. Camp*, 54 F.4th 307, 312 (5th Cir. 2022). Similarly, "where the pleadings are sufficient to overcome [qualified immunity], the district court must deny the motion to dismiss without the benefit of pre-dismissal discovery." *Id*.

### III.   ANALYSIS

The Court finds that Plaintiffs' pleadings successfully overcome the Detention Officers' qualified immunity defenses. To pierce qualified immunity at this stage, the Plaintiffs must sufficiently allege that: (1) the Detention Officers each violated one of Shelton's statutory or constitutional rights, and (2) that the right was clearly established at the time of the challenged conduct. *Converse v. City of Kemah*, 961 F.3d 771, 774 (5th Cir. 2020). The Court has discretion as to which of the two prongs it assesses first; however, "often the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a [federal] right at all." *Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021). The Court does so here.

A. **Plaintiffs successfully plead that the Detention Officers each individually violated Shelton's rights.**

The Court finds that Plaintiffs have sufficiently alleged violations of Shelton's rights under the Fourteenth Amendment. Plaintiffs' section 1983 claims invoke the protections of the Fourteenth Amendment because Shelton was a pretrial detainee. (Dkt. 72 at p. 16); *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996). "The Fourteenth Amendment guarantees pretrial detainees a right 'not to have their serious medical needs met with deliberate indifference on the part of the confining officials.'" *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001)); *see also Austin v. Johnson,* 328 F.3d 204, 210 n.10 (5th Cir. 2003) ("Although both the Eighth and Fourteenth Amendments protect the safety and bodily integrity of prisoners, the legal standards are virtually identical."). Violation of this right by deliberate indifference to serious illness or injury is actionable under section 1983. *Carter v. Reach*, 399 F. App'x 941, 942 (5th Cir. 2010).

A delay in providing or calling for medical care can constitute deliberate indifference where it results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 1191, 193 (5th Cir. 1993); *see also Cope*, 3 F.4th at 209 ("promptly failing to call for emergency assistance when a detainee faces a known, serious medical emergency … constitutes unconstitutional conduct"). Plaintiffs can show deliberate indifference for each Detention Officer who (1) was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," and (2) actually "dr[ew] the inference." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 755 (5th Cir. 2001). However, "deliberate

indifference cannot be inferred merely from a negligent or even grossly negligent response to a substantial risk of serious harm." *Thompson*, 245 F.3d at 458-59; *see also, e.g., Delaughter v. Woodall*, 909 F.3d 130, 136 (5th Cir. 2018) (clarifying that "mere disagreement with one's medical treatment is insufficient to show deliberate indifference"); *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (explaining that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference") (citations omitted).

Specifically, Plaintiffs may show deliberate indifference here by alleging that the Detention Officers refused to treat Shelton, ignored Shelton's complaints, intentionally treated Shelton incorrectly, "or engaged in similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985); *Easter v. Powell*, 467 F.3d 459, 465 (5th Cir. 2006). Qualified immunity must be considered as to each defendant individually, and the Court does so below.[2] *Shefeik v. Busby*, 836 F. App'x 315, 317 n.1 (5th Cir. 2021).

---

[2] The Detention Officers argue that Plaintiffs' alternative pleadings as to Garcia and Lauder's alleged roles in Shelton's death are fatal to Plaintiffs' attempt to overcome qualified immunity. (Dkt. 129 at p. 10). The Court disagrees. "A party may state as many separate claims or defenses as it has, regardless of consistency." FED. R. CIV. P. 8(d)(3); *see also Leal v. McHugh*, 731 F.3d 405, 414 (5th Cir. 2013) (finding that "allegedly inconsistent factual allegations" are "not fatal" to plaintiff's complaint); *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 674 (5th Cir. 2003) ("Plaintiffs are permitted to plead in the alternative."). Accordingly, Plaintiffs' allegations need not be consistent under the federal rules so long as their different theories are plausible.

### i.     *Officer Lauder*

The Court finds that Plaintiffs have alleged with sufficient specificity that Lauder acted with deliberate indifference to Shelton's serious medical needs. In particular, Plaintiffs allege that Lauder:

- Was directly told by a nurse to take Shelton to the Clinic (Dkt. 72 at p. 27);

- Was directly told by Shelton himself that he had symptoms of diabetic ketoacidosis and needed insulin (*Id*. at p. 32);

- Saw for herself that Shelton was skipping meals (*Id*. at pp. 48 – 49); and

- Forged a red transit pass after discovering Shelton's corpse (*Id*. at p. 55).

These pleadings support that Lauder knew—not just from being told twice, but also from her own observations—that Shelton was suffering from serious medical need. Under Fifth Circuit precedent, "[a] serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert*, 463 F.3d at 345 n.12. Even if Lauder had not been told by the nurse that Shelton needed to go to the Clinic (a recommended treatment for his high blood glucose), "a layman would recognize that care is required" when a Type 1 diabetic skips meals. *See id*. Additionally, Lauder's forging of the red transit pass buoys the implication that Lauder was aware of Shelton's medical need and understood that she should have issued Shelton a pass to the Clinic prior to his death. As such, the Court finds that Plaintiffs successfully plead both that Lauder was aware of facts from which the inference could be drawn that a substantial risk of serious harm to Shelton existed and that Lauder actually drew the inference.

Further, the Court finds that Plaintiffs have sufficiently alleged that Lauder met this inference with deliberate indifference. First, Plaintiffs allege that Lauder refused to take Shelton to the Clinic after being told to do so by a nurse. (Dkt. 72 at p. 28). Next, Plaintiffs allege that Lauder refused to get medical attention for Shelton even after Shelton told Lauder that he needed insulin. (*Id*. at p. 32). Finally, Plaintiffs allege that Lauder refused to monitor Shelton and instead fabricated checks on the log, despite knowing that Shelton needed medical attention. (*Id*. at p. 47). As such, the Court finds that Lauder refused to treat Shelton, ignored Shelton's complaints, and engaged in similar conduct that would clearly evince a wanton disregard for Shelton's serious medical needs, respectively.

These delays in providing medical care resulted in Shelton's death, an obvious substantial harm. As such, Lauder was deliberately indifferent to Shelton's serious medical needs in violation of the Fourteenth Amendment. Accordingly, the Court finds that Plaintiffs have successfully alleged that Lauder violated Shelton's constitutional rights, and the Court holds that the first prong of the requisite analysis to pierce qualified immunity is satisfied.

### ii. *Officer Garcia*

The Court finds that Plaintiffs have alleged with sufficient specificity that Garcia acted with deliberate indifference to Shelton's serious medical needs. In particular, Plaintiffs allege that Garcia was directly told by a nurse to take Shelton to the Clinic. (Dkt. 72 at p. 27). As with Lauder, this allegation demonstrates that Garcia was directly told about a recommended treatment. Consequently, Garcia knew that Shelton was suffering

from a serious medical need. *See Gobert*, 463 F.3d at 345 n.12 (a "serious medical need is one for which treatment has been recommended"). Thus, the Court finds that Plaintiffs have sufficiently pled both that Garcia was aware of facts from which the inference could be drawn that a substantial risk of serious harm to Shelton existed and that Garcia actually drew the inference.

Further, the Court finds that Plaintiffs have alleged that Garcia met this inference with deliberate indifference. First, Plaintiffs allege that Garcia refused to take Shelton to the Clinic after being told to do so by a nurse. (Dkt. 72 at p. 28). Next, Plaintiffs allege that Garcia refused to monitor Shelton and instead fabricated checks on the log, despite knowing that Shelton needed medical attention. (*Id*. at pp. 43 – 44). As such, the Court finds that Garcia both refused to treat Shelton and engaged in similar conduct that would clearly evince a wanton disregard for Shelton's serious medical needs.

Again, these delays in providing medical care resulted in Shelton's death, an obvious substantial harm. As such, Garcia was deliberately indifferent to Shelton's serious medical needs in violation of the Fourteenth Amendment. Accordingly, the Court finds that Plaintiffs have successfully pled that Garcia violated Shelton's constitutional rights, and the Court holds that the first prong of the requisite analysis to pierce qualified immunity is satisfied.

**B.     Shelton's rights were clearly established at the time of the violation.**

The Court finds that Shelton's rights were clearly established at the time of the violation. To overcome qualified immunity, Plaintiffs must adequately plead that the

Detention Officers' "conduct was objectively [un]reasonable in light of clearly established law." *Thompson*, 245 F.3d at 457. In the Fifth Circuit, the law is "clearly established" only where pre-existing law dictates "the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law in these circumstances." *Sama v. Hannigan*, 669 F.3d 585, 591 (5th Cir. 2012). Thus, even if a defendant's conduct actually violates a plaintiff's constitutional rights, the defendant is entitled to qualified immunity unless "all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's rights." *Carroll v. Ellington,* 800 F. 3d 154, 169 (5th Cir. 2015). The Court finds that Plaintiffs successfully plead such a case here.

When attempting to show that a right was clearly established at the time of the violation, "[i]t is the plaintiff's burden to find a case in his favor that does not define the law at a high level of generality." *Vann v. City of Southaven, Mississippi*, 884 F.3d 307, 310 (5th Cir. 2018) (quotation marks omitted). The inquiry "must be undertaken in light of the specific context of the particular case, not as a broad general proposition." *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020) (brackets and ellipsis omitted). "Although qualified immunity does not require a case in point, existing precedent must have placed the statutory or constitutional question beyond debate[,]" such that "every reasonable official would understand that what she is doing violates that right." *Id*. (brackets and quotation marks omitted).

The Detention Officers concede that Shelton had the "right not to have [his] serious medical needs met with deliberate indifference." (Dkt. 129 at p. 7) (citing *Dyer*, 964 F.3d at 380). Further, since at least 2006, the Fifth Circuit has recognized that a delay in medical care is a constitutional violation where there has been deliberate indifference that results in substantial harm. *Easter*, 467 F.3d at 464.³ Specifically, the Fifth Circuit has recognized a violation of a "clearly established" right where an official refused to treat a detainee, ignored his complaints, intentionally treated him incorrectly, or "engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Rogers v. Jarrett*, 63 F.4th 971, 978 (5th Cir. 2023) (citing *Sims v. Griffin*, 35 F.4th 945, 951 (5th Cir. 2022) (quoting *Easter*, 467 F.3d at 465)).

The Court finds that Plaintiffs satisfy their burden to produce a relevant pre-existing case. Specifically, Plaintiffs look to *Easter* and *Domino*, arguing that these two cases work to demonstrate that Shelton's right was clearly established at the time of his violation:

> "*Easter* and *Domino* put both Lauder and Garcia on notice that they could not do precisely what they did here: refuse to get Mr. Shelton to the clinic for medical treatment when told by a nurse he needed medical attention, ignore his complaints of serious symptoms they also personally observed that he was experiencing, intentionally do the opposite of what the [nurse] said to do concerning his need for treatment, and engage in conduct—like repeatedly and intentionally over the course of several hours refuse to monitor him for signs of medical distress despite an obligation to do so—that evinced a wanton disregard for his serious medical needs."

(Dkt. 140-2 at p. 26); *Easter*, 467 F.3d at 465; *Domino*, 239 F.3d at 755. The Court is persuaded by this argument.

---

³ Again, the standards for a pretrial detainee under the Fourteenth Amendment and a prisoner under the Eight Amendment are the same. *Garza v. City of Donna*, 922 F.3d 626, 634 (5th Cir. 2019).

The Fifth Circuit has held that the rule articulated in *Easter* clearly establishes what behavior violates a prisoner's rights. *Sims*, 35 F.4th at 952 (finding officers liable for a constitutional violation where they knew a prisoner has swallowed a bag full of drugs, vomited multiple times, screamed for help, pleaded to go to the hospital, and steadily deteriorated since his arrival at the jail).[4] The Court finds that Plaintiffs' pleadings contain facts similar enough to those in *Easter* that "it would be clear to a reasonable officer that [the Detention Officers'] conduct was unlawful in the situation [they] confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

The *Easter* court, considering *Domino*, explained: "Taking Easter's allegations as true, … [the official] knew that Easter (1) had a heart condition, (2) was experiencing severe chest pain, and (3) did not have his prescribed heart medication. … Therefore, it can be inferred from the circumstances that [the official] was subjectively aware of a substantial risk of harm to Easter's health." *Easter*, 467 F.3d at 463. Similarly, the Detention Officers here allegedly knew that Shelton had diabetes, knew he was experiencing symptoms of ketoacidosis, and knew he did not have his insulin. As the Fifth Circuit determined with respect to the officials in *Easter*, the Court finds that the failure of the Detention Officers

---

[4] The Court recognizes that its analysis of Shelton's rights under this prong "is governed by law as it was clearly established at the time of conduct in question." *Springer v. Rekoff*, No. 3:14-CV-300, 2017 U.S. Dist. LEXIS 73014, at *9 (S.D. Tex. May 12, 2017) (citing *Petta v. Rivera*, 143 F.3d 895, 899-900 (5th Cir. 1998)). Further, the Court acknowledges that *Sims* was decided a few months after Shelton's alleged violation and is therefore inappropriate for consideration. *See Sims*, 35 F.4th at 951. However, the right acknowledged by the Fifth Circuit in *Sims* was established in *Easter* in 2006—nearly sixteen years before Shelton's violation. *Id*.

to provide treatment options despite their subjective awareness renders their conduct "not objectively reasonable in light of clearly established law." *Id*.

Accordingly, the Detention Officers' conduct was such that all reasonable officers in their circumstances would have then known that their conduct violated Shelton's rights, and the Court holds that Shelton's rights were clearly established at the time of the Detention Officers' alleged violation.

## IV. CONCLUSION

The Court finds that Plaintiffs allege with the requisite specificity that Garcia and Lauder each violated Shelton's clearly established constitutional rights under 42 U.S.C. § 1983. Accordingly, the Court holds that Plaintiffs' pleadings successfully overcome the defense of qualified immunity proffered by Garcia and Lauder, and the Court **DENIES** the Motion to Dismiss and Assertion of Qualified Immunity (Dkt. 129).[5]

SIGNED at Houston, Texas on March 6, 2025.

*[signature]*
GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE

---

[5] To the extent that the Detention Officers seek a Rule 12(b)(1) motion to dismiss based on the argument that Plaintiff Borchgrevink does not have standing to bring these claims, the Court **DENIES** such a motion. As the Court previously held, Plaintiff Borchgrevink has standing to bring claims as the independent administrator of Mr. Shelton's estate. (Dkt. 167); *see Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845 (Tex. 2005) (plaintiff is able to remedy defective capacity to relate back to timely original petition on behalf of estate).